**DOTT. LUCA CAPORALI**
MEDICO CHIRURGO
MASTER UNIVERSITARIO II LIVELLO IN MEDICINA N.B.C.
SPECIALISTA IN MEDICINA DEL LAVORO
SPECIALISTA IN MEDICINA LEGALE

# PARERE MEDICO-LEGALE IN PERSONA DI CHRISTOPHER CHARLES GARDNER

**NOTA**: *"Le notizie di carattere sanitario, contenute nella presente, sono fornite sotto il vincolo del segreto professionale e d'ufficio, tutelate dalla normativa vigente".*

**Dott. Luca Caporali**
Medico Chirurgo
Master Universitario II Livello in Medicina N.B.C.
Specialista in Medicina del Lavoro
Specialista in Medicina Legale
Via Della Chiesa di S. Romolo, 14 Lastra a Signa FI

FAX 055/8722895
MAIL caporali.lu@gmail.com

## ACCERTAMENTO SULLE CONDIZIONI DI SALUTE DI PERSONA DETENUTA

Lo scrivente era nominato medico legale, di parte attrice, al fine di verificare le condizioni di salute del **Sig. Christopher Charles Gardner, nato a New Orleans (U.S.A.) il 08/07/1955**, attualmente agli arresti domiciliari a Firenze e se queste risultino compatibili con la possibile estradizione coatta e con la vita carceraria, ovvero sussistano controindicazioni di natura clinica.

### ESAME DELLA DOCUMENTAZIONE CLINICA E VISITA MEDICA

In data 01/07/2021 e successive, lo scrivente si recava presso l'indirizzo ove è attualmente, detenuto domiciliarmente, il Sig. C.C. Gardner, per accertarne le condizioni di salute.

Tali si sono mostrate precarie, già dalla prima visita. Il Periziando è difatti affetto da esiti chirurgici, chemioterapici e radioterapici di carcinoma destruente del palato duro, operato.

Oltre alla voluminosa documentazione clinica presentata, il sottoscritto, per esprimere il presente parere si è affidato a Specialisti: Maxillo-Facciale, Radiologo e dell'Apparato Respiratorio.

1

Le visite specialistiche sono state fatte, non solo per aver un quadro medico-legale documentato su dati obiettivi e strumentali, ma anche ai fini terapeutici. Il Paziente, infatti, per i gravi esiti dai quali è affetto, ha bisogno di cure continue.

**ANAMNESI PATOLOGICA ED ESAME DELLA DOCUMENTAZIONE CLINICA:**

Nel mese di Giugno 2004 il Paziente fu visitato presso la Clinique de Genolier, Svizzera e fu diagnosticato affetto da un: *tumore del palato duro, classificato, anatomo-patologicamente, come un carcinoma a cellule squamos*e.

Ha effettuato, per questo, nel luglio 2004, chemioterapia e 42 sedute di brachiterapia radioterapica, fino al 30 agosto

A fine agosto 2004, a causa delle terapie effettuate, altamente debilitanti a livello somatico, ma ancor di più a livello locale, sviluppò una: *infezione in bocca da ustioni da radiazioni, con compromissione anche del sistema immunitario*.

Nel settembre 2004, il paziente, affetto da *neutropenia*, ebbe una importante perdita di peso – da 90 chili a 66 chili (giugno 2004– settembre 2004), per difficoltà nell'alimentazione.

Nel luglio 2005, i tessuti lesi dalla radioterapia, degenerarono in tessuto fibroso non funzionante e restringente il faringe ed il primo tratto dell'apparato respiratorio con importanti conseguenti difficoltà deglutitorie e respiratorie

Nel 2007 fu diagnosticato affetto da: *osteonecrosi della mandibola, da radiazioni e perdita dei denti, da radiazioni,* per cui fu proposto un intervento chirurgico, con asportazione di tessuto osseo mandibolare ed innesto di osso autologo, dall'area del bacino, con anche implementazione del circolo sanguigno, per contrastare i fenomeni necrotici e favorire i processi riparativi.

2

Fu sottoposto quindi, nell'ottobre 2009, ad intervento di innesto osseo dell'anca, ricostruzione microvascolare della bocca interna, presso l'Ospedale C.H.U.V. di Losanna, Svizzera.

L'intervento non fu scevro da complicanze, tanto che il Paziente ebbe un *episodio di embolia polmonare da T.V.P.*, dopo l'intervento chirurgico ed un arresto cardiaco (C.H.U.V. ottobre 2009).

Date le complicanze polmonari, da trombo-embolia, e gli esiti da intervento chirurgico, il paziente accusò anche, ed è ancora sofferente di insufficienza respiratoria, dovuta anche alla fibrosi interstiziale diffusa dei tessuti del collo, causata dalla radioterapia subita.

Tale quadro è evolutivo. La fibrosi, così come la neuropatia facciale e latero-cervicale dalla quale è affetto, sono in progressione clinico-patologica, con conseguenti disfunzioni dell'apparato masticatorio, digerente e respiratorio.

Per la valutazione del quadro patologico, il Paziente si è dovuto sottoporre, in data 16/07/2021, a visita specialistica dell'apparato maxillo-facciale e del collo, dal Dott. Giuseppe Spinelli, Direttore della Chirurgia Maxillo Facciale dell'Azienda Ospedaliero-Universitaria Careggi Firenze.

Lo stesso consigliava, ai fini della valutazione clinica, un esame T.A.C. del collo e del torace, eseguito, in data 21/07/2021, all'Istituto Prosperius di Firenze: *quesito clinico: follow-up operato per etp del palato con chemio-radioterapia, nel 2008.*

*Non disponibili precedenti per opportuno confronto.*

*Descrizione.*

*Collo:*

*Esiti chirurgici nell'emicollo di sinistra con linfoadenectomia latero-cervicale e sottomandibolare, rimozione della ghiandola sottomandibolare; l'asse faringo-laringeo è per questo deviato verso sinistra.*

3

*L'asse vascolare del collo, all'altezza dell'angolo mandibolare, appare circondato da un piccolo alone di tessuto amorfo, forse cicatriziale, in rapporto con il ventre del muscolo sterno-cleido-mastoideo che a sua volta appare nettamente ridotto di volume per ipertrofia; a ciò corrisponde affondamento del piano cutaneo retro-mandibolare.*

*La parotide sinistra è completamente artofica in relazione ad esiti di trattamento radioterapico.*

*A livello del palato duro per quanto valutabile in presenza di artefatti da materiale protesico dentario non si rilevano franche alterazioni dei piani tissutali molli.*

*Regolare la pervietà aerea di cavità etmoido-sinusali bilateralmente.*

*Non linfoadenopatie di aspetto e volume critici a livello latero-cervicale a destra.*

*Artrosi atio-odontoidea.*

*Modeste alterazioni spondilo-unco-artrosiche nei livelli C4-C5 e C5-C6.*

*Torace:*

*cavità pleuriche libere da versamento.*

*Non linfoadenopatie.*

*Strie-banderelle fibro-consolidative nel segmento mediale del lobo medio e ventrale dell'LSD a ridosso della pleura pericardica.*

*Non altre alterazioni focali nodulari o diffuse nel parenchima polmonare bilateralmente.*

*In addome superiore si segnala la presenza di multipli microcalcoli radiopachi nella colecisti.*

Il 22/07/2021, per le difficoltà respiratorie, il Sig. C. Gardner si sottoponeva a <u>visita specialistica pneumologica</u>, con annessa spirometria, dal Prof. Gian Luca Chelucci.

Lo stesso Sanitario, dopo aver eseguito l'esame spirometrico ha ricollegato, i risultati dei parametri ottenuti ad una *"possibile restrizione grave"*.

In data 31/07/2021 il Dott. Giuseppe Spinelli, sulla base delle visite cliniche effettuate e degli accertamenti strumentali (T.A.C., Spirometria) certificava, con relazione scritta, che *il Sig. Gardner Christopher Charles nato a New Orleans l'8/07/1955 è affetto da esiti di carcinoma a cellule squamose mascellare (CACS) sx e osteoradionecrosi mandibolare sx.*

*Nel 2004: CACS del palato duro, trattato chirurgicamente con chemioterapia, radioterapia e brachiterapia adiuvante (luglio agosto 2004), con successive infezioni ricorrenti e alterazioni del sistema immunitario (neutropenia).*

*Nel 2007 osteoradionecrosi mandibolare sx trattata chirurgicamente con resezione a tutto spessore della mandibola sx e ricostruzione con lembo libero da cresta iliaca.*

*Nel 2009 si è verificata embolia polmonare e arresto cardiaco, con successivo danno polmonare.*

*Ha eseguito spirmoetria, in data 22/07/2021 che indica grave deficit funzionale ventilatorio di tipo restrittivo.*

*Ha eseguito nuova TC in data 21/07/2021.*

*Al controllo odierno il Sig. Gardner presenta:*

*-Eduntulia sub totale della mandibola con impossibilità a portare la protesi mobile*

*-Paralisi parziale del nervo facciale sx*

*-Disfagia*

*-Anchiloglossia*

*-Ridotta apertura della bocca*

*-Neuropatia periferica orecchio, collo e tronco sx*

*-Esiti cicatriziali con deficit tissutale della regione mandibolare e del collo sx.*



Case 2:19-cr-00099-LA-NJ   Filed 07/18/22   Page 6 of 27   Document 17-1

**ATTUALMENTE IL PAZIENTE RIFERISCE:** astenia costante, dovuta alla disfagia che non permette una congrua alimentazione. Riferisce infatti si può nutrire, solo con cibi semiliquidi ad una certa temperatura, simile all'ambiente.

Secchezza delle fauci ed importante disfagia conseguente.

Questa è dovuta all'iposalivazione ed alla difficoltà alla deglutizione che deve essere lenta e controllata, per le importanti sequele derivanti dall'intervento terapeutico (radiante e chirurgico), la sottomandibolare di sinistra è stata rimossa e la parotide omolaterale è atrofica.

È dovuta anche al dissesto dell'apparato digerente, nel suo primo tratto, per la fibrosi, da terapia radiante, ai tessuti del collo.

Dispnea per piccoli sforzi, a causa della insufficienza respiratoria con sindrome restrittiva grave, dalla quale è affetto.

Anestesia e paralisi dell'emifaccia sinistra, che comporta ed aggrava le dispnea e la disfagia, parestesie arti superiori, soprattutto a sinistra, con limitazione dei movimenti articolari.

### CONCLUSIONI MEDICO LEGALI

Dopo visite dirette, le visite specialistiche sopra riportate ed esame della documentazione medica prodotta da quei Nosocomi che lo ebbero e lo hanno tuttora in cura, per i gravi esiti da Carcinoma a cellule squamose, si può affermare che lo stesso sia attualmente affetto da:

*fibrosi tissutale della regione del collo, da esiti riparativi in tessuto fibroso, chiusura parziale del passaggio interno della glottide, restringimento della trachea e dello sfintere esofageo superiore, paralisi del nervo facciale di sinistra e parte superiore sinistra del busto, postumi iatrogeni da radiazioni, con danno alle ghiandole salivari e conseguente disfagia generalizzata, specie per i cibi solidi, paralisi facciale.*

6

*Ipomobilità della lingua (anchiloglossia), perdita dei denti e conseguente sostituzione protesica. Insufficienza respiratoria da sindrome restrittiva grave.*

Tali gravissimi esiti, oramai stabilizzati, non più emendabili, ma destinati solo ad un peggioramento nel tempo, rendono, chiaramente, la vita a regime carcerario, incompatibile per il Paziente che deve osservare terapie, diete personali ed essere sottoposto, periodicamente, a visite specialistiche.

Considerato poi che la salute è il bene primo per la persona, anche se sottoposta a regime restrittivo, è opportuno, anzi necessario, che suddette visite periodiche, continuino ad essere effettuate dai Sanitari che lo ebbero in cura, in Svizzera, sin dal 2004, ossia dal Dr. Alexandre Jaquinet e Dr. Matti Aapro della Clinique de Geneolier e dal Dr. Martin Broome dell'Ospedale C.H.U.V..

È quindi necessario che il paziente torni presto in Svizzera, per continuare le terapie periodiche con i Sanitari di fiducia, cosa che non potrebbe più fare, se estradato in U.S.A., benchè siano presenti anche lì, chirurghi di fama internazionale, che lo potrebbero "potenzialmente seguire".

Ma tra il potenzialmente ed il certamente, essendo la salute della persona, anche detenuta, il primo interesse da tutelare, c'è molta differenza.

L'estradizione comporterebbe, di sicuro, il trasferimento del Sig. C.C. Gardner, in un luogo lontano da chirurghi maxillo-facciali, in grado di seguirlo, periodicamente, mentre in Svizzera, anche la vicinanza fisica, ai luoghi di cura, consentirebbero la vita del Paziente. Non una vita migliore, ma la vita, significando che l'estradando avrebbe una prognosi *quoad valetudinem* e *quoad vitam* negativa, ad esito infausto, se non seguito dagli stessi Specialisti che lo hanno in cura, dall'anno 2004.

Durante la permanenza, ai domiciliari, a Firenze, lo stesso è stato costretto a cure mediche più volte, ricorrendo ad esami strumentali e Specialisti dell'apparato maxillo-facciale e dell'apparato respiratorio, in quanto affetto da dispnea e disfagia.

Il regime di arresti domiciliari ha permesso, non senza difficoltà, lo svolgimento di quelle visite che lo stesso Paziente dovrebbe poter fare in Svizzera, ove ha i propri Sanitari di fiducia. Un regime carcerario renderebbe ciò impossibile.

C'è altro. Il regime carcerario significa promiscuità, aria chiusa, spazi confinati, scarsa tendenza all'igiene, come caratteristica peculiare della popolazione carceraria, lontananza da qualsiasi presidio Ospedaliero, a carattere specialistico.

Il Sig. C.C. Gardner non può permettersi di incorrere in infezioni, meno che altro, respiratorie, in quanto andrebbero a colpire un apparato ed una persona già altamente debilitata, in tali distretti anatomici, proprio per il pregresso carcinoma e la terapia che ha dovuto subire.

Il regime carcerario sarebbe causa, dato il contesto sopra descritto, di infezione subitanea, con gravissimo rischio, per la vita del Paziente.

Tutto ciò senza tener conto dell'attuale emergenza data dalla pandemia mondiale da Covid 19 (Sars-Cov-2).

Nella promiscuità del regime carcerario, con anche la pandemia sopradetta, il Paziente sarebbe da subito costretto in un ambiente incompatibile con la vita, date le precarie condizioni di salute.

C'è altro. Il Paziente, data la radioterapia destruente subita ed il pregresso carcinoma del palato duro, ha perso tutti i suoi denti e parte dell'osso mandibolare inferiore dell'emilato sinistro.

8

Abbisogna perciò di una alimentazione controllata e lenta, con cibi semiliquidi, preparati più volte al giorno e poco per volta. Può bere, ma a piccoli sorsi.

Alcuni carceri, in U.S.A., si sono organizzati, per ostacolare il diffondersi del virus, tra i detenuti, col servire il pasto che viene consumato all'interno delle proprie celle.

Logisticamente sarebbe impossibile permettere al Paziente di poter avere 5-6 piccoli pasti al giorno, con dieta specifica e prodotti scelti.

L'estradizione comporterebbe quindi un rischio elevato per la salute del Paziente che versa in condizioni patologiche obiettivamente molto precarie, imprevedibili e sicuramente destinate al peggioramento con gli anni, con rischio per la vita, se estradato lontano da quegli Ospedali che lo ebbero e lo hanno in cura, in Svizzera.

Non prendiamo nemmeno in considerazione il regime carcerario, che è difatti destinato, solo a persone idonee fisicamente alla tolleranza dello stesso e tutto quello che comporta, non per ultimo la convivenza forzata, con persone di dubbia provenienza e la commistione giornaliera e notturna con altri.

Ciò è fattore favorente l'insorgenza di malattie infettive. Il Sig. C.C. Gardner, nella sua fragilità, deve prevenire le infezioni ad ogni costo, compreso quello che lo potrebbe e lo dovrebbe vedere, in regime di libertà, in Svizzera, vicino ai nosocomi di cui sopra.

Lo stesso è persona fragile e da tutelare. È affetto infatti da grave compromissione dell'apparato respiratorio, strumentalmente ed obiettivamente osservata, causata dalle terapie radianti subite e dagli esiti delle embolie polmonari. Per tale motivo e soprattutto in questo periodo di emergenza mondiale, data la pandemia da Covid-19, il Paziente deve evitare ogni tipo di situazione che comporti un aumentato rischio di

9

contrarre malattie infettive, respiratorie, soprattutto. Allo stesso è anche controindicato l'uso di mascherina, come protezione delle vie aeree, essendo affetto da patologia che ne controindica l'uso.

Studiando la documentazione prodotta, si evince, infatti che il Paziente è persona molto attenta alla salute, stante la gravissima patologia che lo ha afflitto e lo affligge ancora, nei suoi esiti.

In libertà, così come agli arresti domiciliari, a Firenze si sottoponeva e si è sottoposto a necessari controlli specialistici periodici.

Inoltre, considerato il quadro clinico-patologico sopra esposto, si può anche affermare che il Sig. C.C. Gardner sia affetto da patologie per le quali il volo aereo risulta controindicato.

Lo stesso ha avuto una embolia polmonare, con conseguente arresto cardiaco. Le embolie polmonari pregresse costituiscono controindicazioni per il volo, in quanto i soggetti che ne hanno sofferto, più frequentemente di altri possono avere nuovi episodi ed il volo aereo è condizione predisponente alla formazione di trombi con embolie conseguenti.

La tromboembolia polmonare è una patologia che comporta la morte del Paziente, anche se prontamente trattata, a volte; difatti, nel Periziando provocò un attacco cardiaco. Gli esiti della tromboembolia polmonare e conseguente attacco cardiaco sono permanenti e possono comportare un rischio grave, *quad vitam*, durante il volo aereo. Durante le ore di volo transoceanico la persona è sottoposta a stasi prolungata e posture incongrue, fattori favorenti la trombosi e conseguente embolismo.

Il Periziando è affetto da sindrome restrittiva grave, con insufficienza respiratoria e, considerata la differenza di pressione atmosferica che si viene a creare, nella carlinga di un aereo, può essere causa di ingravescente dispnea, con conseguenze imprevedibili, sovraccarico

Case 2:19-cr-00099-LA-NJ   Filed 07/18/22   Page 11 of 27   Document 17-1

dell'apparato cardio-respiratorio, in paziente con pregresso attacco cardiaco, da tromboembolismo polmonare.

Il paziente con insufficienza respiratoria, soprattutto grave, come del caso, accertata obiettivamente e strumentalmente, ha bisogno, per una migliore ossigenazione, di vivere a quota marina, affinchè la maggior pressione atmosferica possa vicariare, almeno in parte, alla difficoltà ventilatoria.

Nelle carlinghe dei moderni aerei, benchè pressurizzate, si viene a creare una atmosfera rarefatta, come quella che si trova in alta montagna, pericolosa per la vita del Paziente che non potrebbe ossigenarsi sufficientemente.

Un volo aereo è quindi del tutto da evitare, in quanto il Periziando è affetto da patologie, per il quale il volo è notoriamente controindicato.

Il Sig. C.C. Gardner è poi affetto da eduntulia, con impossibilità a portare la protesi mobile, a causa della ingravescenza della osteo-radio-necrosi.

Le protesi fisse del paziente sono anch'esse fattori controindicanti il volo.

Se esso dovesse essere affrontato, sarebbe obbligatorio rendere edotta la Compagnia Aerea ed il Comandante dell'aereomobile, che stanno per imbarcare un Paziente affetto da gravi esiti di patologia tumorale con grave insufficienza respiratoria, di tipo restrittivo, predisposto alla formazione di trombi ed emboli, che ha causa di questi ha subito un arresto cardiaco, con protesi fisse e mobili, costituenti ostacoli fisici delle vie aeree. Le protesi tendono, infatti, a causa della alterazione dei tessuti e delle microcavità aeree, durante il volo, a staccarsi dalla loro sede.

Se fosse allora fornita, per il volo, una assistenza fissa medica ed infermieristica, i Sanitari dovrebbero essere informati che, se dovesse scatenarsi una crisi respiratoria, durante il volo, evento più che prevedibile, essi non sarebbero in gradi di intubare il paziente, in quanto

l'apertura buccale è limitata a 3 cemtimetri e mezzo, e la trachea, così come tutto l'asse, è deviato a sinistra.

Riassumendo, in una estradizione coatta, tramite volo transoceanico, negli Stati Uniti d'America, il Comandante e la Compagnia aerea devono essere avvisati della presenza, a bordo, di un Paziente con grave insufficienza respiratoria, portatore di protesi fisse e mobili, tendente alla formazione di tromboembolismi polmonari, per i quali ha avuto già un attacco cardiaco nel caso più che probabile, di una crisi respiratoria da ipossia ed ipopressione. E che questo paziente, anche con la potenziale presenza di Sanitari a bordo, non può essere ventilato a sufficienza e sicuramente non intubato, per la limitazione dell'apertura buccale e la deviazione dell'asse respiratorio, a sinistra. Informato chi di competenza di ciò, dovrebbero quindi acconsentire, contro ogni logica sanitaria all'imbarco e trasporto del Paziente ed accettare le conseguenze civili e penali, nel caso di danno biologico o morte del Paziente.

Non è possibile nemmeno un trasporto via mare, per il Periziando, in quanto, egli deve essere sottoposto a visite costanti, per la progressione peggiorativa della sintomatologia. Un lungo viaggio lo costringerebbe a dover rinunciare a quei trattamenti sanitari ai quali si sottopone, per le cure del caso. Il Paziente riferisce che non potrebbe poi sopportare un viaggio in mare di 10-15 giorni, in quanto ha il terrore di viaggiare per mare e soffre di naupatia e cinetosi.

Proviamo ad immaginare cosa possa significare vomitare, per una persona con l'asse digestivo-respiratorio deviato, portatore di protesi fisse e mobili ed impossibilità ad una sufficiente apertura buccale. Minimo che possa accadere è che il vomito trovi altre vie dove uscire, andando ad allagare le vie respiratorie, con conseguente annegamento e morte dell'estradando.

Anche in questo caso sarebbe impossibile soccorrerlo, per la impossibilità alle manovre di aspirazione del materiale gastrico, dalle fauci, che non si aprono e la deviazione dell'esofago e trachea, da fibrosi post radioterapia.

Andiamo a questo punto ad immaginarsi cosa vuol dire intubare e provvedere all'aspirazione del vomito, una persona che sta velocemente decedendo, affetta da insufficienza respiratoria grave, deviazione dell'asse del collo, con deficit dell'apertura buccale e con protesi fisse e mobili. Impossibile, dando per scontato, ovviamente, che a bordo ci sia personale medico ed infermieristico debitamente informato e la presenza dei più moderni presidi sanitari.

Anche in questo caso, prima dell'imbarco, sarebbe obbligatorio informare la Compagnia ed il Comandante dell'Unità Navale, del rischio che si stanno prendendo a bordo, accettando di rispondere per le conseguenze civili e penali, nel caso di danno biologico o morte del Paziente.

Alla luce dell'esame della documentazione clinica presentata e degli esami clinici sostenuti si rende quindi necessaria, per i motivi di salute sopra esposti, obiettivamente e strumentalmente dimostrati, nella loro complessità e gravità, una determinazione diversa dall'estradizione, che possa permettere al Paziente di continuare ad essere seguito dagli stessi Sanitari che lo hanno ed ebbero in cura, in Svizzera, da molto tempo (2004) e che venga scartata, fin d'ora, l'ipotesi del regime carcerario, incompatibile con la vita del Paziente.

Firenze 02/08/2021                                  Dott Luca Caporali

**DR. LUCA CAPORALI**
DOCTOR SURGEON
UNIVERSITY MASTER II LEVEL IN MEDICINE NBC
SPECIALIST IN OCCUPATIONAL MEDICINE
SPECIALIST IN FORENSIC MEDICINE
VIA DELLA CHIESA DI S. ROMOLO, 14 LASTRA A SIGNA FI

FAX 055/8722895VERIFICATION
MAIL caporali.lu@gmail.com

## OF CONDITIONS DETAILED HEALTH

The writer was appointed medical examiner, plaintiff, in order to verify the health conditions of **Mr. Christopher Charles Gardner, born in New Orleans (USA) on 08/07/1955**, currently under house arrest in Florence and if these are compatible with the possible forced extradition and with prison life, or if there are contraindications of a clinical nature.

### EXAMINATION OF THE CLINICAL DOCUMENTATION AND MEDICAL EXAMINATION

On 01/07/2021 and subsequent ones, the writer went to the address where Mr. CC Gardner is currently held domiciled, to ascertain his health conditions.

These have shown themselves to be precarious, right from the first visit. The Periziando is in fact affected by surgical, chemotherapy and radiotherapy outcomes of destructive carcinoma of the hard palate, operated on.

In addition to the voluminous clinical documentation presented, the undersigned, to express this opinion has relied on Specialists: Maxillofacial, Radiologist and Respiratory System.

1

The specialist visits were made, not only to have a medical-legal framework documented on objective and instrumental data, but also for therapeutic purposes. The patient, in fact, for the serious outcomes from which he is suffering, needs continuous care.

**PATHOLOGICAL HISTORY AND CLINICAL DOCUMENTATION EXAMINATION :**

In June 2004 the patient was examined at the Clinique de Genolier, Switzerland and was diagnosed with a: ***hard palate tumor, classified, anatomo-pathologically, such as squamous cell carcinoma***and.

For this reason, in July 2004, he underwent chemotherapy and 42 sessions of radiotherapy brachytherapy, until 30 August

At the end of August 2004, due to the therapies carried out, highly debilitating on a somatic level, but even more on a local level, he developed a: *infection in the mouth from radiation burns, also compromising the immune system*.

In September 2004, the patient, suffering from *neutropenia*, had a significant weight loss - from 90 kilos to 66 kilos (June 2004 - September 2004), due to difficulty in feeding.

In July 2005, the tissues injured by radiotherapy degenerated into non-functioning and narrowing fibrous tissue the pharynx and the first part of the respiratory system with consequent important swallowing and respiratory difficulties.In

2007 he was diagnosed with: *osteonecrosis of the jaw, radiation and of the teeth, from radiation*, for which awas proposed surgical intervention, with the removal of mandibular bone tissue and grafting of autologous bone, from the pelvis area, with also implementation of the blood circulation, to counteract necrotic phenomena and promote reparative processes.

Case 2:19-cr-00099-LA-NJ   Filed 07/18/22   Page 16 of 27   Document 17-1

He then underwent, in October 2009, a <u>hip bone graft surgery, microvascular reconstruction of the internal mouth</u>, at the CHUV Hospital in Lausanne, Switzerland.

The surgery was not without complications, so much so that the patient had an *episode of pulmonary embolism from DVT*, after surgery and cardiac arrest (CHUV October 2009).

Given the pulmonary complications, from thrombo-embolism, and the results of surgery, the patient also suffered, and is still suffering from respiratory failure, also due to diffuse interstitial fibrosis of the neck tissues, caused by the radiotherapy undergone.

This picture is evolutionary. Fibrosis, as well as the facial and latero-cervical neuropathy from which he is affected, are in clinical-pathological progression, with consequent dysfunctions of the chewing, digestive and respiratory systems.

For the evaluation of the pathological picture, the patient had to undergo, on 16/07/2021, a specialist examination of the maxillofacial apparatus and neck, by Dr. Giuseppe Spinelli, Director of Maxillofacial Surgery of the Hospital -University Careggi Florence.

The same recommended, for the purpose of clinical evaluation, a <u>CT scan of the neck and chest</u>, performed, on 07/21/2021, at the Prosperius Institute in Florence: *clinical question: follow-up operated for PTE of the palate with chemo- radiotherapy, in 2008.*

*No precedents available for appropriate comparison.*

*Description.*

*Neck:*

*Surgical outcomes in the left hemicolle with latero-cervical and submandibular lymphadenectomy, removal of the submandibular gland; the pharyngo-laryngeal axis is therefore deviated to the left.*

3

*The vascular axis of the neck, at the height of the mandibular angle, appears surrounded by a small halo of amorphous tissue, perhaps scarring, in relation to the belly of the sternocleidomastoid muscle which in turn appears clearly reduced in volume due to hypertrophy; this corresponds to the sinking of the retro-mandibular skin plane.*

*The left parotid is completely arthrophic in relation to the results of radiotherapy treatment.*

*At the level of the hard palate, although it can be evaluated in the presence of artifacts from dental prosthetic material, no frank alterations of the soft tissue planes are detected.*

*Adjust the air patency of ethmoid-sinus cavities bilaterally.*

*No lymphadenopathy of critical aspect and volume at the right lateral-cervical level.*

*Atio-odontoid arthrosis.*

*Modest spondylo-unco-arthritic alterations in C4-C5 and C5-C6 levels.*

*Chest:*

*pleural cavities free from effusion.*

*Not lymphadenopathy.*

*Fibro-consolidative striae-bands in the medial segment of the middle and ventral lobe of the LSD close to the pericardial pleura.*

*No other focal nodular or diffuse changes in the lung parenchyma bilaterally.*

*In the upper abdomen, the presence of multiple radiopaque microcalculi in the gallbladder is noted.*

On 22/07/2021, due to respiratory difficulties, Mr. C. Gardner underwent a <u>specialist pneumological examination</u>, with attached spirometry, by Prof. Gian Luca Chelucci.

The same sanitary, after having performed the spirometric examination, reconnected the results of the parameters obtained to a *"possible severe restriction"*.

On 07/31/2021 Dr. Giuseppe Spinelli, on the basis of clinical visits and instrumental tests (CT, Spirometry) certified, with written report, that *Mr. Gardner Christopher Charles born in New Orleans on 08/07 / 1955 suffers from outcomes of left maxillary squamous cell carcinoma (CACS) and left mandibular osteoradionecrosis.*

*In 2004: CACS of the hard palate, surgically treated with chemotherapy, radiotherapy and adjuvant brachytherapy (July August 2004), with subsequent recurrent infections and changes in the immune system (neutropenia).*

*In 2007 left mandibular osteoradionecrosis treated surgically with full thickness resection of the left mandible and reconstruction with free iliac crest flap.*

*Pulmonary embolism and cardiac arrest occurred in 2009, with subsequent lung damage.*

*He performed spirmoetry, on 07/22/2021 which indicates severe restrictive ventilatory functional deficit.*

*He performed a new CT on 07/21/2021.*

*At today's check-up, Mr. Gardner presents: -*

**Subtotal eduntulia of the mandible with inability to wear the mobile prosthesis**

**- Partial paralysis of the left facial nerve -**

**Dysphagia -**

**Anchyloglossia -**

**Reduced opening of the mouth**

**- Peripheral neuropathy of the ear, neck and left trunk**

**- Scarring with tissue deficit in the mandibular region and in the left neck.**


**CURRENTLY THE PATIENT REPORTS**: constant asthenia, due to dysphagia that does not allow adequate nutrition. In fact, he reports that it can only be fed with semi-liquid foods at a certain temperature, similar to the environment.

5

Dry mouth and major consequent dysphagia.

This is due to the hyposalivation and the difficulty in swallowing which must be slow and controlled, due to the important sequelae deriving from the therapeutic intervention (radiant and surgical), the left submandibular has been removed and the ipsilateral parotid is atrophic.

It is also due to the disruption of the digestive system, in its first tract, due to fibrosis, from radiation therapy, to the tissues of the neck.

Dyspnea for small efforts, due to respiratory insufficiency with severe restrictive syndrome, from which he is affected.

Anesthesia and paralysis of the left half-face, which involves and aggravates dyspnea and dysphagia, upper limb paraesthesia, especially on the left, with limitation of joint movements.

## LEGAL DOCTOR CONCLUSIONS

After direct visits, the specialist visits reported above and examination of the medical documentation produced by those hospitals that had it and still have it under treatment, for the serious outcomes of squamous cell carcinoma, it can be said that the same is currently affected from:

*tissue fibrosis of the neck region, from reparative outcomes in fibrous tissue, partial closure of the internal passage of the glottis, narrowing of the trachea and upper esophageal sphincter, paralysis of the left facial nerve and upper left torso, iatrogenic after-effects from radiation , with damage to the salivary glands and consequent generalized dysphagia, especially for solid foods, facial paralysis.*

*Hypomobility of the tongue (ankyloglossia), loss of teeth and subsequent prosthetic replacement. Respiratory failure from severe restrictive syndrome.*

6

These very serious outcomes, now stabilized, no longer amenable, but destined only to worsen over time, clearly make life in prison, incompatible for the patient who must observe therapies, personal diets and be subjected, periodically, to specialist visits .

Considering then that health is the primary good for the person, even if subjected to a restrictive regime, it is appropriate, indeed necessary, that the aforementioned periodic visits continue to be carried out by the health professionals who have treated him in Switzerland since 2004, ie by Dr. Alexandre Jaquinet and Dr. Matti Aapro of the Clinique de Geneolier and by Dr. Martin Broome of the CHUV Hospital.

It is therefore necessary for the patient to return to Switzerland soon, to continue the periodic therapies with trusted healthcare professionals, which he could no longer do, if extradited to the USA, although internationally renowned surgeons are also present there, who could "potentially to follow".

But between the potentially and the certainly, since the health of the person, even a detainee, is the first interest to be protected, there is a lot of difference.

The extradition would certainly involve the transfer of Mr. CC Gardner, to a place far from maxillofacial surgeons, able to follow him, periodically, while in Switzerland, physical proximity to the places of care would also allow life. of the Patient. Not a better life, but life, meaning that the extradition would have a prognosis *negativequoad valetudinem* and *quoad vitam* , with an inauspicious outcome, if not followed by the same Specialists who have been treating him since 2004.

During his stay, the at home, in Florence, the same was forced to medical treatment several times, using instrumental examinations and Specialists of the maxillofacial and respiratory system, as suffering from dyspnea and dysphagia.

7

The house arrest regime has allowed, not without difficulty, the carrying out of those visits that the patient himself should be able to make in Switzerland, where he has his own trusted health professionals. A prison regime would make this impossible.

There's more. The prison regime means promiscuity, closed air, confined spaces, poor tendency to hygiene, as a peculiar characteristic of the prison population, distance from any hospital, of a specialized nature.

Mr. CC Gardner cannot afford to incur infections, least of all, respiratory infections, as they would affect an apparatus and an already highly debilitated person, in these anatomical areas, precisely due to the previous carcinoma and the therapy that he had to undergo. .

Given the context described above, the prison regime would cause sudden infection, with very serious risk, for the patient's life.

All this without taking into account the current emergency given by the global pandemic from Covid 19 (Sars-Cov-2).

In the promiscuity of the prison regime, with also the aforementioned pandemic, the patient would be immediately forced into an environment incompatible with life, given the precarious health conditions.

There's more. Given the destructive radiotherapy undergone and the previous hard palate carcinoma, the patient lost all his teeth and part of the lower mandibular bone of the left side.

It therefore needs a controlled and slow diet, with semi-liquid foods, prepared several times a day and little by little. Can drink, but in small sips.

Some prisons in the USA have organized themselves to prevent the spread of the virus among prisoners by serving the meal that is eaten inside their cells.

Logistically it would be impossible to allow the patient to have 5-6 small meals a day, with a specific diet and chosen products.

8

Extradition would therefore entail a high risk for the health of the Patient who is in pathological conditions that are objectively very precarious, unpredictable and certainly destined to worsen over the years, with risk to life, if extradited away from those hospitals that had it and have it under treatment, in Switzerland.

We do not even take into consideration the prison regime, which is in fact intended only for people physically fit to tolerate it and all that it entails, not least the forced cohabitation, with people of dubious origin and the daily and nocturnal mingling with others.

This is a factor favoring the onset of infectious diseases. Mr. CC Gardner, in his frailty, must prevent infections at all costs, including what he could and should see him, in a regime of freedom, in Switzerland, near the hospitals mentioned above.

The same is a fragile person and to be protected. In fact, he is affected by severe impairment of the respiratory system, instrumentally and objectively observed, caused by the radiant therapies undergone and by the results of pulmonary embolisms. For this reason and especially in this period of world emergency, given the Covid-19 pandemic, the patient must avoid any type of situation that involves an increased risk of contracting infectious and respiratory diseases, above all. Similarly, the use of a mask is also contraindicated, as a protection of the airways, being affected by a pathology that contraindicates its use.

Studying the documentation produced, it is clear that the Patient is a very attentive person to health, given the very serious pathology that has afflicted him and still afflicts him, in its results.

At liberty, as well as under house arrest, in Florence he underwent and underwent the necessary periodic specialist checks.

Furthermore, considering the clinical-pathological picture described above, it can also be said that Mr. CC Gardner is suffering from diseases for which air travel is contraindicated.

The same had a pulmonary embolism, resulting in cardiac arrest. Previous pulmonary embolisms are contraindications for flying, as subjects who have suffered from them may have new episodes more frequently than others and air flight is a predisposing condition to the formation of thrombus with consequent embolisms.

Pulmonary thromboembolism is a pathology that leads to the death of the patient, even if promptly treated, at times; in fact, in the Appraisal he caused a heart attack. The outcomes of pulmonary thromboembolism and subsequent heart attack are permanent and can carry a serious risk, *quad vitam*, during the flight. During the hours of transoceanic flight the person is subjected to prolonged stasis and incongruous postures, factors favoring thrombosis and consequent embolism.

The Periziando is suffering from severe restrictive syndrome, with respiratory insufficiency and, considering the difference in atmospheric pressure that is created in the cockpit of an airplane, it can cause worsening dyspnoea, with unpredictable consequences, overload of the cardio-respiratory system , in a patient with a previous heart attack, due to pulmonary thromboembolism.

The patient with respiratory insufficiency, especially severe, as appropriate, objectively and instrumentally ascertained, needs, for better oxygenation, to live at sea level, so that the greater atmospheric pressure can take care, at least in part, of the ventilatory difficulty.

In the nacelles of modern aircraft, although pressurized, a rarefied atmosphere is created, such as that found in the high mountains, dangerous for the life of the patient who could not oxygenate himself sufficiently.

An airplane flight is therefore completely to be avoided, as the Periziando is suffering from pathologies, for which the flight is notoriously contraindicated.

Mr. CC Gardner then suffers from eduntulia, with the impossibility of wearing the mobile prosthesis, due to the worsening of the osteo-radio-necrosis.

The patient's fixed prostheses are also contraindicating factors for flight.

If it were to be addressed, it would be mandatory to inform the Airline and the Commander of the aircraft that they are about to embark a Patient suffering from severe outcomes of tumor pathology with severe respiratory insufficiency, of a restrictive type, predisposed to the formation of thrombus and emboli, who caused them suffered cardiac arrest, with fixed and mobile prostheses, constituting physical obstacles to the airways. Prostheses tend, in fact, due to the alteration of the tissues and the air microcavities, during the flight, to detach from their seat.

If fixed medical and nursing assistance were then provided for the flight, the Healthcare Professionals should be informed that, if a respiratory crisis should occur, during the flight, a more than predictable event, they would not be able to intubate the patient. how much the buccal opening is limited to 3 and a half cemtimeters, and the trachea, as well as the whole axis, is deviated to the left.

In summary, in a forced extradition, via transoceanic flight, to the United States of America, the Captain and the airline must be notified of the presence, on board, of a Patient with severe respiratory insufficiency, wearer of fixed and mobile prostheses, tending to formation of pulmonary thromboembolism, for which he has already had a heart attack in the more than likely case of a respiratory crisis due to hypoxia and hypopressure. And that this patient, even with the potential presence of Sanitary on board, cannot be ventilated sufficiently and certainly not intubated, due to

the limitation of the buccal opening and the deviation of the respiratory axis, to the left. Having informed whoever is competent of this, they should therefore agree, against all sanitary logic, to boarding and transporting the Patient and accepting the civil and criminal consequences, in the case of biological damage or death of the Patient.

Even a transport by sea is not possible, for the Appraiser, as he must be subjected to constant visits, due to the pejorative progression of the symptoms. A long journey would force him to have to give up those health treatments to which he undergoes, for the appropriate treatments. The Patient reports that he could not then endure a 10-15 day sea voyage, as he is terrified of traveling by sea and suffers from naupathy and motion sickness.

Let's try to imagine what it could mean to vomit, for a person with a deviated digestive-respiratory axis, wearer of fixed and mobile prostheses and the impossibility of a sufficient mouth opening. The least that can happen is that the vomit finds other ways to escape, flooding the respiratory tract, resulting in drowning and death of the extradited person.

Also in this case it would be impossible to help him, due to the impossibility of aspiration of the gastric material, from the jaws, which do not open and the deviation of the esophagus and trachea, from post radiotherapy fibrosis.

Let's go at this point to imagine what it means to intubate and provide for the aspiration of vomit, a person who is rapidly dying, suffering from severe respiratory insufficiency, deviation of the neck axis, with deficit of the buccal opening and with fixed and mobile prostheses . Impossible, assuming, of course, that on board there are duly informed medical and nursing staff and the presence of the most modern health facilities.

Also in this case, before boarding, it would be mandatory to inform the Company and the Commander of the Naval Unit of the risk they are taking on board, agreeing to answer for the civil and criminal consequences, in the case of biological damage or death of the Patient.

In the light of the examination of the clinical documentation presented and the clinical examinations sustained, it is therefore necessary, for the health reasons set out above, objectively and instrumentally demonstrated, in their complexity and gravity, a determination other than extradition, which can allow the Patient to continue to be followed by the same health professionals who have and have been treating him in Switzerland for a long time (2004) and that the hypothesis of a prison regime, incompatible with the life of the patient, is discarded as of now.

Florence 02/08/2021 Dr. Luca Caporali

13