

Neutral Citation Number: [2015] EWHC 3257 (Comm)

Case No: 2014 – 000358
(Formerly 2014 Folio 836 & others)

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

Rolls Building
Fetter Lane
London, EC4A 1NL

Date: 10/11/2015

Before:

**THE HONOURABLE MR JUSTICE FLAUX**
- - - - - - - - - - - - - - - - - - - -
**Between:**

| | |
|---|---|
| **BONHAMS 1793 LTD** | <u>Claimant</u> |
| **- and -** | |
| **(1) MS KRISTINE KLEVE LAWSON** | <u>Defendants</u> |
| **(2) MR JOSEPH L FORD III** | |
| **(3) MR CHRISTOPHER GARDNER** | |
| **(4) MS FLORENCE SWATERS** | |
| **(5) COPLEY MOTORCARS CORPORATION** | |
| **(6) MR LESLIE WEXNER** | |
| **(7) MR JOSE ZANOTTI CAVAZZONI** | |

- - - - - - - - - - - - - - - - - - - -

**Mr Ian Mill QC & Mr Mark Vinall** (instructed by **Jones Day**) for the **Claimant**
**Mr Richard Eschwege** (instructed by **Ross & Co Solicitors LLP**) for the **Fourth Defendant**
**Mr Joseph Ford the Second Defendant in person**

**The other parties did not attend**

Hearing dates: 19th and 20th October 2015
- - - - - - - - - - - - - - - - - - - -

# Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this
Judgment and that copies of this version as handed down may be treated as authentic.

.............................

THE HONOURABLE MR JUSTICE FLAUX

DEFENDANT'S
EXHIBIT

**1028**

**The Honourable Mr Justice Flaux:**

Introduction

1.      By an Order dated 5 June 2015 (as varied by an Order dated 9 September 2015), I ordered the trial of the following preliminary issue:

> *"As at 27 June 2014, before the auction of the Ferrari model 375 Plus Grand Prix Roadster, serial no. 0384AM (the "Car"), did:*
>
> *(i)  Ms Swaters; or*
>
> *(ii) Ms Lawson and Mr Ford*
>
> *have title to the Car (including, for the avoidance of doubt, any spare parts)*
>
> *without prejudice to any dispute as to title between Ms Lawson and Mr Ford on the one hand, and Mr Gardner on the other."*

2.      The Car is one of only six 375 Plus Ferraris ever made, only four of which remain in existence. It is presently in a container in Southampton in a fully restored condition pending the determination of the disputes between all the various parties arising from the auction by Bonhams at the Goodwood Festival of Speed in 2014. Although the preliminary issue refers to "the Car" there are in fact three elements to consider: (i) the chassis; (ii) the spare parts and (iii) the original engine. There is no dispute that Ms Swaters owns the original engine which she located in the United States and purchased for U.S. $610,000 in 2009. The preliminary issue concerns title to the chassis and the spare parts.

3.      The purpose of ordering the preliminary issue was to determine one of the principal issues concerning the ownership of the Car, that between Ms Swaters on the one hand and Ms Lawson and Mr Ford on the other, with a view to narrowing the remaining issues for determination at any subsequent trial involving other parties. At the 5 June 2015 hearing, Bonhams, Ms Swaters and Mr Wexner were agreed that there should be a trial of the preliminary issue. Ms Lawson and Mr Ford, who were then represented by the same solicitors and counsel, resisted the ordering of a preliminary issue. Their position was and is that all issues of title between themselves and Ms Swaters should be determined in Ohio, in proceedings in the Court of Common Pleas in Hamilton County where Ms Swaters commenced proceedings in February 2010 to recover the spare parts.

4.      Ms Lawson and Mr Ford in fact issued a Part 11 application seeking to set aside or stay the proceedings against them but I dismissed that application, determining that it was made far too late and after they had both submitted to the jurisdiction of this court by the filing of their Defence and Counterclaim. Although they clearly do not like that ruling, neither of them has sought permission to appeal it to the Court of Appeal and they are bound by the ruling.

5.     The Car had been bought by Ms Lawson's father Karl Kleve from a James Kimberly in a damaged condition in 1958. The wrecked chassis is alleged by Ms Lawson and Mr Ford to have been stolen from a field at the premises of Mr Kleve in Ohio on about 13 January 1989 and then sold by the thieves to a car dealer in Georgia, Guy Anderson. Mr Anderson in turn sold it to Michel Kruch, a Belgian dealer whose company traded as L'Exception Automobile.

6.     Ms Swaters' case is that her father, Jacques Swaters, acquired title to the chassis when he bought it in good faith from L'Exception Automobile pursuant to a written contract in Belgium on 15 March 1990. The spare parts and the engine were missing when he acquired the chassis. The chassis remained in the possession of Mr Swaters until his death in 2010 and since then has been in the possession of his daughter. Further or alternatively, Ms Swaters says that, on 2 September 1999, pursuant to a Settlement Agreement governed by New York law, Mr Kleve settled any claims he had to the Car as a whole (including the spare parts) and transferred to Mr Swaters any and all rights which he might have had in the Car. Accordingly, Ms Swaters' case is that Mr Swaters acquired good title to the Car either under Belgian law or New York law and Ms Lawson and Mr Ford have no rights to the Car.

7.     Mr Kleve died in Ohio in 2003. Ms Lawson has continued to claim that she inherited the Car despite the 15 March 1990 sale contract and the 2 September 1999 Settlement Agreement. Mr Ford, whose business is the acquisition of distressed assets, purchased a majority share in whatever interest Ms Lawson had in February 2010. Before then, he had had no involvement with the Car or its history.

8.     Both in the proceedings in Ohio and in the present proceedings, Ms Lawson and Mr Ford have advanced a series of allegations, some of which are quite improper, against Ms Swaters and her father in their attempt to establish a claim to the Car.  Their case has shifted and changed. For a long time, they made allegations of forgery in relation to the Settlement Agreement, but those allegations have been shown to be false by the joint report of the expert forensic document examiners.

9.     By the time of the trial of the preliminary issue, Ms Lawson and Mr Ford had dispensed with the services of their solicitors and counsel. Ms Lawson declined to attend the trial, writing a letter to the court dated 14 October 2015 in which she again sought to challenge the jurisdiction of this court to determine the ownership issue, notwithstanding my previous ruling that the court had jurisdiction and that she had submitted to the jurisdiction, a ruling which she has not sought to appeal.

10.    Mr Ford represented himself at the trial. Although he has a qualification as an attorney in Louisiana, it appears that he has hardly practised. As I have said his business is the acquisition of disputed and distressed assets. As he put it in cross-examination he cherry picks what to acquire and is a consultant solving complex problems. Although he was not familiar with English court procedure, he was well able to present and argue his case and had some assistance from Mr Timothy Smith, an Ohio criminal attorney who was an acquaintance of Mr Kleve and had given certain advice to him and who has acted for Ms Lawson in the Ohio proceedings since 2013. Mr Smith also attended the trial of the preliminary issue to give evidence.

11.    The case of Ms Lawson and Mr Ford as pleaded by counsel then acting for them in relation to the issue whether Mr Swaters had acquired good title in the Car in March

1990 was set out in the Amended Defence and Counterclaim served on 6 July 2015. In summary, that case was that Mr Swaters had not acted in good faith because (i) he was an experienced dealer; (ii) this was the only unrestored Ferrari 375 Plus; (iii) prior to the purchase there had been a high profile criminal trial in Atlanta concerning the theft of the vehicle; (iv) the theft had also been covered in industry publications; (v) Mr Swaters was aware at the time of the purchase that there was an allegation that the car he was purchasing had been stolen in Ohio; (vi) the Car was being sold without its VIN (Vehicle Identification Number) plate; (vii) he purchased it at considerably below market value for the equivalent of less than U.S. $100,000 when its real value was about U.S. $500,000; (viii) there were irregularities in the documentation accompanying the Car including that the receipt for the sale to Mr Kruch was for a price of only U.S. $4,500, the bill of lading described it wrongly as "racing automobile parts" and the import declaration differed from the bill of lading and correctly described the Car but gave its value as U.S. $4,500; (ix) as part of the alleged purchase, Mr Swaters agreed that he would deal with any claims in the event a third party claimed to be the true owner; (x) shortly after the alleged purchase, Mr Swaters offered to purchase Mr Kleve's rights to the Car for U.S. $85,000; (xi) not having obtained any such agreement with Mr Kleve, Mr Swaters subsequently arranged for the Car to be restored in Italy using the VIN 0394 which he knew to be incorrect; (xii) that in the premises there was at least reasonable doubt as to the true ownership and title of which Mr Swaters was on notice.

12. At the trial, it appeared that Mr Ford maintained all these allegations but he also went further and sought to suggest that the sale contract was some sort of sham and that Mr Swaters had actively sought to conceal the Car from being discovered by Mr Kleve or others by describing it with a chassis number 0394AM rather than 0384AM. In effect, he accused Mr Swaters of dishonesty in relation to those matters, neither of which was pleaded. It is wholly unacceptable that such serious allegations should be advanced without being pleaded or supported by any evidence.

13. In relation to the Settlement Agreement, the pleaded case as set out in the Amended Defence and Counterclaim was that there was no valid and binding settlement. The following allegations were advanced: (1) that Mr Kleve only ever agreed to enter a Settlement Agreement for a price of U.S. $3 million not the price of U.S. $625,000 set out on the first page of the Settlement Agreement and his offer to do so expired; (2) Mr Mark Daniels, the agent who concluded the Settlement Agreement on his behalf, did not have actual authority as a matter of New York law to conclude the Settlement Agreement for U.S. $625,000 because it was agreed between him and Mr Kleve that any actions taken by him were subject to Mr Kleve's approval, the Settlement Agreement was concluded by Mr Daniels for his own benefit, not that of Mr Kleve and that the Limited Power of Attorney dated 18 August 1999 did not reflect the true scope of Mr Daniels' authority; (3) Mr Daniels did not have apparent authority as a matter of New York law to conclude the Settlement Agreement because there were numerous irregularities which would have put a reasonable or prudent person on enquiry; and (4) there was no contract formed in respect of the Settlement Agreement because Mr Kleve's offer made on 16 July 1999 was not accepted within a reasonable time as required by the New York Uniform Commercial Code and/or because Mr Lancksweert failed to make full payment to *"Daniels for the benefit of Kleve and Daniels"* as required by clause 5 of the Settlement Agreement.

14.    The specific matters relied upon in support of the allegation that there were irregularities which would have put a reasonable person on enquiry are: (i) that Mr Philippe Lancksweert (Mr Swaters' former business partner who negotiated and concluded the Settlement Agreement on his behalf) knew or should have known that Mr Daniels' statement that the spare parts had been stolen was not true; (ii) that there were redacted signatures in the documentation presented by Mr Daniels on 1 September 1999; (iii) that there was a lapse of time of 44 days between Mr Kleve's signature on 16 July 1999 and 2 September 1999, during which time the price of U.S. $625,000 was negotiated; (iv) that Mr Daniels was unable to produce the Power of Attorney referred to on the first page of the Settlement Agreement but only a letter of authority dated 18 June 1999 which required Mr Kleve's consent before any agreement as to price was reached; (v) that Mr Daniels produced only a copy of the 18 August 1999 Power of Attorney which it is alleged had been fraudulently altered; (vi) that Mr Daniels requested two cheques to be paid over, one for U.S. $400,000 made out to Kleve and Daniels and one made out to National Search Services ("NSS"), Mr Daniels' company, for U.S. $225,000; (vii) that Mr Daniels requested and Mr Lancksweert agreed to omit the identity of the escrow agent and (viii) that Mr Lancksweert demanded an affidavit from Mr Daniels concerning liability for any deficiency in his authority.

15.    At trial, it appeared that all these points were still being pursued by Mr Ford, together with further points such as (i) that Mr Lancksweert and the New York attorneys who advised him in relation to the Settlement Agreement were on notice of Mr Daniels' absence of authority because the 18 August 1999 Power of Attorney was asynchronous with Mr Kleve's signature of the Settlement Agreement on 16 July 1999; (ii) the request for payment to NSS was suspicious in that it indicated that Mr Daniels was defrauding Mr Kleve and payment to the agent was not permitted by the Power of Attorney as a matter of New York law so that the Settlement Agreement was in some way invalid and (iii) Mr Kleve never received any payment under the Settlement Agreement so that it was void for want of consideration.

16.    Ms Lawson and Mr Ford also relied on Ohio law, to which the New York lawyer whom they called as an expert, Mr Jason Racki, said the New York courts would defer, for two propositions which they contended defeated Ms Swaters' claim: (i) that Ohio law imposes a six month time limit for claims to be brought against the estate of a deceased and no claim had been brought by Ms Swaters against Mr Kleve's estate in relation to the Car within six months of his death, so that her claim in the present proceedings was somehow time barred and (ii) that the Certificate of Motor Vehicle Title Act of Ohio imposes certain requirements for a valid transfer of title of an Ohio titled vehicle and there were irregularities in the title document transferring title to Mr Swaters, so that there was not a valid conveyance of title to him. For reasons set out below, Ohio law is irrelevant, but even if it were relevant, these are both thoroughly bad points.

The witness evidence

17.    Before making my findings as to whether Mr Swaters acquired good title to the Car in 1990 or 1999, I should state my views on the evidence of the witnesses called by the parties. Ms Swaters gave evidence. Inevitably, her evidence about events in the 1990s was limited to matters of which her father had informed her as she had no involvement with the Car until later, after the Settlement Agreement, but she gave her

evidence in a straightforward and honest manner. Mr Lancksweert also gave evidence for her. He had been Mr Swaters' business partner for many years and he was involved both in the decision to acquire the chassis in 1990 and in the negotiation and conclusion of the Settlement Agreement in 1999. I formed a favourable impression of him as a man of integrity and I accept his evidence.

18.     Mr Swaters died in December 2010. Before he died, he swore an affidavit dated 15 May 2010 in the Ohio proceedings setting out the circumstances in which he had bought the chassis and his attempts to establish that it was indeed 0384AM as opposed to some other chassis number, given the confusion that had existed, both at the time that the various 375 Plus cars had been raced in the 1950s and subsequently, as to which cars bore which chassis number and which had crashed, leading to uncertainty as to which chassis had survived. Ms Swaters has served a Civil Evidence Act notice in respect of that affidavit. Despite Mr Ford's attempt to impugn the integrity and good faith of Mr Swaters, I see no reason not to accept the evidence he gave in that affidavit.

19.     Mr Ford called Mr Timothy Smith, who as I have said, is an Ohio criminal attorney who was an acquaintance of Mr Kleve and provided advice to him at various times. His evidence was confused and implausible. He has acted for Ms Lawson in the Ohio litigation since August 2013 and, like her, refuses to acknowledge the jurisdiction of this court. He has a financial interest if the litigation is concluded in favour of Ms Lawson and Mr Ford and he also accepted that he had been in some professional trouble, having been on probation in the United States and therefore suspended from practice. I had doubts as to his probity and did not consider him a reliable witness.

20.     Mr Ford gave evidence himself. He was not in a position to give any direct evidence of events in the 1990s, not having been involved with the Car or the people concerned until he purchased what is in effect a majority share of Ms Lawson's interest in the litigation in 2010. This lack of any personal knowledge did not stop him from expressing opinions and speculating both in his witness statement (most of which was strictly inadmissible) and in his oral evidence. He was, as Mr Eschwege for Ms Swaters described him, a professional litigant and his evidence was of no assistance to the court other than to highlight that he was prepared to advance any argument, however outrageous or outlandish, that he thought might assist his cause.

21.     One factual witness for Mr Ford and Ms Lawson, who might have been in a position to give relevant evidence, particularly in cross-examination, was Ms Lawson herself. For example, she could have given evidence about her father's knowledge of the Settlement Agreement and the settlement monies. Her absence is particularly striking in circumstances where it is alleged by her and Mr Ford that no monies were received. The fact that she declined to attend to give evidence, but her attorney, Mr Smith did give evidence was extraordinary. Mr Eschwege invited me to draw appropriate adverse inferences against Ms Lawson and Mr Ford from her failure to give evidence, applying the principles in *Wisniewski v. Central Manchester Health Authority* [1998] PIQR 324 at p.340 *per* Brooke LJ.

22.     The parties produced expert reports from forensic document examiners, Mr Steven Slyter for Ms Swaters and Mr Stephen Cosslett for Ms Lawson and Mr Ford, but in the event, they produced a joint report in which they agreed that there had been no alteration to the amount entry of U.S. $625,000 on the first page of the Settlement

Agreement, so that there is no question of the Agreement having been somehow fraudulently altered, a point which was previously centre stage in Ms Lawson and Mr Ford's allegations. It was agreed that it was not necessary for the experts to give evidence. I set out their findings in more detail when I deal with the Settlement Agreement below.

23.    The parties also produced expert reports from Belgian lawyers, Professor Matthias Storme for Ms Swaters and Mr Stan Brijs for Ms Lawson and Mr Ford, but, as is apparent from their Joint Report, on the critical aspects of Belgian law for present purposes, they were in agreement so that it was not necessary for them to give oral evidence.

24.    Reports were produced on New York law from New York lawyers, Mr John Kiernan, co-chair of the litigation department of Debevoise & Plimpton LLP in New York for Ms Swaters and Mr Jason Racki for Ms Lawson and Mr Ford. They both gave oral evidence. Mr Kiernan was an impressive witness, as Mr Eschwege rightly described him the epitome of what this court expects of an expert, measured and objective. The same could not be said of Mr Racki. I have considerable doubt as to whether he could properly be described as an expert on New York law at all, since he seems only to have qualified as an attorney in 2011 or 2012 and appears to work on contract to firms as some sort of independent contractor for particular projects. He was certainly not measured or objective but was prepared to advance a series of curious propositions, such as that a New York court interpreting the Settlement Agreement would have deferred to Ohio law, which were clearly designed not to assist the court in establishing the relevant New York law but to assist Ms Lawson and Mr Ford if he could in winning the case, in complete disregard of the duty of an expert to the court. Save where his evidence corresponded with that of Mr Kiernan, I reject it and I accept the evidence of Mr Kiernan on every point of New York law.

25.    I gave permission to Ms Lawson and Mr Ford at the case management conference on 9 September 2015 to call expert evidence of Ohio law although I was convinced (and remain convinced) that it is of no relevance for the reasons set out below. Ms Lawson and Mr Ford produced a report from William Graf and Ms Swaters one from Bryce Lenox. Neither was called to give evidence, but I accept Mr Eschwege's submissions that Mr Graf's report, which proceeds on an erroneous factual basis, is flawed and should be rejected. I accept the evidence of Mr Lenox.

Events leading up to the purchase of the Car by Mr Swaters

26.    Mr Swaters was a highly decorated war hero, having fought in the Belgian resistance in the Second World War. After the war, he took up motor racing and raced for a number of years as a "gentleman" driver. He set up a racing team which became known as Ecurie Francorchamps which raced classic cars including Ferraris. In 1952, he became the first official Belgian importer of the marque and began a long relationship with the Ferrari factory and friendship with Enzo Ferrari himself. He established Garage Francorchamps as a Ferrari and classic car dealership. In 1980, he entered into a business partnership with Mr Lancksweert. As Mr Lancksweert said in his witness statement they had a good reputation and built up a highly respected dealership.

27.     As Ms Swaters described in her witness statement, in 1989 Mr Swaters was approached by a well-known Belgian car dealer, Michel Kruch, who sought assistance from him in identifying whether the wreck of a car that Mr Kruch had located in the United States was a Ferrari. Mr Kruch showed her father a photograph of the wreck and asked if he thought it was a Ferrari. He had apparently asked some other Belgian car dealers whether they thought the car in the photograph was a Ferrari. Mr Swaters investigated the photograph and, with the assistance of the Ferrari factory concluded that despite its terrible state, it could be a Ferrari. He told Mr Kruch that if he bought it, Mr Swaters in turn would buy it from him in order to restore it. Mr Ford sought to suggest in his submissions that in some way this involvement of Mr Swaters before the chassis was imported into Belgium demonstrated that he was on notice or was aware that the chassis was stolen. There is no evidential basis for this assertion.

28.     Mr Kruch purchased the car from Guy Anderson's company in Georgia, the Worldwide Exchange, for U.S. \$4,500. The sales invoice issued by Worldwide Exchange described the car as *"1 car disassembled in parts"* and described the car in a Note: *"This is as is where is. The car is only 40% complete, no engine, no seats, no interior, no wheels, no bodywork in rear. Car only includes chassis, trans, nose section (severely damaged) 1 spare tire"*. Mr Ford submitted that the price of U.S. \$4,500 was at a gross undervalue. He also submitted that the bill of lading pursuant to which Mr Anderson shipped the container with the wreck inside was suspicious because it referred to the contents as "Racing Automobile Parts". He went so far as to suggest that this was an attempt on the part of both Mr Anderson and Mr Kruch to conceal the exportation of the chassis out of the United States from the U.S. Customs. In this context it is important to note that Mr Anderson and two other men named Kelley and Christian were charged with interstate transportation of stolen motor vehicles and conspiracy (the two thieves pleaded guilty). They stood trial in Atlanta in November 1989 but, at least so far as Mr Anderson and Mr Kelley are concerned, they were acquitted, as the prosecution was unable to establish to the satisfaction of the jury that they had known the chassis was stolen when they took possession of it. In my judgment, the description of the contents of the container in the bill of lading was not inherently suspicious. It accorded with the description of the car in the sales invoice as a car *"disassembled in parts"*.

29.     One of the leitmotifs of Mr Ford's submissions was that the criminal trial in some way would prove his case that Mr Kruch and Mr Swaters had not acted in good faith. Given that the man who sold Mr Kruch the chassis was acquitted and neither Mr Kruch nor Mr Swaters were involved in the trial, it is difficult to see how anything that occurred at that criminal trial in the United States could implicate Mr Kruch or Mr Swaters. In any event, although Mr Ford referred to transcripts of the trial which would in some way establish his case, he only produced a handful of pages from the transcripts and exhibits at the trial in his supplementary bundle for the preliminary issue trial. Since he drew the court's attention to these in his skeleton argument for the hand down of the judgment, I have considered them carefully but contrary to his submissions, do not consider that they assist in the determination of the preliminary issue.

30.     He also relied upon the fact that the same Ferrari expert, Mr Nowak, who later ascribed a value to a 375 Plus in restored condition of U.S. \$3 million had given expert evidence at the criminal trial that the chassis was worth U.S. \$500,000, Mr

Ford's intention being to demonstrate that both the sale by Mr Anderson to Mr Kruch and the sale by Mr Kruch to Mr Swaters were at a gross undervalue. However, he did not produce copies of any expert report Mr Nowak had provided and, although he produced a single page from the transcript of Mr Nowak's evidence at the criminal trial, in which Mr Nowak asserted that the chassis was worth U.S. $500,000, Mr Nowak was not called to give evidence at the trial before me. Given the seriousness of the allegation that the sale to Mr Swaters was at a gross undervalue, the court would have expected the party making the allegation, Mr Ford, to call expert evidence as to the value of the chassis in its then condition in 1989, not merely to rely on evidence at a criminal trial in the United States more than twenty five years ago, which Ms Swaters has had no opportunity to challenge.

31.    Even if such expert evidence that the chassis was worth U.S $500,000 was given at the criminal trial I would find it very difficult to accept that the chassis in its then condition was worth anything like that amount. Although Mr Ford cavilled at the description of the chassis as "a burnt-out wreck", Mr Eugene Glenn of the Federal Bureau of Investigation ("FBI") described it in a letter to Ferrari in Italy on 6 October 1994 as a *"dilapidated carcass"*. In his affidavit, Mr Swaters refers to the chassis number being almost illegible: *"due to the vehicle's damaged condition and also a result of fire"*. In a report in February 1996, the FBI described the Car in these terms: *"the rear portion of the Plus, its hood, two doors, wheels, and three brake drums had been removed"*. They also described how the VIN plate had been prised from the firewall by vandals the year before the theft.

32.    In my judgment a chassis in that dilapidated condition with no VIN plate to definitively identify it was not worth a fraction of U.S. $500,000. If it had been worth anything like that much, it would surely not have been left in a field by Mr Kleve. After his death, his entire collection of other classic vehicles was valued (in Exhibit D to in the Amended Schedule of Assets filed by Ms Lawson as Administrator of her father's estate with the Probate Court in Ohio) at only U.S. $86,770. Tellingly, the 375 Plus chassis was not included in his assets on his death by Ms Lawson. However, if the chassis when he was in possession of it had been worth anything like U.S. $500,000, it would surely have been given pride of place in his collection, not left to moulder in a field. Furthermore, this is an example of an issue on which Ms Lawson could have been asked questions if she had attended the trial and given evidence. I reject Mr Ford's suggestion that the price paid by Mr Kruch for the burnt out chassis was at a gross undervalue.

33.    Returning to events in Belgium, it appears that the U.S. authorities became aware that the chassis was in Belgium and requested the Belgian authorities to return the vehicle to Mr Kleve in the United States. In August 1989, Mr Kruch became aware of the allegations that the chassis had been stolen and immediately informed the Belgian authorities that he was the owner of the chassis, scarcely the act of a man with a guilty conscience. The Belgian authorities seized the chassis and the public prosecutor ("procureur du Roi") conducted an investigation. It appears that the investigation included a request for information from Mr Paramore, a Belgian lawyer instructed by Mr Kleve, although it is unclear whether Mr Kleve ever provided the information sought by Mr Paramore in his letter of 1 February 1990.

34.    On 14 February 1990, the office of the public prosecutor issued a written release lifting the seizure of the Car and permitting Mr Kruch "free use" of the Car. The

original French refers to "disposition libre" which seems to me to make it clear that the prosecutor was saying that Mr Kruch was free to dispose of the Car as he wished, including by sale. The release provided in full, in translation, as follows:

> "RE: wreck of Ferrari type 375 plus automobile, serial number 0384 AM
>
> The undersigned Michel WATERPLAS, Superintendent at the Brussels Criminal Investigation Department, hereby certifies that, further to the ruling handed down by the King's Prosecutor in Brussels (Dr. 27.11.1233/89), seizure of the automobile referenced above has been lifted today, 2/14/90.
>
> Mr. KRUCH may therefore have free use of this automobile."

35.  In his submissions, Mr Ford sought to suggest that the Belgian authorities had not investigated thoroughly the circumstances in which Mr Kruch acquired the chassis. He even seemed to be insinuating that there had been some sort of complicity between the Belgian authorities and Mr Kruch and Mr Swaters designed in some way to thwart Mr Kleve. Those allegations are very serious and, whilst I am prepared to make every allowance for the distrust some Americans have for Europeans, the allegations should not have been made. They are unpleaded and unsupported by any evidence and I reject them.

36.  Although the release by the public prosecutor referred to the vehicle as 0384AM, because of the absence of the VIN plate it remained unclear whether the chassis was indeed that of 0384AM because, as Mr Swaters says in his affidavit, the chassis number was almost illegible on the frame due to its damaged condition and as a result of fire. Mr Kruch arranged for an x-ray inspection of the chassis by Sabena Technics (the technical department of the Belgian airline) to determine the true chassis number. In a letter dated 21 February 1990, they stated: *"we hereby confirm that by x-ray inspection we discover the number 3?4AM (? =8 or 9) on the vehicle frame. I am also convinced that this frame is original"*. In other words, that x-ray analysis could not determine whether the chassis number on the frame was 0384AM or 0394AM. Mr Ford sought to cast doubt upon the status of this letter because it contained the notation at the bottom "For internal purposes only". Whatever the reason for that notation, the report did not remain internal to Sabena Technics but was given to Mr Kruch (who had commissioned it) and annexed to the contract of sale to Mr Swaters (see below). In any event, I consider there can be little doubt that the report sets out accurately what Sabena Technics were able to discern from their x-ray analysis. I will return to the uncertainty as to chassis numbers of Ferrari 375 Plus cars a little later in the judgment, when I deal with Mr Ford's contentions as to why the sale to Mr Swaters was not in good faith.

37.  On 15 March 1990, a written sales contract was entered into between L'Exception Automobile, represented by its chief executive, Mr Kruch, and Garage Francorchamps represented by its directors, Mr Swaters and Mr Lancksweert, for the sale of the chassis. The preamble to the contract stated: (i) the vendor had purchased the wreck of a vehicle presented as a Ferrari 375 Plus with the chassis number given as 384AM, in the United States in February 1989; (ii) the vendor had lawfully imported this wreck to Belgium from the United States and paid the import duties;

(iii) there had been legal proceedings in the United States against various persons suspected of having concealed the wreck which had allegedly been stolen from its owner; (iv) that in August 1989, having learnt that the wreck was sought by the judicial authorities, the vendor immediately informed the authorities of the fact that it owned the wreck which had been stored in its garage for several months; (v) that the wreck was therefore put under seal at the garage and the vendor was interviewed by the Belgian judicial authorities; (vi) that following detailed explanation by Mr Kruch as to how he had purchased the wreck in good faith and as to his peaceful, public, continued and unequivocal possession of the wreck, the seals were lifted on 14 February 1990, with the vendor having free use of the vehicle, as set out in the letter from the public prosecutor which was annexed to the contract; (vii) that the vendor had had a technical assessment carried out by Sabena Technics, their report also being annexed to the contract, which established that the 3 and the 4 were legible but there was doubt as to whether the middle figure was an 8 or a 9 and that their assessment showed the numbers were those struck originally and not therefore altered by subsequent improper modifications; and (viii) the purchaser was a professional in the field of vintage Ferraris and prior to the agreement had had every opportunity to examine the wreck in detail and form a detailed opinion with regard to its origin and history, taking account notably of its consultation of the archives of the Ferrari factory in Italy.

38. The contract then provided that the vendor sold the wreck to the purchaser on the basis that the sale was at the exclusive risk and cost of the purchaser, without any guarantee for hidden defects or for breach of quiet possession due to a third party. The only guarantee given was as to the accuracy of the preamble. It was expressly agreed that if the wreck became the object of claims by any third party (including anyone claiming rightly or wrongly to be the dispossessed true owner) the purchaser was solely responsible for such claims. The sale price agreed was 3,500,000 Belgian francs for which receipt was duly given. Transfer of ownership took place from that day, 16 March 1990. The agreement was governed by Belgian law. It was signed by Mr Kruch, Mr Swaters and Mr Lancksweert.

39. In addition to the sales contract, there was an invoice from L'Exception Automobile to Garage Francorchamps for the price of the vehicle, which was described as *"vehicule en epave"* in translation, a vehicle which is a wreck. That invoice set out the purchase price of 3,500,000 Belgian francs. After addition of 33% value added tax, the total price was 4,655,000 Belgian francs. That invoice was signed by both parties and above the seller's (i.e. Mr Kruch's) signature is written: *"Recu cheque KB No 222367"*, confirmation that Mr Kruch had received a cheque in payment of the price.

Acquisition of good title in the chassis as a matter of Belgian law

40. At the time when that agreement transferred title, the chassis was in Belgium. On normal conflicts of laws principles, Belgian law as the *lex situs* governs whether good title to the chassis was transferred to Mr Swaters: see *Dicey, Morris & Collins, The Conflict of Laws* (15th edition) [24R-001].

41. Belgian law has two modes by which a person may acquire title to property: (i) transfer based on contract and (ii) bona fide acquisition pursuant to Article 2279 of the Belgian Civil Code. So far as the application of the first mode is concerned, Mr

Swaters bought the chassis pursuant to a sales contract with Mr Kruch's company so that, if Mr Kruch acquired good title to the chassis, then Mr Swaters acquired good title in any event. As Mr Storme points out in his report, under the relevant provisions of the Belgian Criminal Code, the public prosecutor could only release the chassis to and upon the demand of the owner and the restitution of the chassis to Mr Kruch indicates that the public prosecutor was satisfied that Mr Kruch was the owner i.e. that he had acquired it in good faith. In the circumstances, I consider that Mr Kruch did have good title as a matter of Belgian law when he subsequently entered into the sale contract with Mr Swaters, from which it follows that Mr Swaters acquired good title pursuant to that contract.

42.     If Mr Kruch did not have good title then the issue arises whether Mr Swaters nonetheless acquired good title pursuant to Article 2279. That provides, so far as relevant (in translation):

> "I. In matters of personalty, possession is equivalent to title.
>
> II. Nevertheless, one who has lost or from whom was stolen a thing may claim it during three years, counting from the day of the loss or theft, against the one in whose hands he finds it, saving for that one his recourse against him from whom he holds it…"

43.     The Article has two requirements: (i) possession and (ii) good faith at the time of the acquisition. The relevant principles of Belgian law are essentially agreed between the Belgian law experts:

(1)     It is sufficient for the possessor to be in good faith for the purposes of Article 2279 at the time he acquires possession. Good faith is to be assessed on the basis of his knowledge at the moment of acquisition. That does not exclude subsequent conduct (such as intentionally hiding possession) as evidence of lack of good faith at the moment of acquisition.

(2)     There is a rebuttable presumption that the possessor acquired possession in good faith.

(3)     Good faith means that the possessor believed and could have believed that he acquired the goods from the owner or from a person who had capacity or authority to transfer title, even if this was not the case in reality.

(4)     The good faith of the possessor is a fact intensive enquiry which takes into account all the circumstances. It is thus a question of fact for this court and not for the experts, although Mr Brijs purported to express his view on the issue.

44.     So far as the third of these agreed propositions is concerned, in their joint report the two Belgian law experts cited as an example of a case where that proposition was applied the decision of the Cour de Cassation (the highest Belgian court) of 16 December 2010. Mr Storme had in fact cited that decision for this proposition in [78] of his report. In an extraordinary passage in his closing submissions, Mr Ford contended that he had downloaded and translated the case, that it did not support the proposition for which Mr Storme contended and that this somehow cast doubt upon

the veracity of Mr Storme. Mr Ford had apparently overlooked that the experts agreed the proposition and referred to the case in their joint report. This was another regrettable example of the impermissible lengths to which Mr Ford was prepared to go in seeking to disparage anyone involved with Ms Swaters (here her Belgian law expert) in support of his case.

45. So far as the fourth agreed proposition is concerned, the Belgian law experts agree that the release of the chassis by the public prosecutor does not give rise to *res judicata* but is a relevant factor for determining the buyer's good faith, although they disagree as to its significance. Ultimately, that is a question of fact for the court.

46. One issue about which the Belgian law experts were not agreed was whether the effect of Article 2279 (II) is to vest title in the possessor immediately, or only to do so after three years. Mr Storme's view is that under the Article the possessor who has acted in good faith will acquire at least a conditional title immediately and that his title will only be set aside by a "revindication", court proceedings commenced under Article 2279 (II) by the person from whom the goods were stolen or who has lost them within three years of the theft or loss. Mr Brijs on the other hand considers that the possessor only acquires good title after three years in the case of goods which were stolen or lost. If this point mattered, I would prefer the analysis of Mr Storme, but it is not necessary to decide the point, because on any view Mr Kleve did not commence proceedings to regain possession or revindication within three years of the chassis being stolen, from which it follows that, if Mr Swaters' possession was in good faith when he acquired the chassis, by 13 January 1992, at the latest, Mr Swaters had good title in the chassis and has had good title ever since.

47. On the question of whether the purchase of the chassis was made in good faith, Mr Swaters stated that he and Mr Lancksweert had acted in good faith in his affidavit in Ohio, where he said: *"In March 1990, I partnered with Philippe Lancksweert and purchased the Vehicle in good faith from L'Exception Automobile in Belgium."* In his witness statement, Mr Lancksweert made it very clear that he and Mr Swaters were only prepared to buy the chassis after the investigation by the Belgian authorities had concluded in the release of the Car to Mr Kruch on the basis he had free disposition of it. Mr Lancksweert said: *"Jacques and I had not been prepared to buy the chassis if there was any question mark over its ownership. Mr Kruch also reassured us that he had bought the Car in good faith. The release of the chassis by the Belgian authorities was the critical moment for Jacques and me. The Belgian authorities had investigated the allegations and were satisfied that Mr Kruch could sell the Car. The release gave us the assurance that in Belgium we in turn as buyers from a Belgian seller were now free to work on the chassis."*

48. In cross-examination by Mr Ford, Mr Lancksweert said that, as Ferrari representatives in Belgium, he and Mr Swaters would not have agreed to buy a stolen car. Mr Ford put to him an advertisement in the Ferrari Market Letter in February 1989 about stolen Ferraris, including the 375 Plus, but Mr Lancksweert said he had not seen this advertisement and did not know whether Mr Swaters had. They had not known the Car was stolen until after they bought it. I see no reason not to accept the evidence of Mr Lancksweert, whom as I have said I considered an honest witness. I consider that, despite the slurs on his and Mr Swaters' character insinuated by Ms Lawson and Mr Ford, it is inconceivable that, as reputable dealers and the sole Ferrari distributors in Belgium, they would have risked their reputation by buying the chassis, if they had

known it was stolen or if the person from whom they were buying it was implicated in theft.

49.     Of course they knew that there had been allegations in the United States that it was stolen and criminal proceedings against various people in the United States, since this is recorded in the preamble to the sales contract but that is not the same thing as knowing that the chassis was in fact stolen, let alone that Mr Kruch was implicated in the theft (which, of course, he was not). They were entitled to rely upon the fact that the Belgian public prosecutor had investigated the circumstances in which Mr Kruch had acquired the chassis and released the chassis back to him on the basis that he was free to dispose of it as he wished. As I held in [41] above, the public prosecutor would only have released the chassis to Mr Kruch if satisfied he was the owner and had acquired the chassis in good faith. In the circumstances, I consider that in relying upon the restitution of the chassis to Mr Kruch by the public prosecutor, Mr Swaters and Mr Lancksweert themselves acted in good faith for the purposes of Article 2279.

50.     So far as the points relied upon by Ms Lawson and Mr Ford as demonstrating lack of good faith at the time of the sale contract are concerned, in the findings I have just made, I have dealt with the allegations referred to in sub-paragraphs (i), (iii) to (v), (viii) and (ix) of [11] above. Apart from the issue of the absence of the VIN plate, in order to determine whether there is any force in the other allegations, it is necessary to set out some of the history of the confusion over chassis numbers of Ferrari 375 Plus cars and some of the events and correspondence subsequent to the sales contract, whilst bearing in mind the agreed principle of Belgian law that subsequent events are irrelevant to the issue whether the possessor acted in good faith at the time of acquisition, save to the extent that those subsequent events and correspondence are indicative of bad faith at the time of acquisition.

51.     In relation to the allegation about the absence of the VIN plate being indicative that the provenance of the chassis was suspicious, in cross-examination Mr Lancksweert denied that there was anything alarming or strange about the VIN plate having been ripped off, saying that there are cars which are sold without a VIN plate and that was why the Sabena Technics report was required. Quite apart from that evidence, which I accept, the suggestion by Ms Lawson and Mr Ford that the absence of the VIN plate was suspicious is unconvincing, given that the VIN plate was not removed because of or during the theft but had been torn off by vandals prior to the theft in an unconnected incident.

52.     Mr Swaters exhibits to his affidavit in the Ohio proceedings material which precedes the sale contract which supports the case that there was uncertainty as to the chassis numbers of the Ferrari 375 Plus cars, even in the 1950s when they were being raced. For example, in an article from 1984 in Cavallino magazine, which describes itself as the magazine for Ferrari enthusiasts, it is stated that the 375 Plus cars were built solely for the offensive of the half dozen races of the Sports Car Championship of 1954, there were only a few constructed and many early Ferrari race cars have disappeared because Ferrari usually set them aside when done with them.

53.     In relation to the 1954 races, the article describes how in the Tour of Sicily, a 375 Plus driven by Umberto Maglioli went off the road and crashed heavily, but it is not known which chassis this was and whether it was repaired. The article describes how two 375 Pluses were entered in the Mille Miglia in May 1954, one for Farina and one

for Maglioli. Farina's car went off the road and hit a tree and the chassis of that car is reportedly known as 0386AM. It was said to have been discarded as beyond repair, but that was not definite. Maglioli's car was reported as 0394AM, with certain distinctive features such as a streamlined headrest and a more penetrating nose, but that car crashed as well. In the next race at Silverstone a car similar in appearance to 0394AM appeared driven by Froilan Gonzalez, which won the race. The article then describes how other evidence suggests that the car which won at Silverstone was in fact 0392AM.

54.     The article continues that at Le Mans in June 1954, Ferrari entered three cars, one driven by Maglioli and Paolo Marzotto, numbered 3 which some commentators have said was 0394AM, because of its similarity to the winner at Silverstone, but the competition record for 0392AM states that it was car number 3. Having described subsequent races, the article stated: *"There is a great deal of confusion over all these 375 Pluses, not only at Le Mans, but at all the other races as well. The only thing that can be stated with any certainty is that the real winning car may never be known conclusively."*

55.     Another example, which Mr Swaters exhibits to his affidavit, of the confusion over the chassis numbers is Ferrari Album 2 from 1981 which describes the car driven by Gonzalez at Silverstone and then driven by Maglioli and Marzotto at Le Mans in 1954 as 0394AM, which was then sold to Jim Kimberly. The Album includes photographs of "0394AM" at Silverstone where it was driven to victory by Gonzalez and of Mr Kimberly in practice in 0394AM at March Field in 1954. Mr Swaters also exhibits a Ferrari Market Letter from March 1986 which includes a photograph with the caption: *"Jim Kimberly's 375 Plus S/N 0394. Car did not finish the 1954 24 Hours of Le Mans, with Paolo Marzotto and Umberto Maglioli."* The text of the letter states: *"Attempting to put together the individual history for each car requires a heavy reliance on the physical appearance of the cars. Until recently, given the fact that S/N 0384 was not believed to have been a 375 Plus and S/N 0386 had been destroyed, it was fairly simple-only S/N 0394 had the streamlined nose. But now S/N 0384 can lay claim to the same feature."*

56.     What emerges from those articles is that, at the time of the sales contract, there was considerable confusion, even among the specialists, as to what the chassis numbers were of the 375 Pluses, whether 0384AM and 0394AM was the same car, which 375 Plus had won which race and which 375 Pluses had survived into the 1980s. This provides an illuminating background to two allegations made by Ms Lawson and/or Mr Ford, that the sale to Mr Swaters and Mr Lancksweert at a price equivalent to about U.S. $100,000 was at a substantial undervalue and that Mr Swaters concealed the true identity of the Car by describing it as 0394AM.

57.     So far as the first of those allegations is concerned, this was strenuously denied by Mr Lancksweert in his evidence. In his witness statement he says that the price they paid reflected the wrecked condition of the chassis and the risk they were taking that the wreck might not turn out to be one from the famous car. In support of that he refers to Mr Swaters' affidavit. In cross-examination, Mr Ford put to him that the price at which Mr Kruch bought from Mr Anderson of U.S. $4,500 was an absurdly low price, to which his response was: *"it is a low price but nothing to do with us. We paid the right price for a wreck"*. Given the uncertainty as to whether the wreck was the car raced by Maglioli at the Mille Miglia and by him and Marzotto at Le Mans and by

Gonzalez at Silverstone and the physical condition of the chassis at the time of purchase, I am quite satisfied that the price paid by Mr Swaters and Mr Lancksweert of 3,500,000 Belgian francs was a reasonable and fair price as Mr Lancksweert maintained, and not a purchase at an undervalue. As I have already found, I reject the case advanced by Ms Lawson and Mr Ford based upon some undisclosed and untested expert evidence in the U.S. criminal proceedings that the chassis was worth U.S. $500,000 at the time of the purchase by Mr Swaters and Mr Lancksweert in March 1990.

58.     Despite Mr Ford's assertion in his submissions that Mr Swaters was aware, at the time of the purchase in March 1990 and thereafter, that the wreck was definitely that of 0384AM and that he then deliberately concealed its true identity by describing it as 0394AM, the contemporaneous correspondence belies that suggestion. In his witness statement Mr Lancksweert describes how he and Mr Swaters were aware of Mr Kleve's claims and after the purchase did not want Mr Kleve to continue to make allegations about the Car and try to damage their reputation. He describes how they approached Mr Kleve to see what they could do to stop him making claims and also to obtain the missing parts for the Car such as the fuel tank if Mr Kleve had them. He describes writing to Mr Kleve direct and through lawyers and how he even went to Ohio to meet Mr Kleve to see if he would be willing to settle his claim that the chassis was his, but at that stage the discussions came to nothing. He found Mr Kleve an odd man to deal with, quite eccentric.

59.     This evidence of Mr Lancksweert was not challenged in cross-examination and is borne out by the contemporaneous correspondence. On 26 March 1990, Mr Lancksweert wrote to Mr Kleve on Garage Francorchamps notepaper with a Ferrari logo a letter which confirmed that Ferrari of Belgium (clearly a reference to Garage Francorchamps) in addition to paying him a sum of money for the frame of the car would feature him and his assistance in the recovery of the car in the history to be written after the car had been restored at the Ferrari factory and subsequently exhibited at the Ferrari Museum in Brussels.

60.     At about the same time, on 2 April 1990, New York attorneys acting for Mr Swaters and Mr Lancksweert wrote to Mr Kleve. Criticism is made by Mr Ford of the fact that the letter stated: *"As you know I represent Ferrari"* as somehow misrepresenting the position. There is no basis for that criticism. Garage Francorchamps was the exclusive representative of Ferrari in Belgium and this statement presumes that Mr Kleve knew who he represented. There is no evidence Mr Kleve was misled. The letter went on to offer him U.S. $85,000 for the title to the car, stating that for that sum Ferrari would also expect his assistance in locating other parts from the original car and in providing his knowledge of its history.

61.     Mr Ford submitted that the fact that, within days, Mr Lancksweert was prepared to offer Mr Kleve U.S. $85,000 for the Car demonstrated that the sale contract with Mr Kruch was at an undervalue. In my judgment, that submission is based upon a misapprehension. The offer of U.S. $85,000 was clearly made on the basis that Mr Swaters had already purchased the chassis from Mr Kruch for the equivalent of about U.S. $100,000, so that that offer of U.S. $85,000 was the price for buying out Mr Kleve in respect of his claims to the Car, together with purchasing the spare parts he had. That offer has no bearing or relevance to the price Mr Swaters was prepared to agree for the chassis.

62.     Mr Lancksweert explains the reasons for these approaches to Mr Kleve in his witness statement:

>       *"We did not doubt that we had title to the Car, but we were prepared to see what we could do so that Mr Kleve would not continue to make claims about the Car, which, as far as we were concerned were not correct. Of course at the time we had bought only the chassis. It was damaged and incomplete. It was missing the parts such as the fuel tank. If there were spare parts retained by Mr Kleve it made sense to reunite these with the chassis even if their true value was low or doubtful. That was why we approached Kleve in 1990..."*

63.     That explanation makes perfect sense and again was not challenged by Mr Ford in cross-examination. The correspondence certainly does not suggest that Mr Swaters and Mr Lancksweert knew the chassis was stolen, only that Mr Kleve was claiming it was his. Also that correspondence belies the suggestion that they were concealing the Car from Mr Kleve. They were quite open about their intention to restore the Car at the Ferrari factory in Italy then exhibit it in the Ferrari Museum.

64.     At around the same time, there was correspondence about the Car between Mr Swaters and a well known Ferrari expert in the United States, Mr David Seibert, editor of Prancing Horse Magazine. Mr Seibert sent a fax to Mr Swaters on 3 April 1990 saying he was fairly certain that 0384AM was the car driven by Marzotto in the 1954 Mille Miglia where it crashed. He said he had a copy of the assembly sheets indicating the car was revised for the Carrera Messicana run in November 1954, but he did not believe it ran in the race. He continued that, as Mr Swaters knew, the car ended up near Cincinnati, Ohio in a field with a number of other cars, all apparently owned by Mr Kleve. Mr Seibert then set out some of the history of the theft of the vehicle, some of which subsequently proved inaccurate. The only significance of what Mr Seibert said for present purposes is that it would suggest to someone in the position of Mr Swaters in Belgium that the history was confused but that, although the car may well have been stolen at some stage, if he had purchased in good faith, as I have held that he did, he would be the owner. Indeed, having referred to the fact that none of those charged in the United States criminal proceedings made any claim to ownership, Mr Seibert himself stated: *"It is possible that a subsequent 'purchaser' in Europe may be able to make some claim of having purchased the car in good faith, and therefore has some ownership interest."*

65.     Mr Swaters' response on 4 April 1990 to this fax was enthusiastic:

>       *"Thank you very much for your fax of yesterday. What a wonderful documentation you sent me. This will help me a lot for the negotiation and for the rebuild of this car. ...*

>       *Don't you think that this car, which is definitely the 0384 is the car that was entered by Ferrari at the Mille Miglia for Maglioli at the Le Mans Marzetto/Maglioli and Silverstone Gonzales?*

> *At the three events Ferrari entered the car under the number 0394. But 0394 according to the factory was never build, was only an engine sold to Vandervell/Whitehead.*
>
> *According to Ferrari documentation, 0384 was rebuild 1954 Sept 2 and sold to Kimberly.*
>
> *On the chassis of this car you can found the number 03?4. The ? is for sure either a 8 or a 9. That's why I think it possible that, by mistake they entered 0384 at the Mille Miglia, Le Mans and Silverstone under the number 0394.*
>
> *Last week I was in Maranello and looked through the archives and found:*
>
> *0384 KIMBERLY*
>
> *0392 GOLDSMITH*
>
> *0396 EDGAR*
>
> *0398 VALIENTE*
>
> *0400 DESTROYED BY THE FACTORY*
>
> *Do you know what happened between KIMBERLY and KARL KLEVE (Cincinnati)??"*

66.     This information was evidently derived from Mr Swaters' own researches into the history of the Car, both from the various publications which he exhibited to his affidavit twenty years later and in the Ferrari archives. This version of the history contradicts what Mr Seibert was fairly certain about in his fax, as Mr Seibert admits in his subsequent fax referred to below. Mr Ford alighted on the statement by Mr Swaters in his fax that the car *"is definitely the 0384"* as demonstrating that he knew that the car he had bought was 0384AM stolen from Karl Kleve and he had actively sought to conceal its identity thereafter by misdescribing it as 0394. In my judgment, the fax demonstrates nothing of the kind, only the obvious enthusiasm of a Ferrari expert who hopes he has purchased the chassis of a famous car, although there are still doubts as to whether it really is 0384. As Ms Swaters said when Mr Ford suggested to her in cross-examination that her father had sought to conceal the identity of the Car: *"I remember my father didn't know which number it was due to the Sabena x-ray and he was obsessed with knowing the truth"*. In that context, it is also striking that, in their report in February 1996 the FBI state: *"From 0384's first race it was mistakenly identified by sports writers as 0394AM and is still historically identified in motorsports literature as 0394AM."*

67.     Mr Seibert responded to Mr Swaters' fax the following day saying that: *"if this chassis really 'owns' the history usually ascribed to 0394, many questions might be answered. My belief that 0384 was the Marzotto car (crashed) from the 1954 Mille Miglia was based on the assumption that 0394 was a different car, that the car crashed by Farina was 0386 and that Marzotto was driving a 4.9 liter car. By process*

*of elimination this would most likely have been 0384. If, instead, this is the car which is usually described as 0394, then its history would include the Maglioli entry at the 1954 Mille Miglia. Marzotto and Maglioli at Le Mans and Gonzalez at Silverstone. The car would then have been sold to Jim Kimberly who sold it to Howard Hively of Cincinnati, Ohio. Another interesting fact, tending to support your theory, is that I have data sheets for several 375 Pluses: 0384, 0392, 0396 and 0398. These seem to be the only ones sold from the factory, if 0400 was destroyed and 0394 was only an engine. On the other hand, if the Maglioli MM car was 0384, then I'm not sure of the identity of the Marzotto car-could it perhaps have been 0400?"*

68.     Mr Swaters responded the next day saying he had asked Ferrari to search in the old documentation for something more *"and at actual point they think 0394 may have existed and been sold with another engine and that engine 0394 have been sold to Vandervell. They are specially trying to find the original invoice to Kimberly."* I have referred extensively to this correspondence to demonstrate that, contrary to Mr Ford's assertion, there was no certainty about the precise identity and chassis number of the Car. Rather, here were two Ferrari enthusiasts swapping theories on the subject.

69.     On 11 April 1990, Mr Swaters faxed Mr Seibert to say his attorney, Nick Ackerman, who was trying to buy 0384 for him from Mr Kleve, had spoken to a William Victor who was a good friend of Mr Kleve. Apparently Mr Kleve would never sell to a trader but would sell to a real Ferrari Museum and Mr Victor was ready to convince him. The problem was Mr Victor did not know Mr Swaters and was not convinced he would restore the car with the help of the Ferrari factory for final destination in a Ferrari Museum. Mr Swaters asked Mr Seibert to speak to Mr Victor to explain the story of Mr Swaters and Garage Francorchamps.

70.     Mr Seibert then spoke to Mr Victor, as recorded in his fax to Mr Swaters also on 11 April 1990. Mr Victor worked for a Mr Stegman, a Ferrari collector, and he was familiar in general terms with Mr Swaters and his cars. He and Mr Stegman both knew Mr Kleve well and described him as eccentric. He doubted whether Mr Kleve would sell as he wanted to start his own museum. He referred to Mr Kleve having many parts of the Car including the gas tank, the other wheel and the steering assembly.

71.     Mr Swaters responded on 12 April 1990 thanking Mr Seibert for his help. He summarised the situation in these terms:

> 1.     *I would like very much to buy the car and rebuild it with the help of the Factory, make clear the situation, 384 or 394 and keep it in the future museum. I think this car is worthwhile.*
>
> 2.     *I have already spoken with the factory and they agree to help me to found the real story and to rebuild the car.*
>
> 3.     *The man who owns the car in Belgium is ready to sell to me the car, because he realises he will never be able to rebuilt the car, but he is a trader and is asking 1.000.000 US $ towards the Belgian law, he is the real owner, because he bought it in good faith, imported it regularly, paid the taxes...*

4. *Before to reach at an acceptable deal with the actual legal owner in Belgium, I want to make an acceptable agreement with Karl Kleve.*

5. *If I don't buy the car, the actual owner for sure will sell it to another trader. I think that Lamplough [a dealer whom Mr Seibert had said had been in Cincinnati and offered Mr Kleve US $800,000 for the car] wants to pay 500.000 US $ for the car but he wants the ownership and physically the remain of the chassis."*

72.     Mr Seibert replied on 17 April 1990 and said he supported Mr Swaters' attempt to buy the Car from the Belgian owner as well as from Karl Kleve. He would like to see the Car restored and believed Mr Swaters was the person to do this. He said that legally he suspected that by international law and Belgian law, the owner in Belgium had the right to sell the Car to him, even though it was stolen prior to purchase. From talking to Mr Victor he believed Mr Kleve did not understand this and believed his car was going to be returned to him and only he had the right to sell it. Mr Seibert did not believe that he could explain the matter to Mr Victor and Mr Kleve in such a way that they would accept his representations. Mr Swaters' attempts to buy Mr Kleve's title via Mr Seibert seem to have ended there.

73.     Mr Ford relied upon Mr Swaters' fax of 12 April 1990 quoted at [71] above as evidence that Mr Swaters had not in fact purchased the chassis at that date and that therefore the sale contract of 16 March 1990 was not genuine, but in effect a sham. The fax of 12 April 1990 is certainly a curious document, but on the other hand, an allegation that the sales contract was not genuine or a sham is an allegation that the signatories of that contract, namely Mr Kruch, Mr Swaters and Mr Lancksweert were acting deceitfully: (see the classic definition of a "sham" by Diplock LJ in *Snook v London and West Riding Investments Limited* [1967] 2 QB 786 at 802C-E). Whilst Mr Ford cross-examined Ms Swaters about the fax of 12 April 1990 and put his case to her, notwithstanding that, since she was not involved at the time, she was unable to throw any light on what was going on, he did not put the fax or his case to Mr Lancksweert who was the one person giving evidence, who not only signed the allegedly sham contract, but might have been able to provide an explanation for Mr Swaters' fax. In view of that omission to put the allegation to Mr Lancksweert, I would be extremely reluctant to conclude that he had participated in a sham and, indeed, given the potential adverse effect on his reputation of such a conclusion, I consider it would be quite wrong to reach that conclusion.

74.     Quite apart from that difficulty for Mr Ford's case, the question remains what is the most likely explanation for the fax of 12 April 1990. In my judgment, the most likely explanation is that, for whatever reason, Mr Swaters did not want Mr Seibert to know he had already purchased the chassis from the Belgian owner. Mr Ford's case that the fax represents the true position, namely that he had not purchased the Car at that stage so that the sales contract was not genuine is frankly implausible. That case must involve the sales contract having been created subsequently to make it appear that Mr Swaters had purchased the chassis in March 1990. However, if that is right, why on earth fabricate a sales contract document with a price appreciably lower than the price at which the 12 April 1990 fax states that the Belgian owner was prepared to sell. Surely if any contract was being fabricated subsequently, it would have contained a price which was the same as the U.S. $1 million referred to in the fax or more, particularly since, on this hypothesis, those who fabricated the sales contract

document were not acting in good faith and would have been anxious to avoid any suggestion of a sale at an undervalue. Furthermore, the manuscript notation on the invoice referred to at [39] above is clear evidence that the price of 3,500,000 Belgian francs was paid by Mr Lancksweert at the time, a strong indication that the sales contract was made on 15 March 1990 and is genuine.

75.     Accordingly, as I have said, it seems to me that the far more likely explanation is that the sales contract was genuine but that, for whatever reason, Mr Swaters did not want to tell Mr Seibert that he had already purchased the chassis. Obviously that gives rise to the question whether that subsequent conduct (which would otherwise be irrelevant to the question of whether Mr Swaters purchased in good faith as a matter of Belgian law on 16 March 1990) indicates lack of good faith as at 16 March 1990. In circumstances where Mr Lancksweert, who as I have said, might have been able to provide a legitimate explanation, was not asked about this in cross-examination, I would be extremely reluctant to conclude that the fax was indicative of lack of good faith.

76.     Aside from the issue of price which I have dealt with, Mr Ford's principal point as to lack of good faith is that Mr Swaters was trying to conceal from Mr Kleve the whereabouts of the Car. Given that part of the context of the correspondence with Mr Seibert was a negotiation with Mr Kleve for the purchase of his rights, any suggestion that the fax of 12 April 1990 was designed to conceal the whereabouts of the chassis from Mr Kleve is entirely fanciful. The approaches to Mr Kleve by Mr Swaters, Mr Lancksweert and the U.S. attorneys made it quite clear that Mr Swaters and/or Mr Lancksweert had physical possession of the chassis, so that there is no question of them trying to conceal the Car or its provenance from Mr Kleve. In my judgment, the suggestion that Mr Swaters tried to conceal the true position as regards ownership or the location of the Car from Mr Kleve is unsustainable.

77.     Mr Ford also alleged that Mr Swaters subsequently tried to conceal the whereabouts of the Car when he had it shipped to Ferrari in Italy for the repair and restoration work in 1991 and 1992 because all the invoices and shipping documents described the Car with chassis number 0394. This allegation is fanciful in the extreme. There was genuine uncertainty as to the identity of the Car and it does seem to have been interchangeably described as 0394 or 0384. The continuing confusion as to the identity of the Car and as to chassis numbers appears from the FBI letter to Ferrari of 6 October 1994: *"During the August 1992 FF-40 exhibition sponsored by Garage Francorchamps, Francorchamps owner Jacques Swaters displayed a newly restored 375 Plus, reported to be chassis number 0394AM. This vehicle is an exact duplication of the Umberto Maglioli, Froilan Gonzalez, Paolo Marzotto, Jim Kimberly and Howard Hively car with its distinguishing notched headrest, sloping front and headlights, and overhanging front, universally referred to in racing periodicals as 0394AM but which now appears to be the stolen 0384AM of Mr Kleve's"*. There is nothing in the suggestion that Mr Swaters was trying to hide the Car from Mr Kleve or anyone else. He was open about and understandably proud of his restoration project.

78.     In the circumstances, nothing in Mr Swaters' subsequent conduct has any bearing on his good faith at the time of his purchase of the chassis in March 1990 and, in my judgment, he obtained good title to the chassis as a matter of Belgian law in March 1990. Furthermore, although Mr Kleve had some correspondence with the U.S.

Embassy in Brussels in April and May 1990 seeking their assistance in recovering the chassis from which it is pretty clear he knew Mr Swaters had the chassis, he did not commence proceedings in Belgium for revindication within three years of the theft or at all, notwithstanding that he received advice from a Belgian lawyer, Mr Paramore. Accordingly, on any view, Mr Swaters had good title as a matter of Belgian law from 13 January 1992.

Events leading up to the Settlement Agreement

79.   The restoration of the Car undertaken by Mr Swaters was a long and expensive process. As the FBI recorded, in August 1992 the Car returned to Belgium from Italy and was exhibited at an event to celebrate the 40th anniversary of Ferrari Francorchamps, which was attended by individuals from Ferrari in Italy. In all, including the subsequent purchase of the original engine, Ms Swaters and her father have spent some £637,500 restoring the Car.

80.   In December 1994, Mr Lancksweert left Garage Francorchamps to work for Ferrari in the United States. As part of his exit deal, Mr Lancksweert and Mr Swaters agreed to divide their interest in the Car equally.

81.   Although Mr Kleve made no claim to the ownership of the Car in Belgium, in Ohio he made a series of applications to the Ohio authorities to have issued to him a number of 'certificates of title' (dated 24 March 1994, 16 March 1995 and 21 March 1997) recording that he was the purported owner of the Car. I agree with Mr Eschwege that these documents are irrelevant to the analysis of ownership. I accept the evidence of Mr Lenox that possession of an Ohio certificate of title cannot of itself confer ownership of a vehicle. The certificates of title cannot apply to the chassis, which was in Belgium, and cannot apply to the spare parts, which do not in themselves fall within the scope of the Ohio Certificate of Motor Vehicle Title Act, which only applies to a "motor vehicle" as defined. The spare parts do not fall within that definition.

82.   On 5 April 1995, Mr Kleve appointed Mr Mark Daniels of NSS as his agent to recover the Car. He entered into arrangements to pay NSS a commission if the Car was recovered which was set out in a Contract dated 23 August 1995 as 30% with all costs included in the fee, although informants' fees were not to exceed U.S. $250,000, to be paid at the time of final disposition (liquidation, settlement or return of the property to Mr Kleve). Mr Kleve signed a series of powers of attorney giving Mr Daniels authority to act on his behalf in relation to the Car, in particular Limited Powers of Attorney dated 6 March 1997 and 28 October 1998.

83.   The Power of Attorney dated 6 March 1997 seems to have been given in anticipation of discussions which took place between Mr Daniels and a Doug Freedman who acted as an intermediary between Mr Daniels and Mr Swaters. Apparently in anticipation of a possible settlement, on 21 March 1997, NSS was registered with the Ohio court (as recorded on the certificate of title granted to Mr Kleve that day) as first lienholder of the Car, the lien presumably being in respect of any fee or commission due to NSS if there was a settlement. However, whatever discussions took place in March 1997 came to nothing. It was not until the spring of 1999 that serious negotiations to resolve the dispute as to ownership took place.

84.    Mr Swaters appointed Mr Lancksweert, who was then living in Los Angeles, as his agent in the negotiations. In due course, Mr Swaters executed a document headed "Designation of Agent" which designated Mr Lancksweert as agent on behalf of the business partnership between them with due authority to take all necessary actions and execute and deliver all necessary documents to consummate the transaction contemplated under the Settlement Agreement between Mark Daniels, Karl Kleve and Mr Lancksweert.

85.    Mr Daniels acted on behalf of Mr Kleve. Mr Lancksweert instructed the New York law firm Seyfarth, Shaw, Fairweather and Geraldson ("SSFG") to act for him and negotiate with Mr Daniels. As he explained in his evidence, SSFG vetted and arranged all the documents, formalities and payment mechanisms. This is an important reality check as regards the plausibility of many of Ms Lawson and Mr Ford's multitude of arguments as to why the Settlement Agreement was not valid and binding on Mr Kleve. If they are right, then SSFG were negligent at best, possibly worse. It is inherently unlikely that experienced New York lawyers would not have satisfied themselves, for example, that Mr Daniels was authorised to enter into the Settlement Agreement and that any documents he presented were genuine.

86.    Drafts of the Settlement Agreement and associated documentation were being negotiated by April 1999. This is apparent from a fax of 29 April 1999 from Mr Steven Greenspan of SSFG to Mr Daniels, enclosing the "attached revised Settlement Agreement, General Release and Covenant not to Sue for both Karl Kleve and yourself and the Bill of Sale". In that draft the settlement amount is recorded as U.S. $750,000. Mr Lancksweert's evidence is that that was the figure he and Mr Swaters were prepared to offer. Although Mr Ford sought to make much (by reference principally to telephone conversations between Mr Daniels and Mr Kleve which Mr Kleve recorded and to which I return in more detail below) of the suggestion that Mr Kleve was only prepared to settle for U.S. $3 million, Mr Lancksweert's evidence, which I accept, is that no-one ever told him that Mr Kleve wanted U.S. $3 million.

87.    On 16 June 1999, Mr Daniels faxed Mr Nathaniel Akerman of SSFG sending revised agreements, saying: *"After much discussion with Karl, this is what he has agreed to and has already said has or will be executed."* The attached agreements were essentially in the form eventually signed by the parties. The amount of the settlement (which was to be paid by Mr Lancksweert into an escrow account) is left completely blank on the first page of the Settlement Agreement faxed on that occasion.

88.    On 23 June 1999, SSFG sent the draft agreements back to Mr Daniels with a number of suggested amendments in manuscript, including a modification to the "Transfer Documents" Mr Kleve would be required to deliver pursuant to clause 2, to include the original VIN plate. This presented Mr Kleve with a problem, since he could not locate the original VIN plate. It had not been stolen with the chassis, since as noted above, prior to that, it had been ripped off by vandals, but he could not locate it. In due course, at Mr Daniels' suggestion he reported it to his local police in Green Township, Cincinnati, Ohio, as recently lost or stolen and also swore an affidavit to that effect which was provided to SSFG.

89.    On 16 July 1999, Mr Kleve appeared before Denise Schmidt, a notary public in Ohio, and signed the Settlement Agreement. The notarisation stated: *"Before me, the undersigned authority, on this day personally appeared KARL KLEVE known to me to*

*be the person whose name is subscribed in the foregoing. GIVEN UNDER MY HAND AND SEAL THIS 16 DAY of JULY 1999".* The Settlement Agreement which he signed consisted of three pages and, as I find, in all probability, at the time of his signature, the settlement amount on the first page was left blank. This not only accords with the fact that the amount was still to be negotiated between Mr Daniels and Mr Lancksweert, but is borne out by the expert opinion of the forensic document examiners, to which I refer below. On 19 July 1999, the Settlement Agreement was then signed by Mr Daniels *"Acting Agent (Attorney in Fact) for Karl Kleve and as corporate officer of National search Services"* before Eric Salani, a notary public in Florida, who subscribed the same rubric as set out above.

90.    On 27 July 1999, SSFG sent Mr Lancksweert a draft of an escrow agreement pursuant to which SSFG would act as escrow agent. Under clause 1 of the draft Settlement Agreement (and indeed of the executed Agreement) Mr Lancksweert was to pay the settlement amount into the escrow account, from where, under clause 2, it would not be released until Mr Daniels had delivered executed Transfer Documents. Mr Ford pointed out that the draft escrow agreement set out the documents that Mr Daniels was to present at closing of the transaction, including *"Letter of Authority from Kleve authorising Daniels to enter into the transaction contemplated under the Settlement Agreement"*, but no such letter had ever been produced. I do not regard that as in any sense suspicious, given the width of the Power of Attorney which Mr Kleve undoubtedly did sign, as referred to below. SSFG also sent Mr Lancksweert a draft amendment to the Settlement Agreement to deal with keeping it confidential. That draft amendment also stated: *"Mr Karl Kleve and the current owner of the 1955 Ferrari 375 Plus serial number 0384AM have reached a mutually satisfactory settlement with regard to the sale of the automobile. As a result of the settlement, all claims with regard to ownership of the automobile have been resolved."* In due course, that amendment was signed by both Mr Lancksweert and Mr Daniels on behalf of Mr Kleve.

91.    On 31 July 1999, Mr Lancksweert faxed back to Mr Greenspan of SSFG the signed escrow agreement and amendment. He asked Mr Greenspan to check with Mr Daniels if he could provide all the requested documents. He stated: *"We should find an agreement on the amount within 48 hours"*.  On 5 August 1999, Mr Lancksweert telephoned Mr Greenspan to say that, in light of the missing VIN plate and certain original parts (for example the front bonnet and the fuel tank) the parties had agreed to adjust the settlement amount downwards from U.S. $750,000 to $625,000. Mr Lancksweert explained this in his witness statement: *"Jacques and I had originally been prepared to pay Mr Kleve U.S. $750,000 in order for him to release any claims. However, as far as Jacques and I were concerned the agreement was in relation to the Car as a whole, and the releases were in respect of the Car as a whole. But since the Car was missing the VIN plate and some other parts, Jacques and I thought that there should be a reduction in the settlement price to U.S. $625,000"*.

92.    Although, understandably, in his statement Mr Lancksweert said he could not remember the negotiations in detail, this demonstrates that, at around that time at the beginning of August 1999, Mr Daniels told Mr Lancksweert that the VIN plate and spare parts were missing. Ms Lawson and Mr Ford have a pleaded case that Mr Daniels told Mr Lancksweert that the spare parts were stolen, a statement which Mr Lancksweert knew or should have known was false because SSFG had copies of

photographs of the spare parts on display at Mr Kleve's premises and a FBI report listed those parts as not being reported stolen. This is said to be one of the matters that should have put Mr Lancksweert on enquiry so that Mr Daniels did not have ostensible authority. This was always an odd plea, but none of it was put to Mr Lancksweert in cross-examination. In any event the mere fact that there were photographs of the spare parts does not mean that they could not have been stolen subsequently, so that it is difficult to see how it could be said that Mr Lancksweert was put on enquiry.

93.     Furthermore, given that Mr Kleve in fact still had the spare parts, if his agent Mr Daniels did lie to Mr Lancksweert and say that the spare parts had been stolen when they had not, I do not see how that could have put Mr Kleve (and therefore by definition Ms Lawson and Mr Ford) in a better position as regards the issue whether, on the true construction of the Settlement Agreement, Mr Kleve forewent any claims and transferred title to the spare parts. Otherwise, Mr Kleve would have been able to profit from his agent's dishonesty. In cross-examination of Mr Lancksweert, Mr Ford sought to extract from him an admission that, because the price was reduced, the spare parts were excluded from the Settlement Agreement, but in my judgment, although Mr Lancksweert showed some tendency to accept that, the issue whether the Settlement Agreement included the spare parts is ultimately a question of construction for the court.

94.     On 11 August 1999, Mr Daniels faxed Mr Greenspan apologising for the delay, saying that whenever he needed something from Mr Kleve it took ten times longer than it should. He referred to the fact that there was now an affidavit about the VIN plate. In relation to the question of release of his lien, he said that the Head Supervisor Clerk of the Title Division of the State of Ohio had told him that, if he released the lien, it would no longer be valid, which would leave him with some exposure. The procedure was that, once the lien was satisfied by receipt of payment, the lienholder would sign off the lien portion and forward it to the State and the Clerk's Office would stamp it "Cancel". Alternatively, on payment the lienholder would forward Title to the new owner, who would then forward it to the Clerk for cancellation and the Title would be delivered to the new owner's address. This would obviously cause some delay, so Mr Daniels proposed a solution which was that he would forward a lien release agreement and SSFG would then make a wire transfer to NSS whose bank details he set out and once SSFG got the [cancelled] Title back from the clerk, then they would make a second wire transfer or a cashier's cheque payable to Mark Daniels and Karl Kleve for the remaining amount. This is obviously the genesis of the payment of the two cheques.

95.     On 18 August 1999, Mr Kleve appeared before Ms Schmidt the notary public again and signed a Limited Power of Attorney which was notarised by the notary with the same rubric as set out at [89] above. The Power of Attorney constituted and appointed Mr Daniels Mr Kleve's true and lawful Attorney-in-Fact:

> "with power to act in my stead and in my behalf regarding
> Ferrari 375 Plus (Grand Prix Roadster) Chassis No: 0384AM
> With full complete authority and power, including but not
> limited to, investigate, negotiate, present documents, receive
> documents, convey, make endorsements, to sign and swear to
> any document, to perform any act that may be necessary or

*require[d] by United States or International law or regulation...*

*Giving and granting to this Attorney-in-Fact power and authority to do and perform every act necessary and proper to be done in the exercise of any of the foregoing powers as fully as I might or could possibly do, if present, with full power of substitution and revocation, hereby ratifying and conforming all that my Attorney-in-Fact shall lawfully do or cause to be done by virtue of this document.*

*This power shall remain in full force until cancelled in writing...*

*This power shall be binding upon and inure to the benefit of the parties herein, their estate, successors and assigns".*

96. On 23 August 1999, Mr Daniels faxed various documents to Mr Greenspan, including the report from Mr Kleve to his local police department on 17 August 1999, that, at some point in the last year, the VIN plate had been lost or stolen.

97. On 30 August 1999, no doubt in anticipation of the closing meeting that was to take place at SSFG's offices in New York on 2 September 1999, Mr Daniels had a copy of the original 18 August 1999 Power of Attorney certified by a notary public in Palm Beach, Florida where he lived. The notary certified and sealed an Affidavit of Certified Copy which provided: *"I, Beth A Ryan, a Notary Public in and for the State of Florida, do hereby state and certify based on satisfactory evidence and the production of documentation by the presentor, that the attached document is a true and correct copy of the original document personally viewed."* On 1 September 1999, the same notary public certified and sealed an Affidavit of Certified Copy in the same terms in respect of the Settlement Agreement. The copy which she certified now contained the settlement amount of U.S. $625,000, strong evidence that, on or before 1 September 1999, that amount had been written on to the original Settlement Agreement by Mr Daniels.

98. On 1 September 1999, Mr Daniels also faxed to Mr Greenspan copies of the Settlement Agreement (the first page of which had the settlement amount of U.S. $625,000 in his manuscript), copies of three different versions of a General Release and Covenant Not to Sue, to be provided by each of Mr Kleve, Mr Daniels and Mr Lancksweert, an Agreement Release of Theft Status, a Lien Release and a Bill of Sale. On the same day, on 1 September 1999, Mr Daniels faxed Colonel West of the Green Township police department referring to the fact that, at the point that settlement was reached, it would be necessary to remove the vehicle from theft status. Mr Daniels sent as part of the fax copies of the notarised Power of Attorney and Letter of Authority executed by Mr Kleve for his file. He said that if settlement was reached, he would forward a request to remove the vehicle from theft status.

The closing meeting and the agreements signed

99. On 2 September 1999, the closing meeting took place at SSFG's offices in New York. Both Mr Lancksweert and Mr Daniels were in attendance. In his witness statement Mr

Lancksweert said that the meeting went smoothly. He executed the necessary documents. In particular, Mr Lancksweert signed the original Settlement Agreement (with the settlement amount of U.S. $625,000 in it) upon which Mr Kleve and Mr Daniels had already placed their notarised signatures. Mr Lancksweert's signature was notarised by Yvonne Williams a notary public in the State of New York, with the same rubric as set out at [89] above. The notary public also certified a true and correct copy of the original Settlement Agreement. Mr Lancksweert's signature on the Amendment referred to at [91] above and the General Release and Covenant not to Sue from him were also notarised by the same notary public.

100.   Mr Daniels signed the other documents as the Attorney-in-Fact of Karl Kleve, pursuant to the Power of Attorney: the Amendment, the Bill of Sale, the General Release and Covenant not to Sue from Karl Kleve, the Lien Release and the Agreement Release of Theft Status. Mr Daniels also signed the General Release and Covenant not to Sue from himself. His signature on all those documents was witnessed and notarised by Ms Williams, the notary public.

101.   In proof of his authority to act and sign on behalf of Mr Kleve, Mr Daniels produced the copy of the 18 August 1999 Power of Attorney which had been certified by the Florida notary public, together with her Affidavit of Certified Copy in respect of the Power of Attorney. At the closing meeting, Mr Daniels also signed (and his signature was witnessed and notarised by Ms Williams, the New York notary public) an Affidavit which referred to the Power of Attorney dated 18 August 1999 giving him complete authority to convey the Car to Mr Lancksweert and to take whatever action was necessary to convey that property including execution of the various documents. He confirmed in the Affidavit that he had no knowledge of the death or incapacity of Mr Kleve or of any revocation of the Power of Attorney and represented that he had complete authority under the Power of Attorney to convey the Car under the operative sales documentation he was signing and executing that day. He agreed to return any consideration paid to him in the event that his authority under the Power of Attorney did not apply to the transaction.

102.   Mr Ford sought to rely upon the fact that Mr Daniels had provided this Affidavit, evidently at the behest of SSFG, as somehow demonstrating that Mr Lancksweert and SSFG were aware that he did not have authority to enter into the Settlement Agreement or the other documentation. In my judgment, it demonstrates nothing of the kind. It is far more likely that this was the New York lawyers being ultra-cautious in circumstances where Mr Kleve was not at the closing meeting and the Power of Attorney had been signed a fortnight earlier. It is certainly not indicative of knowledge of any defect in his authority.

103.   So far as the terms of the documents signed at the closing meeting are concerned, the Settlement Agreement itself provided in the Recitals:

> "WHEREAS Kleve is the owner of the herein referenced automobile, [of] which was removed from his possession in or about 1989. The automobile described TO WIT

FERRARI 375 PLUS serial number: 0384AM ("Subject Automobile")

Thereafter Kleve retained the services of Mark Daniels/National Search Services to locate and recover the subject automobile, or alternatively negotiate any resolution, disposition or settlement, subject to the satisfactory approval of Kleve and;

WHEREAS Daniels is the corporate officer of National Search Services Inc having encumbrance for services rendered for the benefit of Kleve on the subject automobile and Daniels personally is appointed Attorney-in-Fact holder of a Power of Attorney executed by Kleve, and;

WHEREAS Lancksweert is the agent/representative of the person or entity currently in possession of the subject automobile for purposes of settlement, resolution and disposition of the aforementioned subject automobile and;

WHEREAS the parties are negotiating and acting in their capacity for the benefit respectively of their agency."

104.    The operative provisions of the Settlement Agreement provided inter alia as follows:

1.    THAT as soon as reasonably possible upon execution of this Agreement Lancksweert shall deposit an amount equal to U.S. $625,000 in lawful United States currency in an escrow account ("the Account") satisfactory to Lancksweert, such amounts to be released only upon written direction of Lancksweert after satisfaction of the conditions set forth in section 2 below.

2.    Upon deposit of the escrow amount and written notice to Daniels or a designated representative's verification of the escrow deposit, Daniels shall within two days following such notice, deliver to a designated representative of Daniels executed ownership documents of the subject automobile; to include the Title, Power of Attorney, Letter of Authority, Lien Release and Bill of Sale, all of which have been reviewed by Lancksweert in advance (collectively the "Transfer Documents"). In addition to the Transfer Documents, Daniels and Kleve shall provide a letter certifying that the release of the theft status of the subject automobile and the transfer of good and clear title and executed relevant documents for the benefit of Lancksweert or to any other person or entity as Lancksweert may designate shall be valid and released to Lancksweert upon satisfactory evidence that Lancksweert has deposited the full and complete amount and the receipt thereof, as previously herein indicated in

Section 1. Simultaneously upon release of the Transfer Documents to Lancksweert, the funds in the Account shall be released to Daniels or designated representative. If Daniels fails to deliver the transfer documents and related documents, the funds held in escrow shall be returned to Lancksweert immediately.

3. (a) Kleve and Daniels represent and warrant, jointly and severally, that upon consumation [sic] of the transactions provided for above, Lancksweert, or any other person or entity that Lancksweert may designate, shall have good and clear title to and hold all rights, title and interests in the subject automobile free and clear of any claims, liens or encumbrances.

(b) Kleve and Daniels represent and warrant, jointly and severally, that good and free title to the subject automobile shall be conveyed to Lancksweert free and clear of all liens, claims, charges and encumbrances of any kind or nature.

(c) Kleve and Daniels represent and warrant, jointly and severally, that there are no claims, litigation, actions, proceedings, hearings or other administrative or judicial matters pending or threatened, or third party consents required from any person or entity, which would in any way affect the ownership of the subject automobile.

5  Non Performance or Breach by Lancksweert

Lancksweert expressly agrees that he and/or any person or entity on whose behalf Lancksweert is acting, or any person or entity who is acting on behalf of Lancksweert, breaches or fails to remit the complete and full payment as stipulated herein for the benefit of Kleve and Daniels, Kleve and Daniels withdrawl [sic] any agreements or representations, and shall reserve all rights to the subject automobile, as well as, any and all rights to pursue and necessary legal remedies and action.

9  New York Law

This Agreement will be construed in accordance with and governed by the internal laws of the State of New York without reference to the conflicts of laws principals [sic] thereof.

105.    The Bill of Sale provided that Karl Kleve: *"for good and valuable consideration, the receipt of which is hereby acknowledged, does hereby sell, transfer, convey, assign and deliver unto Philippe Lancksweert ("Buyer")…good and marketable title to the Subject Vehicle (as that term is defined in the Settlement Agreement), free and clear of any and all liens, claims. liabilities or encumbrances of every kind and nature, to have and hold such Subject Vehicle unto Buyer its successors and assigns, to and for its or their use forever"*. The Release of Theft Status provided that Mr Kleve agreed to release the theft status as reported to the Green Township Police Department in the theft report dated 24 January 1989. It is not necessary to set out the terms of the General Releases save to note that they reflected the terms and purpose of the Settlement Agreement to resolve and settle any and all disputes between the parties in respect of the Car.

106.    The Lien Release provided by Mr Daniels provided that *"for good and valuable consideration, the receipt of which is hereby acknowledged, [he] does hereby release any lien, liability and encumbrance"* and then continued in similar terms to the Bill of Sale. In fact, Mr Daniels produced at the closing meeting the 21 March 1997 Ohio Certificate of Title of Karl Kleve which had recorded the lien, with notation by NSS that the lien had been discharged and a stamp from the Clerk of Courts in Ohio dated 26 August 1999 "Lien Cancelled". On the reverse of the Certificate Mr Daniels as Attorney-in-Fact for Mr Kleve warranted that the title was free of all liens. That warranty was sworn to and subscribed by him before Ms Williams, the notary public in New York on 2 September 1999.

107.    At the closing meeting Mr Lancksweert also produced two cashier's cheques drawn on an account with Fidelity Trust Company International dated 2 September 1999, one in favour of National Search Services for U.S. $225,000 and one in favour of Karl Kleve and Mark Daniels for U.S. $400,000. Although clause 2 of the Settlement Agreement provided that the monies were to be held in escrow until Mr Daniels provided the Transfer Documents, since he provided the Transfer Documents and the Certificate of Title with the stamp "Lien Cancelled" on it at the closing meeting, it is apparent that the escrow account did not in fact need to be operated and the cheques were released to Mr Daniels.

108.    On 2 September 1999, Mr Kenneth Crook, the FBI agent who had investigated the theft and subsequent history of the chassis and who had been in contact at various stages with Mr Kleve, sent Mr Greenspan of SSFG a fax confirming that the Car was not currently reported stolen because there was no record of the VIN with the NCIC, the FBI's National Crime Information Center. From this it is clear that Mr Crook knew that the Settlement Agreement was being concluded and it would be surprising, to say the least, if he knew that, but Mr Kleve did not.

109.    It appears that the cheques were presented by Mr Daniels promptly to his bank, since on the cheque in favour of Mr Kleve and Mr Daniels there is an endorsement by him in favour of Mr Kleve on the reverse on which the stamps indicate that this was endorsed at a bank in Orlando, Florida on 3 September 1999. I deal later in the judgment with the suggestion by Ms Lawson and Mr Ford that Mr Kleve did not receive any money.

110.    On 11 November 1999, the Green Township Police Department produced a statement requesting that the case of the theft of the vehicle be cleared due to the civil

agreement (i.e. the Settlement Agreement) reached on 2 September 1999. Again, it would be surprising if this statement from the police was provided without Mr Kleve's knowledge.

Authenticity of the Settlement Agreement

111.    As noted above, until relatively recently, the main case pursued by Ms Lawson and Mr Ford, as set out in Further Information served on 17 April 2015, was that the Settlement Agreement had somehow been fraudulently altered, in particular that the amount of U.S. $625,000 had been substituted in some way for the amount of U.S. $3 million which it was alleged was originally on the document or that Mr Daniels replaced the original page one of the Settlement Agreement, which bore the figure U.S. $3 million, with a page one bearing the figure U.S. $625,000. There was never any evidence to support this forgery allegation. In particular, Ms Lawson and Mr Ford have never produced a copy of the Settlement Agreement signed by Mr Kleve bearing the figure U.S. $3 million. Although Mr Kleve seems to have faxed a copy of the Settlement Agreement to FBI Agent Crook on 6 June 2000 with the figure of U.S. $3 million filled in on the first page, that copy was unsigned by anyone, so it cannot have been a copy of the document actually signed by Mr Kleve on 16 July 1999.

112.    The case that the Settlement Agreement signed by the parties had been fraudulently altered is comprehensively exploded by the expert evidence of the forensic document examiners. In their joint report, Mr Slyter and Mr Cosslett, who examined the original at different times, agree that there was no evidence of abrasion of the surface of the paper associated with the U.S. $625,000 entry on the first page. They concluded this entry had not been altered. Mr Cosslett examined the document using the ESDA technique to see what indented impressions there were on the second and third pages. He found impressions on both of the amount entry U.S. $625,000 showing that the amount was written on the first page whilst it was above the second and third pages and he found no impressions of any other amount entry.

113.    In my judgment, that demonstrates that the only amount ever entered on the first page of the original as signed by all three signatories was U.S. $625,000, which was almost certainly inserted by Mr Daniels at a time when the first page was stapled to the second and third pages. If the pages had been loose, the impressions on the second and third page of that amount entry would in all likelihood have been slightly blurred. Mr Slyter was able to examine the three staples on the top left hand and concluded there was no evidence they had been removed and that the three pages could not have been changed after they were stapled. By the time of Mr Cosslett's examination the staples had been removed, but there was an entirely innocent explanation for this, that it had been done by staff at Bonhams' solicitors, Jones Day, for photocopying purposes.

114.    Mr Slyter found that the three pages of the original all had the same physical properties and were in all probability from the same stock of paper. He also examined the copy of the Settlement Agreement certified by the Florida notary public, Beth Ryan, on 1 September 1999 and concluded that the Settlement Agreement had not been altered since that certified copy was made.

115.    The suggestion that Mr Kleve signed the Settlement Agreement at a time when page one bore the figure U.S. $3 million and Mr Daniels subsequently swapped that page

one for another page one bearing the figure U.S. $625,000, is implausible in the extreme. It involves the hypothesis that Mr Kleve or someone else inserted the figure U.S. $3 million on the original page one at a time when it was not stapled to or sitting on top of pages two and three, because otherwise there would be some indented impression of that figure on the original page three, which there is not. It seems highly unlikely that the figure would have been inserted on the original at a time when the pages were separated in that way. Furthermore, unless the three pages were being dealt with loose which seems highly unlikely, Mr Daniels could not have replaced the first two pages of the document after they were stapled together, given Mr Slyter's evidence that the staples had not been removed and his conclusion that the three pages could not have been changed after the corner had been stapled.

116.     On the basis of that expert evidence, I consider that, in all probability, when Mr Kleve signed the Settlement Agreement on 16 July 1999, the amount of the first page was blank. That would also be consistent with the fact that at that time negotiation of the settlement amount was still ongoing between Mr Lancksweert and Mr Daniels. Mr Daniels then filled in the amount of U.S. $625,000 on the first page at a later date, in all probability at around the time on 1 September 1999 when Mr Daniels had the copy of the Settlement Agreement notarised in Florida and when all three pages were stapled together. There is no evidence that Mr Kleve ever signed the third page of the original Agreement with any figure filled in on the first page as is borne out by the fact that Mr Cosslett found the impression of the U.S. $625,000 but no other figure on the third page actually signed by Mr Kleve.

117.     In my judgment, the Settlement Agreement is clearly an authentic document which was binding on Mr Kleve if Mr Daniels had authority to enter into the Settlement Agreement and it is to that issue of authority which I now turn.

Mr Daniels' actual authority to conclude the Settlement Agreement

118.     Ms Swaters' primary case is that Mr Daniels had actual authority, conferred by the 18 August 1999 Power of Attorney signed by Mr Kleve. The law of New York on the effect of such a power of attorney as stated by Mr Kiernan is very clear and is essentially the same as English law. It can be summarised as follows. A power of attorney signed by a principal constitutes a grant of actual authority to the agent. The agent designated in the power of attorney becomes the principal's alter ego, with full power and authority to bind the principal within the scope specified in the power of attorney. Where a third party relies on a signed power of attorney, questions concerning the scope of authority that arise from ambiguities in the language of the power of attorney are resolved against the principal in favour of the third party. The Court of Appeals of New York (the highest state court) stated the purpose of a power of attorney in these terms in *Keyes Metropolitan Trust Co* (1917) 220 N.Y. 237: *"The purpose of a written power of attorney is not to define the authority of the agent, as between himself and his principal, but to evidence the authority of the agent to third parties with whom the agent deals"*. Mr Racki seemed to cavil at that principle because the case was decided a hundred years ago, but his unwillingness to accept a basic principle of New York law seemed to me to demonstrate both what an unsatisfactory witness he was and that he was not really an expert on New York law at all.

119. The 18 August 1999 Power of Attorney was clearly in wide enough terms to authorise Mr Daniels to execute the Settlement Agreement and agree the amount of the settlement. It gave Mr Daniels power to act *"in my stead and in behalf regarding"* the Car and gave him *"full complete authority and power" "including but not limited to"* a list of actions, which included conveying, a clear indication that the powers given included to convey title to the Car. Mr Kiernan's evidence, which I accept, is that, as a matter of New York law, the 18 August 1999 Power of Attorney gave Mr Daniels actual authority to bind Mr Kleve to the Settlement Agreement. According to the joint report, Mr Racki was not prepared to give an opinion on that question, a reticence I found distinctly unimpressive.

120. Ms Lawson and Mr Ford seek to challenge the 18 August 1999 Power of Attorney in a number of ways, all of which I consider to be without merit. First they allege in their pleading that Mr Daniels fraudulently altered the Power of Attorney from the one which Mr Kleve signed, but there is absolutely no evidence to support that allegation, which should not have been pleaded. Mr Kleve clearly did sign the Power of Attorney on 18 August 1999, since it was witnessed by a notary public. Mr Daniels then had the Power of Attorney notarised by a notary public in Florida, where he was resident. The statement by that notary demonstrates that she saw the original and was confirming that what she notarised was a true copy. Mr Ford (who as I have said is a non-practising Louisiana attorney) went so far as to assert that it was not open to a notary to do this as a matter of Florida law, which was plainly a nonsensical suggestion made in an effort to overcome an obvious obstacle in his and Ms Lawson's case.

121. Equally, there was nothing in the point which he also advanced that all that was produced by Mr Daniels to the New York lawyers for Mr Lancksweert was the certified copy of the Power of Attorney and not the original. The fact that it was a certified copy establishes that there was a genuine valid Power of Attorney which the notary public had seen, of which she was certifying the copy and that it had not been altered.

122. Second, Ms Lawson and Mr Ford's pleaded case is that Mr Daniels' authority to conclude the Settlement Agreement was circumscribed by a letter of authority signed by Karl Kleve on 18 June 1999. That contains manuscript additions: *"approved by Karl Kleve"* and *"by Karl Kleve"* which are in Mr Timothy Smith's handwriting and which purport to limit Mr Daniels' power to present offers to any counterparty to offers approved by Mr Kleve. Mr Smith claimed in his witness statement that this was done whilst he was on the phone with Mr Kleve. In cross-examination he was unable to say when the manuscript amendments were made although he did not think that he would have altered the letter after Mr Kleve had signed it. Mr Eschwege put to him another copy of the letter with different manuscript, albeit the same words, which he said was also in his handwriting. He was unable to explain why he had added manuscript amendments to two copies of the letter, nor why he had not got Mr Kleve to countersign the amendments, which would have been the usual practice of any competent lawyer. In any event, he was unable to say when the amendments were made.

123. In my judgment, it cannot be safely assumed that these manuscript amendments were made at or around the time that the letter of authority was signed by Mr Kleve, as opposed to at a much later date. As I have said I did not consider Mr Smith a reliable

witness and he has a financial interest in this litigation being determined in favour of Ms Lawson and Mr Ford. However, whenever the letter was altered, it had been and was superseded by the 18 August 1999 Limited Power of Attorney, so that, at the time that the Settlement Agreement was actually concluded on 2 September 1999, the letter of authority (even if the handwritten amendments had been made to it by then) cannot circumscribe Mr Daniels' actual authority which was clearly granted by the later document, the 18 August 1999 Power of Attorney. Furthermore, Mr Lancksweert's evidence, which I accept, is that he neither received nor saw the 18 June 1999 letter of authority at the time of negotiation and conclusion of the Settlement Agreement. That is borne out by the fact that there is no copy of the letter of authority in SSFG's closing file.

124.    Ms Lawson and Mr Ford's pleading also includes a somewhat bizarre allegation that Mr Daniels was unable to produce the Power of Attorney referred to on the first page of the Settlement Agreement, but only the 18 June 1999 letter of authority. In so far as this is a variation on another theme of their case, that Mr Daniels could only have been authorised to conclude the Settlement Agreement by a Power of Attorney in existence at the time when Mr Kleve signed that Agreement on 16 July 1999, the point is based on a wholly misconceived analysis. Whether as a matter of New York law or English law, there was no concluded contract until Mr Lancksweert signed the Settlement Agreement on 2 September 1999 and what matters in terms of the authority of Mr Daniels to conclude a contract on that day is what Power of Attorney he then had, which was, of course, the 18 August 1999 Power of Attorney. The fact that the authority clearly conferred by that Power of Attorney was not given by Mr Kleve to Mr Daniels until after Mr Kleve signed the Settlement Agreement is wholly irrelevant.

125.    Furthermore, since Mr Lancksweert's evidence which, as I have said, I accept, is that he never saw the 18 June 1999 letter of authority, this particular allegation appears to be based on a fundamental factual misapprehension as well. In any event, it was not suggested to Mr Lancksweert by Mr Ford in cross-examination that he did not see the 18 August 1999 Power of Attorney but only a letter of authority.

126.    Third, as I have said, Ms Lawson and Mr Ford have produced transcripts of a number of telephone calls between Mr Kleve and Mr Daniels which Mr Kleve appears to have recorded, according to Mr Smith because he was concerned about being cheated. These calls are relied upon in support of two aspects of their case: (i) that Mr Kleve was only ever prepared to settle for U.S. $3 million and that (ii) there was a limitation on Mr Daniels' authority that any settlement amount had to be approved by Mr Kleve. Generally, I agree with Mr Eschwege's submission that little reliance can be placed on these transcripts. Much of what is said, particularly by Mr Kleve who was by this stage 85 and who was evidently quite eccentric, is confused.

127.    However, what does emerge is that at some stage he and Mr Daniels were intending to trick Mr Lancksweert into signing the settlement documents so that in some way this would amount to an admission which would incriminate him and Mr Swaters, which would assist them in litigation to recover the Car. Thus, on 10 July 1999 Mr Daniels is recorded as saying: *"What I want to do is get these idiots to commit. After they see that you've signed this stuff, get them to sign it, and then I've got those suckers locked"*. Then again on 17 July 1999, he is recorded as saying: *"in this case, with them, being Swaters or his representative, being Philippe, committing to something in*

*written form is a lot better, it holds more water with any type of a litigation or criminal-type pursuit"*. Mr Kleve's reaction in the continuing discussion about committing Mr Lancksweert to signing an Agreement which would be used to try and recover the Car was to say, on 19 July 1999: *"Yeah, we got a win-win situation here"*. This all smacks of sharp practice which does not reflect well on either of them. As a consequence, I am not able to accept at face value what Mr Kleve is recorded as saying after the Settlement Agreement was concluded to FBI agent Kenneth Crook to the effect that he was only ever prepared to settle for U.S. $3 million and that he had not been paid any money by Mr Daniels.

128.    So far as the figure of U.S. $3 million is concerned, it is certainly true that Mr Kleve mentions this figure during the recorded telephone conversations with Mr Daniels, but this seems to be in the context of telling Mr Daniels that he had other prospective buyers for the Car in the United States prepared to pay that sort of money and he seems to have had a hope of pushing up the price by getting the Belgians to compete with these American buyers. This was wholly unrealistic, as Mr Daniels appears to have tried to explain to him. Mr Swaters had possession of the Car, he had good title as a matter of Belgian law and it was he who had incurred the expenditure restoring the Car. It is inconceivable that Mr Swaters and Mr Lancksweert, let alone some buyer in the United States, would have been prepared to pay anything like U.S. $3 million for Mr Kleve's interest in the Car. Whilst the fully restored car in his possession might have been worth that much, his interest in the Car which was not in his possession, or even in the United States, in circumstances where, for whatever reason, he could not even produce the VIN plate or the spare parts, was worth far less than that.

129.    I am also concerned that there may not have been complete disclosure by Ms Lawson and Mr Ford of all the transcripts of telephone conversations between Mr Kleve and Mr Daniels, but only of those which they consider assist their case. It seems to me extremely unlikely that Mr Daniels would have agreed the eventual settlement amount of U.S. $625,000 without having spoken to Mr Kleve about it, told him that this was the best settlement he was going to obtain and secured his agreement to settlement at that level. In those circumstances, I suspect that there were other conversations between them after Mr Kleve signed the Settlement Agreement in blank, the transcripts of which have not been disclosed or for which there are no transcripts, in which Mr Daniels persuaded Mr Kleve to accept settlement at U.S. $625,000. It may be that Mr Kleve did so in the hope that, as he and Mr Daniels had been discussing earlier, he could use the Settlement Agreement in some way in litigation to get the Car back to the United States and to obtain the U.S. $3 million he had been thinking of (or something close to it) and that may explain his subsequent conduct.

130.    Again, this question of Mr Kleve's knowledge that the Settlement Agreement had been executed and his dealings with Mr Daniels are areas where Ms Lawson could have been cross-examined if she had come to give evidence. I find that, in all probability, Mr Kleve did agree to settlement at U.S. $625,000 and did know that the Settlement Agreement had been concluded at that amount. However, even if he did not know and (as I have said is extremely unlikely) Mr Daniels concluded the settlement at that amount without informing Mr Kleve, Mr Daniels had clear actual authority to do so granted by Mr Kleve by the 18 August 1999 Power of Attorney.

131.    It does seem that, under the earlier Powers of Attorney, Mr Daniels was required to obtain the approval of Mr Kleve before concluding any settlement. Indeed this was recorded in the first recital to the Settlement Agreement itself. However, any discussion in the recorded telephone discussions about his authority being limited in that way predates the signature by Mr Kleve of the 18 August 1999 Power of Attorney which did not require his prior approval of a settlement and which Mr Daniels seems to have persuaded him to sign on the practical basis that there would be a problem if he were incapacitated or died. Thus the 18 August 1999 Power of Attorney is the latest in point of time and the one in force when the Settlement Agreement was concluded.

132.    Furthermore, since the 18 August 1999 Power of Attorney provided that it was to remain in force until cancelled in writing, Ms Lawson and Mr Ford would have to establish that there was some written communication causing a reasonable person in Mr Daniels' position to understand that the scope of his authority was more limited than set out in that Power of Attorney. That was Mr Kiernan's evidence as to the position in New York law, which I accept. Ms Lawson and Mr Ford cannot and do not point to any such written communication.

133.    In all the circumstances, the various challenges by Ms Lawson and Mr Ford to the validity and scope of the 18 August 1999 Power of Attorney are without merit. That Power of Attorney was valid and subsisting as at 2 September 1999 when the Settlement Agreement was concluded and, accordingly, Mr Daniels had actual authority to negotiate and agree the settlement amount and to conclude the Settlement Agreement on behalf of Mr Kleve.

Apparent authority

134.    In the circumstances, it is not strictly necessary to consider in detail Ms Swaters' alternative case that, even if Mr Daniels did not have actual authority to conclude the Settlement Agreement on behalf of Mr Kleve, he had apparent authority to do so. However, I will deal with the various matters relied upon by Ms Lawson and Mr Ford as putting a reasonable person in the position of Mr Lancksweert on notice that there was a problem with Mr Daniels' authority, since there is considerable overlap between those matters and the matters they rely upon in support of their assertion that the Settlement Agreement is not valid and binding.

135.    The relevant principles of New York law in relation to apparent authority are very similar to those of English law and can be stated shortly as follows:

(1)    Where an agent acts without actual authority in respect of a transaction, he may nevertheless act with apparent authority where a third party reasonably believes, based on manifestations traceable to the principal, that the agent has authority to act on behalf of the principal;

(2)    Where a principal signs a power of attorney, but separately communicates to the agent that the scope of his authority is narrower than that set out in the power of attorney, the agent will continue to have apparent authority to the full scope of the grant with respect to a third party who is aware of the power of attorney and reasonably relies on the scope of the authority granted therein, but who does not know about the separate limitation.

136.    That second principle of New York law was stated by the New York Supreme Court, Appellate Division in *Neildan Construction v Angona* 619 N.Y.S. 2d. 590 (1994), citing an earlier decision of the Appellate Division in *Grasso v Fiumara* 562 N.Y.S. 2d. 181 (1990) in these terms: *"the third party...was entitled to rely upon the facially valid power of attorney since the circumstances surrounding its presentation would not have put a reasonable person on notice that something was amiss."*

137.    In my judgment, there was nothing suspicious about the 18 August 1999 Power of Attorney, in particular about the fact that Mr Daniels did not produce the original, since he produced a notarised certified copy in relation to which the Florida notary public certified that it was a true copy of the original which she had seen, all of which confirmed that there was a valid Power of Attorney. I have already found that there is nothing in the point that Mr Kleve had signed the Settlement Agreement on 16 July 1999, whereas the Power of Attorney was given on 18 August 1999. The suggestion that any Power of Attorney had to be subsisting at the date Mr Kleve signed the Settlement Agreement is based on a complete misapprehension. There was no contract made until 2 September 1999, when Mr Lancksweert signed the Settlement Agreement and he and Mr Daniels concluded the transaction. Provided that the 18 August 1999 Power of Attorney was valid and subsisting at the date the contract was concluded, which it was, it is irrelevant that the authority conferred by it was not granted until after Mr Kleve signed the Settlement Agreement.

138.    I have also already dealt with the point made by Mr Ford about the fact that Mr Lancksweert and SSFG asked for the affidavit from Mr Daniels effectively warranting his authority and agreeing to indemnify Mr Lancksweert in the event that there was a defect in that authority. In my judgment, asking for that affidavit does not mean that Mr Lancksweert and SSFG knew or were put on notice that there was something amiss with the Power of Attorney. It is inconceivable that, if SSFG had thought that there was anything amiss, they would not have advised Mr Lancksweert not to proceed without further evidence from Mr Kleve himself. All SSFG were doing was protecting their client's position in a particular eventuality, which is not the same thing as knowing or suspecting that eventuality will occur.

139.    Equally, there is nothing in the point upon which Mr Racki sought to place some reliance that there was something suspicious in the lapse of time of 44 days between the signature of the Settlement Agreement by Mr Kleve on 16 July 1999 and the closing meeting on 2 September 1999, which should have put Mr Lancksweert on enquiry. As Mr Daniels said in his fax of 11 August 1999 referred to at [94] above, there does seem to have been some delay in obtaining responses and information from Mr Kleve. Furthermore, Mr Lancksweert readily accepted in evidence that some delay had been caused because he was away on holiday in August. There is nothing remotely suspicious in the lapse of time.

140.    Much was made by Mr Ford of the fact that Mr Lancksweert was asked by Mr Daniels to make payment of two cheques, one to NSS and the other to Mr Kleve and Mr Daniels, in support of his and Ms Lawson's case that this should have alerted Mr Lancksweert to there being some defect in Mr Daniels' authority. There is nothing in this point. The Settlement Agreement signed by Mr Kleve itself provided in clause 2 that the settlement funds were to be released to Mr Daniels or his designated representative, so that Mr Kleve must have understood that the settlement amount in the first instance would be paid to Mr Daniels. Furthermore the provision in the

Power of Attorney that Mr Daniels had full complete authority and power to *"recover, collect and receive all such properties, interests, assets and demands whatsoever"* and *"to take lawful ways and means for the benefit, recovery and receipt thereof by legal process or any other act thereof to be executed"* was clearly wide enough to cover receipt by Mr Daniels of the settlement funds.

141.    In relation to the U.S. $225,000 paid to NSS, that represented 30% of the original settlement amount of U.S. $750,000 and it seems likely that amount of commission would have been due to him under the Contract of 23 August 1995 with Mr Kleve because Mr Daniels had procured agreement to that figure, which was only reduced to U.S. $625,000 because Mr Kleve did not produce the VIN plate or spare parts. The Settlement Agreement referred in terms in the recitals to NSS having an "encumbrance" for services rendered for the benefit of Mr Kleve, clearly a reference to the lien. The closing documents, as I have said, included the Lien Release together with the Certificate of Title stamped with "Lien Cancelled" by the Court clerk in Ohio. There was nothing remotely sinister in Mr Daniels requiring payment to NSS of the commission as a condition of his releasing the lien. Furthermore, Mr Lancksweert's evidence was that when Mr Daniels asked for the U.S. $225,000 to be paid to NSS, he checked with his New York lawyer, who was satisfied from the documents that Mr Daniels could give instructions to that effect, a point on which SSFG were right.

142.    One of the more extravagant allegations advanced by Ms Lawson and Mr Ford is that Mr Daniels stole the settlement funds. This allegation is unsupported by any evidence. I have already said that, as regards the U.S. $225,000 he was entitled to be paid 30% of any sum recovered pursuant to the Contract with Mr Kleve of 23 August 1995, up to a ceiling of U.S. $250,000, which was not exceeded. So far as the balance of the settlement funds, the U.S. $400,000, is concerned, I have already referred at [109] above to the fact that, the day after the Settlement Agreement was executed, Mr Daniels appears to have endorsed that cheque in favour of Mr Kleve, a strong indication that Mr Kleve did receive those funds. I set out in the next section of the judgment the other evidence which supports the conclusion that he did receive the funds. Whilst it is true that, in an affidavit sworn in the Ohio proceedings on 9 July 2010, Ms Lawson states that she went through her father's bank records after his death and there was no payment of U.S. $625,000 or $400,000, she has neither produced the bank records in the present proceedings nor come to court to be cross-examined about her assertion that there was no trace of the payment.

143.    Even if Mr Kleve was not paid, that is a matter between him and Mr Daniels as his agent. It cannot either bring into question the authority of Mr Daniels under the 18 August 1999 Power of Attorney or render the Settlement Agreement invalid. During the course of the trial, Mr Ford advanced a new proposition of New York law (which was not pleaded) and in relation to which Mr Racki produced a Supplemental Report with the permission of the court, that, if an agent is to receive compensation direct from funds payable by the third party to the principal via the agent, there has to be a specific clause to that effect in the Power of Attorney given to the agent. In support of that proposition, Mr Racki relied upon § 5-1505 of the General Obligations Law of New York. However, as Mr Kiernan points out, that provision is in a section of the New York Code dealing with "Financial and Estate Planning" and is only applicable to Powers of Attorney granted in that context, for example in relation to a

testamentary disposition. It is not applicable to a power of attorney granted for commercial purposes, as in the present case.

144. Once that proposition is shown to be a false one, there is nothing in the fact that some of the monies were paid to the agent direct to put Mr Lancksweert on enquiry that there was something suspicious going on. As Mr Kiernan put it, there is no obligation on the third party to determine the amount of any allocation between the principal and the agent. As a matter of New York law, as in English law, that is a matter for the principal and agent *inter se* and does not affect the contractual relationship between the principal and the third party.

145. As set out at [14] above, various other points were pleaded by Mr Ford and Ms Lawson as somehow putting a reasonable person in the position of Mr Lancksweert on enquiry. The first is that the statement by Mr Daniels that the spare parts were stolen was something Mr Lancksweert knew or should have known was not true. As I said at [91] above, the apparent basis for this allegation was that there were photographs of parts on display at Mr Kleve's premises and an FBI report accompanying the photographs in SSFG's closing file. The obvious answer is that none of that dealt with whether the parts had been stolen since the photographs were taken and the FBI report was filed. Furthermore, Mr Lancksweert was not cross-examined about this point. In my judgment there is no basis for the suggestion that he knew or ought to have known that what Mr Daniels said about the spare parts having been stolen was not true.

146. Next a point is taken that the draft agreements sent by Mr Daniels to SSFG by fax on 1 September 1999 had the signatures of Mr Kleve and Mr Daniels himself redacted. It is certainly correct that what was sent by fax did not include the signatures which Mr Kleve and Mr Daniels had put on the document in July 1999, but there may be an explanation for that and in any event, this is a non-point since Mr Daniels produced the Settlement Agreement, with their signatures on it, duly notarised, at the closing meeting the following day. The suggestion that Mr Lancksweert or SSFG having been presented with the signed notarised Agreement should have been in the slightest bit interested in what had been included in the fax the previous day, let alone been put on enquiry, is preposterous.

147. Finally, there is the suggestion that Mr Daniels asked and Mr Lancksweert agreed, that the name of the escrow agent be omitted. This allegation, which was not put to Mr Lancksweert in cross-examination, is incoherent. The Settlement Agreement provided that the monies were to be paid into escrow and SSFG were to act as escrow agent, as was known and understood by Mr Daniels and Mr Lancksweert. In the event, as I have said, it appears that the escrow provisions did not need to be operated.

148. In all the circumstances, in my judgment, there is nothing in any of the alleged irregularities identified by Ms Lawson and Mr Ford which would or should have put a reasonable person in the position of Mr Lancksweert on enquiry that there was something amiss with Mr Daniels' authority to agree the settlement amount and conclude the Settlement Agreement on behalf of Mr Kleve. Had I not concluded that Mr Daniels had actual authority, I would have concluded that he had apparent authority.

Subsequent events after the Settlement Agreement

149. Before considering the question of whether the Settlement Agreement was a valid and binding contract against Mr Kleve and thus against Ms Lawson and Mr Ford as his successors, I should deal briefly with the subsequent events in so far as they are of any relevance.

150. One issue upon which the evidence of subsequent events throws some light is the issue whether Mr Kleve received payment of the U.S. $400,000 settlement amount after the commission of U.S. $225,000 had gone to NSS. I have already referred to the evidence that, on 3 September 1999, Mr Daniels endorsed the U.S. $400,000 cheque in favour of Mr Kleve. Mr Lancksweert's unchallenged evidence was that, about two months after the closing meeting, he telephoned his bank to see if the two cheques had been paid and cleared. He was told that the cheques had cleared, a further strong indication, given the endorsement of the cheque for U.S. $400,000 in favour of Mr Kleve, that the monies were paid to Mr Kleve.

151. One of the transcripts of telephone conversations relied upon by Ms Lawson and Mr Ford is between Mr Kleve and the FBI agent Mr Kenneth Crook on 5 June 2000, during the course of which Mr Kleve seems to be suggesting that the settlement he thought was going to be closed was for U.S. $3 million, that the other number (i.e. the U.S. $625,000) was news to him and that he had received none of the monies. Mr Crook says that his understanding from Mr Daniels was that documents went back and forth to get Mr Kleve's permission and they closed the settlement at what he thought was less than U.S. $600,000. He also refers to being told by Mr Daniels that there was a stipulation that Mr Kleve was to receive another car, a beautiful roadster. In relation to the monies, he said his understanding was there was "a bunch of money in the trust account" and a $340,000 car sitting in a warehouse. It was following that conversation that Mr Kleve apparently gave Mr Timothy Smith an unsigned copy of the Settlement Agreement with the settlement amount filled in on the first page as U.S. $3 million in what Mr Smith said was Mr Kleve's handwriting, for Mr Smith to send it by fax to Mr Crook.

152. On the basis that the figure of U.S. $3 million was filled in by Mr Kleve, the question arises when that was filled in and why. As I have found, at the time that Mr Kleve signed the Settlement Agreement on 16 July 1999, in all probability the settlement amount was left blank. It seems likely that Mr Kleve filled in the figure of U.S. $3 million on a copy of the first page at some later stage. It was certainly not filled in on the original, given the evidence of the forensic document examiners that the amount of U.S. $625,000 had not been altered and that there is no indent of any other amount on the signature page. Given that Mr Smith said that he did not think he had this copy in his file until Mr Kleve gave it to him to send by fax to Mr Crook, it seems to me that it is most likely that Mr Kleve filled in that amount on that copy in June 2000 at the time of his conversation with Mr Crook.

153. As to why he did so, I consider the most likely explanation is that Mr Kleve was trying to convince Mr Crook that he had only ever been prepared to settle for U.S. $3 million. However, as I held at [128] above, any settlement at U.S. $3 million was wholly unrealistic, as Mr Kleve's interest in the Car was worth considerably less than that. That must have been known to Mr Kleve since, as I have also held, it is inherently unlikely that Mr Daniels would have closed the settlement at U.S.

$625,000 without in practice informing Mr Kleve and obtaining his agreement, although the 18 August 1999 Power of Attorney did not require him to do so. The likelihood is that Mr Daniels told Mr Kleve that, without the spare parts and the VIN plate and in circumstances where Mr Swaters and not Mr Kleve had possession of the Car, the best settlement that he could achieve was the U.S. $625,000 being offered by Mr Lancksweert.

154.   The charitable explanation for what Mr Kleve told Mr Crook on 5 June 2000 and for his getting Mr Smith to send the fax of the Settlement Agreement with the figure of U.S. $3 million in it the following day is that he was an old man (by then he was 86 years old) and was confused. A more cynical view would be that, although he knew in September 1999 that there had in fact been a settlement at U.S. $625,000, he remained dissatisfied and convinced he could get more money, he wanted to create the impression that he had only been prepared to settle for U.S. $3 million and that the settlement at U.S. $625,000 was something he had not been prepared to agree. That explanation of what was going on is borne out by Mr Smith's assertion in his witness statement, that he ran into Mr Kleve on the street on about 6 June 2000 and Mr Kleve said he had heard a rumour that people thought he had sold his Ferrari but he had not, which Mr Smith claimed was consistent with what Mr Kleve had told Mr Smith earlier about not being willing to sell for U.S. $750,000 but that he could get U.S. $3 million if he could get the Car back to the United States.

155.   In that context, it is also striking that Ms Lawson exhibits to her 9 July 2010 affidavit in the Ohio proceedings another unsigned copy of the Settlement Agreement with the figure of U.S. $2,500,000 filled in as the settlement amount and with a manuscript alteration to clause 2 to provide that the funds were to be released to "Kleve" or designated representative, not Daniels or designated representative. The provenance of that copy is unclear. It was not in Mr Smith's "Ferrari file", in other words the papers he handed over to Mr Ford in 2010, but in cross-examination Mr Smith claimed to recall that Mr Kleve had told him first of all that he could get U.S. $2,500,000 for the Car, then he had told Mr Smith that the Belgians had offered U.S. $750,000 for the Car but he was going to turn it down, because he could get U.S. $3 million for the Car. I found that evidence implausible.

156.   In my judgment, that copy of the Settlement Agreement with the manuscript amendments, which were not in the original signed by Mr Kleve, was drawn up at some point long after the event to give the impression that Mr Kleve was only prepared to settle on those terms. It does not reflect what was actually agreed. I am fairly sceptical as to whether the conversations that Mr Smith claimed to have had with Mr Kleve did in fact take place, as I found Mr Smith an unreliable witness, but whether they did or not, I consider that, as I have said, Mr Kleve was aware, at the time that the Settlement Agreement was made, that the best settlement amount Mr Daniels could procure was U.S. $625,000 and that the Settlement Agreement had been concluded at that figure.

157.   I also consider that, in all probability, Mr Kleve was paid by Mr Daniels. Quite apart from the endorsement of the cheque and Mr Lancksweert's evidence that both cheques were cashed, at a later stage in February 2005 Mr Lancksweert spoke to Mr Daniels who confirmed that he paid Mr Kleve in part in cash when visiting the bank (which is borne out by the endorsement and the cheques having been cashed) and in

part by giving or selling him a Ferrari 250 for free, which tallies with what Mr Daniels told Mr Crook in 2000.

158. Another reason why it is difficult to accept at face value what Mr Kleve told Mr Crook in June 2000, is that this whole story that Mr Kleve was never prepared to settle for less than U.S. $2.5 million or U.S. $3 million is thoroughly implausible. Quite apart from the fact that, as I have held, those sort of figures were unrealistic and the price being offered by Mr Lancksweert was a reasonable and fair one, Mr Kleve never once approached Mr Swaters or Mr Lancksweert subsequently in the period before his death four years later, to say that he had not agreed the settlement at U.S. $625,000 and therefore demanded that they hand over the Car. He did not complain to them that he had not been paid, nor is there any evidence that he ever made any sort of claim against Mr Daniels.

159. In any event, even if Mr Kleve was not aware of the settlement amount at the time and did not specifically approve it, that is of no relevance where the 18 August 1999 Power of Attorney conferred actual authority on Mr Daniels to negotiate and agree the settlement amount and conclude the Settlement Agreement on Mr Kleve's behalf, irrespective of whether Mr Kleve had given his consent to the particular transaction. Equally, if, contrary to the conclusion I have reached, Mr Kleve was not in fact paid anything by Mr Daniels, that cannot provide Ms Lawson or Mr Ford with any sort of defence. The Settlement Agreement which Mr Kleve signed provided specifically in clause 2 that the funds were to be released to Mr Daniels or his designated representative. That is exactly what occurred, so that Mr Lancksweert provided the consideration as contemplated by the Settlement Agreement. Any issue Mr Kleve had as to non-payment by Mr Daniels was a matter between himself and Mr Daniels as his agent. It could not affect the validity of the Settlement Agreement.

160. Mr Kleve died on 24 December 2003. Ms Lawson was appointed administrator of his estate, of which she and her two sisters were beneficiaries. She lodged with the Probate Court in Ohio an Amended Schedule of Assets of his estate in March 2005. That included at item 9: *"Automobiles and auto parts detailed on Exhibit D attached hereto $86,770"*. Exhibit D listed a number of cars Mr Kleve had owned and Item 31 of the Exhibit was "Miscellaneous Parts" valued at U.S. $25,000. At the end of the Exhibit was a statement signed by Ms Lawson as administrator: *"I certify the above information to be complete and accurate to the best of my knowledge. These values were determined after reviewing Old Cars Price Guide and Old Car Trader valuation guides"*.

161. It is striking that this Amended Schedule of Assets of Mr Kleve's estate did not include the Car, an omission which is some significance not only in relation to Mr Racki's point, to which I refer below, that in some way the validity of the Settlement Agreement should be determined by Ohio probate law, pursuant to which any claim by Ms Swaters would now be time barred, but also in relation to the question whether the claim now advanced by Ms Lawson and Mr Ford that they have ownership in the Car, because Mr Kleve did and retained such ownership on the basis that the Settlement Agreement is invalid, is a bona fide claim. Again the omission of the Car from the Amended Schedule of Assets is an issue on which Ms Lawson would almost certainly have been cross-examined, had she given evidence.

162.    Later in 2005 Mr Swaters and Ms Swaters became aware that Ms Lawson was intending to auction items from her father's estate including the spare parts to the Car, at an auction held without reserve by auctioneers Kruse. The auction notice referred to *"Ferrari 375 parts"*. In August 2005, Mr Swaters' U.S. lawyers wrote to Ms Lawson explaining that the spare parts formed part of the Settlement and sought to collect them. No response was received. However, the auction of the spare parts did not proceed. In cross-examination, Mr Ford sought to suggest that the spare parts were never going to be auctioned at all and were removed from a subsequent auction notice. It was unclear why he was so anxious to deny that the spare parts were put up for auction, possibly it was because the auction was without reserve and that was inconsistent with his case that the spare parts were of considerable value. Whatever the reason for his evidence about this, I did not find it at all convincing.

163.    In December 2006, Ms Lawson sought to offer Mr Swaters title to the Car including the spare parts for U.S. $750,000. As Mr Eschwege rightly submits that offer is completely at odds with Ms Lawson's and Mr Ford's allegation in these proceedings that Mr Kleve's offer price was U.S. $3 million.  Thereafter, Ms Lawson's failure to deliver up the spare parts prompted Mr Swaters and his daughter to commence the Ohio litigation to recover the spare parts which they contend were wrongfully retained by Mr Kleve.

The Settlement Agreement is a valid and binding contract

164.    In my judgment, given that Mr Daniels had actual, alternatively apparent, authority to conclude the Settlement Agreement on behalf of Mr Kleve and that the Settlement Agreement has not been fraudulently altered as Ms Lawson and Mr Ford originally contended, that Agreement was a valid and binding contract which bound Mr Kleve. It settled all the disputes as to ownership and passed title to the Car to Mr Swaters.  I deal with the spare parts and the irrelevant points on Ohio law in the next section of the judgment. Ms Lawson, as the administrator of Mr Kleve's estate and as a beneficiary of that estate, can be in no better position than her father. Mr Ford, who only came on the scene when he purchased a majority share of her interest in February 2010, can only claim through her. None of the various points raised by Ms Lawson and Mr Ford in an effort to impugn the validity of the Settlement Agreement has any merit.

165.    I have already set out earlier in the judgment why, if, contrary to my principal conclusion, Mr Daniels did not have actual authority to conclude the Settlement Agreement, he had apparent authority to do so and why none of the points relied upon by Ms Lawson and Mr Ford would be such as to put a reasonable person in the position of Mr Lancksweert on enquiry. To the extent that the same points are relied upon in support of their case that the Settlement Agreement was not a valid and binding contract (for example the point about there being two cheques, one of them payable to the agent, which rendered the Agreement invalid as a matter of New York law) it is not necessary to repeat what I have already said above. Those points do not make the contract in any sense invalid, any more than they should have put Mr Lancksweert on enquiry as to Mr Daniels' authority.

166.    The point about the lapse of time of 44 days between 16 July 1999 when Mr Kleve signed the Settlement Agreement and 2 September 1999, when Mr Lancksweert signed it and it was concluded was also relied upon by Ms Lawson and Mr Ford as

demonstrating that the offer made by Mr Kleve was not accepted by Mr Lancksweert within a reasonable time as required by the New York Uniform Commercial Code, so that the offer is to be taken to have lapsed so that there was no contract. There are two principal reasons why this is a bad point.

167.    First, although Ms Lawson and Mr Ford refer to "Mr Kleve's 16 July offer" in their pleading, they do not specify what that offer was. Since, as I have found, in all probability the settlement amount on the first page was left blank when Mr Kleve signed it, it cannot have been an offer to settle at any particular amount. The negotiation about the amount of the settlement was between Mr Daniels as Mr Kleve's agent and Mr Lancksweert later in July and in August 1999. There was delay in finalising and closing the Settlement Agreement, in part due to Mr Kleve being slow to respond (as Mr Daniels said in his fax to SSFG of 11 August 1999) and in part because Mr Lancksweert was on holiday in August, but there is no question of the offer made by Mr Daniels on behalf of Mr Kleve not having been accepted within a reasonable time and thus lapsed. In any event, as a matter of New York law, as Mr Kiernan said in his report: *"Mr Daniels' execution of the Transfer Documents pursuant to the terms of the Settlement Agreement after Mr Lancksweert signed the agreement conclusively demonstrated that Mr Kleve's offer remained open under New York law when Mr Lancksweert accepted it by signing an agreement with all the blank terms filled in."* That analysis is clearly correct.

168.    Second, as Mr Kiernan says, the Uniform Commercial Code only applies to an agreement concerning a transaction in goods, which is determined by the agreement's predominant purpose. The predominant purpose of the Settlement Agreement was to settle Mr Kleve's claims to the Car. Accordingly, the Uniform Commercial Code does not apply to this transaction.

169.    Ms Lawson and Mr Ford also contend that there was a breach of clause 5 by Mr Lancksweert because he did not make full payment to Mr Daniels for the benefit of Kleve and Daniels but paid one of the cheques to NSS. This contention is misconceived. As Mr Kiernan explained in his evidence, New York law requires contracts to be read as a whole. Clause 5 must be read with clauses 1 and 2. Clause 2 provides that, upon release of Transfer Documents to Mr Lancksweert, *"the funds in the Account shall be released to Daniels, or designated representative"*. The payment procedures *'stipulated herein'* to which clause 5 refers thus expressly contemplated payment to Mr Daniels' designated representative, which NSS was and the payment was made at his request. In any event, the sum advanced to NSS was in the context of the settlement as a whole for the benefit of *"Kleve and Daniels"*, because without such payment, the lien would not have been released and Mr Kleve and Mr Daniels could not have given the warranties they did in clause 3.

170.    In what is something of an echo of Mr Kleve's apparent intention to use the Settlement Agreement as an admission of some kind by Mr Lancksweert, Mr Ford relies upon the statement in the preamble that: *"Kleve is the owner of the herein referenced automobile"* as some sort of admission by Mr Lancksweert that calls into question the veracity of his evidence that he and Mr Swaters had purchased and acquired good title to the chassis. There is nothing in this point. The recital is merely a statement of the historical position and not some form of admission by Mr Lancksweert and, in any event, the Amendment to the Settlement Agreement signed by Mr Lancksweert and by Mr Daniels on behalf of Mr Kleve, referred to at [90]

above, contains a contradictory statement to the effect that there is a *"current owner"* other than Mr Kleve (i.e. Mr Swaters), negativing any suggested admission. Furthermore, this point of Mr Ford's cannot affect the validity of the Settlement Agreement.

171.    Finally, Ms Lawson and Mr Ford contend that the Settlement Agreement was somehow void for want of consideration because Mr Kleve never received any of the settlement amount. This point is also a bad one for two reasons. First, as I have found, in all probability Mr Kleve did receive the U.S. $400,000. Second, as I pointed out in [159] above, clause 2 of the Settlement Agreement provided specifically in that the funds were to be released to Mr Daniels or his designated representative. This is exactly what occurred, so that Mr Lancksweert provided the consideration as contemplated by the Settlement Agreement which Mr Kleve had signed. Even if, contrary to the finding I have made, he did not receive the funds from Mr Daniels, that is a matter between him and his agent and cannot affect the validity and enforceability of the Settlement Agreement.

Spare parts

172.    As I said at [93] above, the case advanced by Mr Ford on behalf of himself and Ms Lawson was that because, when Mr Daniels indicated to Mr Lancksweert that the spare parts and VIN plate were lost and stolen, the price was reduced from U.S. $750,000 to U.S. $625,000, the spare parts were excluded from the settlement. Although Mr Lancksweert showed some inclination to accept that proposition, ultimately it is a question of construction of the Settlement Agreement whether the "subject automobile" included the spare parts or not.  In considering that question, New York law, like English law, applies an objective approach, looking at the meaning of the language used.

173.    The starting point is that it was plainly the intention of the Settlement Agreement and related documents (such as the Bill of Sale) to transfer the ownership rights to the Car as a whole and resolve any disputes as to ownership. Mr Kleve and Mr Daniels warranted in clause 3 that Mr Lancksweert and any other person he should designate (which would encompass Mr Swaters) would have *"good and clear title to and hold all rights, title and interests in the subject automobile"*. The "subject automobile" (or "subject vehicle" in the Bill of Sale) was defined as "Ferrari 375 Plus serial number 0384AM", clearly a reference to the Car as a whole, not just to the chassis. It would have made no commercial sense for the Settlement Agreement to settle the rights in respect of some parts of the Car but not other parts and if it had been intended to reach such an uncommercial result, it seems to me that the Settlement Agreement would have carved out the spare parts to exclude them and defined the Car differently, either as "the chassis of the Ferrari 375 Plus serial number 0384AM" or as "the Ferrari 375 Plus serial number 0384AM excluding such parts as are retained by Kleve or have been lost and stolen".

174.    The moment one seeks to define how such a carve-out would have been expressed, it can be seen that the "subject automobile" or "subject vehicle" as defined: "Ferrari 375 Plus serial number 0384AM" must include whatever spare parts Mr Kleve had any rights to or interest in. As Mr Eschwege submitted, the chassis and the spare parts make up the Car as it was in 1999 (it being common ground that Mr Kleve did not own or possess the original engine at any time relevant to the present preliminary

issue and that Ms Swaters did not locate and purchase the original engine until 2009). Indeed, in their Amended Defence and Counterclaim, Ms Lawson and Mr Ford describe the spare parts as representing "the original DNA of the Car, which gave it its rarity, authenticity and value". This assertion that the spare parts represented the original DNA of the Car was repeated by Mr Ford in his witness statement. In cross-examination, Mr Eschwege put this assertion to Mr Ford and asked whether, without the spare parts, the Car was not really 0384AM, to which Mr Ford responded: *"Yes it is a replica"*. On that basis, it necessarily follows that, objectively, the transfer of title to the Car effected by the Settlement Agreement and the Bill of Sale included transfer of title to the spare parts.

175.    In my judgment, there is no ambiguity about this in the language of the documents, so that it is neither necessary nor permissible to have regard to the background and extrinsic evidence, but even if it were, this does not assist Ms Lawson and Mr Kleve. The evidence of both Mr Lancksweert and Ms Swaters in their witness statements was that as far as he and Mr Swaters were concerned, the Settlement Agreement was in respect of title in the Car as a whole. Ms Swaters recalls her father saying that the spare parts were part of the deal concluded in the Agreement.

176.    Contrary to Mr Ford's assertion, the reduction in price did not mean the spare parts were excluded from the Settlement Agreement. It simply reflected that since it was being represented that Mr Kleve could not transfer physical possession of them because they were lost or stolen (which was in fact a misrepresentation) the value of the interest he had to transfer was reduced. However, I consider that on the true construction of the Settlement Agreement, he was transferring title and any interest he had in the Car as a whole, so that in the event that the spare parts or VIN plate were located (which in the case at least of the spare parts they were because they had never in fact been lost or stolen) then ownership in them vested in Mr Swaters by virtue of the Settlement Agreement and Bill of Sale.

Irrelevance of Ohio law

177.    The case advanced by Ms Lawson and Mr Ford is that the Settlement Agreement was in some respect invalid or unenforceable as a matter of Ohio law, either because Ms Swaters did not make a claim against Mr Kleve's estate within the six month period following his death imposed by Ohio law, so that the claim is time barred, or because the requirements of the Ohio Certificate of Motor Vehicle Title Act were not complied with, so that there was not a valid conveyance of title to Mr Lancksweert and Mr Swaters. Even if Ohio law were relevant, these points are bad ones, for reasons I will elaborate shortly below.

178.    However, before any consideration of Ohio law could arise, Ms Lawson and Mr Ford face the obvious obstacle that the Settlement Agreement is expressly governed by the internal laws of the State of New York, without reference to New York conflict of laws principles. Mr Racki contends in his report that New York law would defer to Ohio law as regards a claim against the estate and title to the Car, but it is clear that his basis for this assertion (even if it were correct, which it is not for the reasons set out below) involves the application of New York choice of laws i.e. conflict of laws principles. His argument overlooks that the New York law clause in the Settlement Agreement expressly excludes the application of New York conflict of laws principles, so that his argument is fundamentally misconceived.

179. Even if it were permissible to have regard to New York conflict of laws principles, the New York courts would give effect to the choice of law clause and apply New York law to the exclusion of Ohio law. The clear evidence of Mr Kiernan in his supplemental report was: *"New York law and the language of the Settlement Agreement would equally call for application of New York law, not Ohio law, to all issues relating to the effectiveness and validity of the Settlement Agreement".* That proposition is undoubtedly correct and Mr Racki's contrary argument is absurd.

180. His argument rested upon his analysis of two federal authorities. The decision of the District Court for the Southern District of New York (Edelstein DJ) in *John v Sotheby's Inc* 858 F. Supp. 1283 (1994) is a case where the plaintiff contracted with Sotheby's to sell a Rembrandt painting at auction, representing that she owned it. Before the auction a third party came forward claiming to own it and Sotheby's withdrew it from auction. The case concerned the rival claims to ownership. The court found that the plaintiff and her late ex-husband who were resident in Wisconsin purchased the painting in 1960. They were divorced in 1985 and an action was then commenced in Wisconsin for the division of their marital property, in which they entered a stipulation that her ex-husband would not sell the painting. Notwithstanding that stipulation, the ex-husband purported to sell the painting to the third party pursuant to a contract made in June 1985. In November 1989, the plaintiff and her ex-husband entered a Final Marital Settlement Agreement which was approved by the Wisconsin court and which provided that the painting and other paintings should be placed for auction with Sotheby's in New York and the sale proceeds divided equally between the parties.

181. In his analysis set out in his Conclusions of Law, the learned judge, applying the federal diversity jurisdiction, said that he had to determine which law applied to the June 1985 contract between the ex-husband and the third party. It should be noted immediately that there was no express choice of law clause in that contract. Pursuant to the diversity jurisdiction, the federal court had to follow the conflict of laws rules in the place where it was sitting, there New York, under which as the judge found at [7]-[10]: *"the law of the jurisdiction having the greatest interest in the litigation will be applied and…the facts or contracts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict…The Court will apply the laws of the jurisdiction that has the greatest interest in, and is most intimately concerned with, the outcome of a given litigation."*

182. At [11] the learned judge concluded that, although the painting was in New York, the third party was in California and the plaintiff and her ex-husband had been divorced in Nevada, Wisconsin had the greatest nexus to, and interest in, the contract dispute at the heart of the case. His reasons for reaching that conclusion were as follows. The orders issued by the Wisconsin court had a direct bearing on the interpretation of the June 1985 contract. The plaintiff and her ex-husband had resided in Wisconsin, including at the time that contract was made. Following the divorce, the division of the marital property, including the painting, occurred in Wisconsin. The decision of the District Court would impact the property rights of the plaintiff, a Wisconsin resident, and the estate of her ex-husband which was being administered in Wisconsin.

183. Although in cross-examination Mr Racki obstinately insisted that the facts of that case were strikingly similar to those of the present case, in my judgment there is no real

similarity. The relevant contract in the present case was made in New York between a Belgian citizen and a resident of Ohio through an agent resident in Florida. The relevant property was located in Belgium at all material times (with the exception of the spare parts) and the chassis had not been physically in Ohio for more than ten years. In so far as there were probate proceedings in relation to Mr Kleve's estate those did not commence until after his death, in 2005, six years after the Settlement Agreement was concluded. The validity of that Agreement is to be assessed at the time it was concluded, not six years later and, on the basis that it was valid and binding on Mr Kleve at the time it was concluded, ownership of the Car (including the spare parts) had passed to Mr Swaters in 1999 and therefore could not have formed part of his estate. It is striking that Ms Lawson did not list the Ferrari 375 Plus in Schedule D.

184. Furthermore, there is a fundamental distinction as a matter of legal analysis between that case and the present. Here there is a choice of law clause providing that the Settlement Agreement is governed by the internal laws of the State of New York, without reference to its conflict of laws principles. It follows that any court, whether state or federal, considering which law applied to the question of the validity of the Settlement Agreement would apply New York law and would not consider its conflict of laws principles. In contrast the court in *John* was applying those conflict of laws principles, at least in part because there was no express choice of law. In my judgment, the reasoning in that case is of no application to the present case.

185. The other case relied upon by Mr Racki was the decision of the Court of Appeals of the Second Circuit in *Walter E Heller v Video Innovations* 730 F 2d 50 (1984). The plaintiff was a Delaware corporation which leased video equipment from the defendants, who were all resident in New York, pursuant to contracts governed by the law of Illinois, where the plaintiff had its principal place of business. However, before the District Court at first instance, both parties relied primarily on New York law and the judge decided the case on the basis of New York law. One of the issues on appeal was whether he had erred in doing so. In concluding that the judge had not erred, Van Graafeiland CJ giving the judgment of the Court of Appeals stated (omitting the citation of authority in the second paragraph quoted):

> "…both in the court below and in their original briefs in this Court, the parties relied primarily upon New York authorities to support their respective contentions. It is not clear whether the parties did so because they believed that New York law governed or because they believed that there was no material difference between the laws of the two States. Whatever their reasoning, we find no grounds for reversal in the reference to New York law.
>
> Because this is a diversity case, we must apply the choice of law rules of the forum State, in this instance, New York. Although New York courts generally accord deference to choice of law provisions in contracts…such provisions are not controlling and may be disregarded where the most significant contacts with the matter in dispute are in another State. Moreover, in the absence of a strong countervailing public

policy, the parties to litigation may consent by their conduct to the law to be applied."

186.    Mr Racki relied upon this case as authority for the proposition that New York courts adopted the "substantial relationship" approach, which allowed them to disregard an express choice of law, even if the parties had a reasonable basis for it, if the most significant contacts were with another State. Mr Kiernan disagreed, considering that *Heller* was not a case where the court disregarded the parties' choice of law in favour of its own judgment as to with which State the transaction had its most significant connection, but was a case where the parties had chosen themselves to disregard their contractual choice of law and the court held they were entitled to do so. I agree with Mr Kiernan's analysis of *Heller* and consider it is not authority for the proposition for which Mr Racki contends.

187.    In the present case, there is no question of the parties choosing to disregard their choice of law. It is Ms Lawson and Mr Ford who wish, unilaterally, to disregard the express choice of the internal laws of the State of New York and to apply Ohio law through the application of New York conflict of laws principles which the contract says are not to be applicable. In my judgment, this is precisely the sort of situation in which New York courts would enforce the choice of law provision and apply New York law to the construction and validity of the Settlement Agreement.

188.    In any event, even if Mr Racki's proposition were correct, as Mr Kiernan says, Mr Racki has not: *"presented considerations of Ohio interest sufficient to warrant the extraordinary step of disregarding the parties' contractual choice of New York law to govern disputes relating to the transaction."*  The Settlement Agreement was made in New York between a resident of Belgium and a resident of Ohio, the latter acting though a Florida agent. With the exception of the spare parts, the Car had not been in Ohio for more than ten years.  On no view could it be said that the contract or the underlying dispute it was settling had its most significant contacts with Ohio.

189.    It follows that in construing the Settlement Agreement and considering its validity, a New York court would and this court should, applying principles of New York law, disregard Ohio law which is of no relevance to those issues the court has to decide. Even if, contrary to that conclusion, Ohio law were of some relevance, the particular provisions of Ohio law relied upon by Ms Lawson and Mr Ford have no application in the present case.

190.    As I have held, the validity of the Settlement Agreement is to be assessed as at the date it was concluded by reference to its governing law, New York law.  Since the Settlement Agreement was, as I have also held, valid and binding on Mr Kleve from the moment it was concluded, 2 September 1999, and it and the Bill of Sale passed ownership to Mr Lancksweert and Mr Swaters with effect from that date, no part of the Car (including the spare parts) can have formed part of Mr Kleve's estate on his death in December 2003. Ms Lawson's statement as to the accuracy of Exhibit D to the Amended Schedule of her father's Assets forming part of his estate was incorrect. The spare parts did not form part of his estate. As Mr Lenox, Ms Swaters' Ohio law expert, (whose evidence I prefer to that of Ms Lawson and Mr Ford's Ohio law expert, Mr Graf) puts it in his report: *"In Ohio, an asset that is not rightfully owned by the decedent cannot be an asset of the estate."*

191.    As Mr Kiernan observes in his supplemental report, a Probate Court Order in Ohio purporting to approve the transfer of property of an estate cannot determine the ownership of the property if the property was not actually owned by the deceased at death. It follows that any Order of the Probate Court in Ohio Ms Lawson has obtained has no relevance to the question of ownership of the Car (including the spare parts), as such ownership was transferred to Mr Lancksweert and Mr Swaters by the Settlement Agreement and the Bill of Sale four years before Mr Kleve's death and the ownership rights created by those documents cannot be affected by such a court Order.

192.    In those circumstances, contrary to the assertion of Mr Graf, there was no requirement for Mr Swaters and Ms Swaters to present claims as creditors of the Kleve estate and the six month time limit for presentation of such claims is of no relevance. Mr Ford sought to argue in his submissions that the Complaint filed by Mr Swaters and Ms Swaters against Ms Lawson individually and in her capacity as a beneficiary of her father's estate in the Court of Common Pleas in Ohio on 12 February 2010 was such a claim against the Kleve estate. However, it is clear that the claim was being made on the basis that the Settlement Agreement and Bill of Sale had transferred ownership in the entire vehicle, including the spare parts to Mr Swaters through Mr Lancksweert.

193.    As a matter of Ohio law, the claim by Mr Swaters and Ms Swaters, as true owners of the spare parts pursuant to the Settlement Agreement and related documents, against Ms Lawson is not a claim as creditor of the estate so the time limit for such claims does not apply: see the decision of the Ohio Supreme Court in *Lewis v Steinreich* (1995) 73 Ohio St. 3d 299 at 301:

> "When property held by the decedent at the time of her death is actually owned by another from whom possession is wrongfully withheld, such property is not property belonging to the estate and the party claiming ownership is not a creditor of the estate."

194.    The other point taken by Mr Graf to the effect that there are defects in the Certificate of Title (which was in fact notarised by Ms Williams, the Notary Public in New York, at the closing meeting) such that, by application of the Ohio Certificate of Motor Vehicle Title Act, it did not transfer title from Mr Kleve to Mr Swaters, is an equally bad point. The Act concerns procedures for the registration of vehicles located in Ohio and only applies to vehicles which are in Ohio at the date of the relevant transaction. As Mr Lenox states, the mere fact that a person possesses an Ohio certificate of title does not, in and of itself, confer 'ownership' upon that person. He also states that Ohio and federal courts applying Ohio conflicts of laws principles have held that the law of the State where the motor vehicle is located at the time of the transfer determines the creation and transfer of interest in the vehicle: see the decision of the Ohio Supreme Court in *State ex rel. Hertz Corp v Rice* (1968) 14 Ohio St. 2d 34 applied most recently by the Court of Appeals for the Sixth Circuit in *McCaughey v Garlyn Shelton Inc* (2008) Case No. 05-3450.

195.    In the present case, at the time of the transfer of ownership from Mr Kleve to Mr Swaters in September 1999, the Car (apart from the spare parts) had not been in Ohio for more than ten years and was in Belgium. So far as the spare parts are concerned, they do not in themselves constitute a 'motor vehicle' within the meaning of the Ohio Act and the words of the Act make clear that where a motor vehicle is dismantled

such as to lose its character as a motor vehicle, the certificate of title must be surrendered and cancelled.

196. In any event, even if there were defects in the Ohio certificate of title and even if the Ohio Act applied, which it does not, it does not follow that title did not pass to Mr Swaters as a matter of Ohio law. The case upon which Mr Graf relies, the decision of the Court of Appeals of Ohio in *Walther v Walther* (2005) Ohio App LEXIS 933 was a case where there was no evidence of any contractual or other legal obligation to transfer the vehicle. In those circumstances, the court held that a proper transfer of title under the Act was required to effect a transfer of interest in the vehicle. However, in the present case, Mr Kleve had legally obligated himself to transfer the vehicle by the Settlement Agreement. Neither he nor his daughter Ms Lawson could rely upon a certificate of title which they were not entitled to have, to contend that they still have title, because he had transferred his rights under the contract. Indeed if there was any defect in the certificate of title which impeded transfer of ownership as a matter of Ohio law, that would constitute a breach of warranty by Mr Kleve under clause 3 of the Settlement Agreement and Ms Lawson and Mr Ford cannot purport to set up rights which only arise because such a breach of contract has occurred.

197. So far as the transfer of title in the spare parts is concerned, if, contrary to the conclusion I have reached, Ohio law is of any relevance, then I accept Mr Lenox's evidence that Ohio law would look to the Settlement Agreement to determine the question of ownership of the spare parts:

> "Ohio law would therefore look to the agreement of the parties to determine whether title to goods had passed from seller to buyer. The fact that Kleve, and subsequently Ms Lawson might have retained possession of certain Ferrari Spare Parts and after the 1999 Agreement was consummated is not dispositive of title under Ohio law. Instead, the question of ownership of the rights in the Spare Parts would be determined by the 1999 Agreement."

Conclusion

198. Accordingly, for all the reasons set out in this judgment, the answer to the preliminary issue is as follows. As at 27 June 2014, before the auction of the Ferrari model 375 Plus Grand Prix Roadster, serial no. 0384AM (the "Car"), Ms Swaters had title to the Car including, for the avoidance of doubt, the spare parts.