# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA,**

    Plaintiff,

    v.                                                                  Case No. 19-CR-99

**CHRISTOPHER GARDNER,**

    Defendant.

## REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS OUT-OF-COURT AND IN-COURT IDENTIFICATION OF DEFENDANT BY WILLIAM BROWN

On May 29, 2019, a grand jury sitting in the Eastern District of Wisconsin returned a five-count indictment against Christopher Gardner, charging him with four counts of wire fraud in violation of 18 U.S.C. §§ 1343 and 2 and one count of transportation of a stolen motor vehicle in foreign commerce in violation of 18 U.S.C. §§ 2312 and 2. (Docket # 1.) Gardner was extradited from Italy and appeared in this district on June 17, 2022. (Docket # 9.) At that time, Gardner was arraigned on the charges and entered a plea of not guilty. (*Id.*) This case has been designated complex (Docket # 11), and a jury trial before the Honorable Lynn Adelman will be scheduled after resolution of all pretrial motions.

Gardner moves to suppress evidence of William Brown's out-of-court identification of Gardner and to suppress any future in-court identification of Gardner. (Docket # 31.) Gardner also requests an evidentiary hearing on the issue. For the reasons stated below, Gardner's request for an evidentiary hearing is denied, and I recommend that Gardner's motion to suppress be denied.

# FACTS

*1. Background Regarding the Alleged Fraudulent Scheme*

The government alleges that on or about March 4, 2001, Gardner burglarized the workshop of Roy Leiske in Milwaukee, Wisconsin, at which time he stole a 1938 Talbot Lago T150C-SS Teardrop Coupe, bearing chassis number 90108 and having a two-carburetor racing engine bearing the number 17317C ("TL 90108"). (Indictment ¶¶ 2–3, Docket # 1.) The vehicle was one of only approximately sixteen Talbot Lago Teardrop Coupes of its style ever made. (*Id.* ¶ 3.) When it was stolen, the TL 90108 was in a disassembled and unrestored condition. (*Id.*) The government alleges that Gardner caused the vehicle to be transported from Wisconsin and kept in storage until Leiske died in July 2005. (*Id.* ¶ 4.)

Around October 2005, the government alleges Gardner forged a bill of sale and title transfer documents falsely indicating that Gardner had legally bought the TL 90108 from Leiske's heir, R.M. (*Id.* ¶ 5.) The government alleges Gardner forged the documents to defraud potential buyers into believing Gardner was the true owner of the TL 90108 and could convey clear title to the vehicle. (*Id.*) Around October 10, 2005, Gardner traveled to Milwaukee to meet with the Milwaukee Police Department ("MPD") to ask for assistance regarding the TL 90108. (*Id.* ¶ 6.) Gardner allegedly falsely told the MPD that even though the TL 90108 was reported as stolen in 2001, Leiske's nephew had located parts to that automobile, and Gardner was in the process of lawfully purchasing those parts from the nephew. (*Id.*) Around October 23, 2005, Gardner allegedly mailed law enforcement in Milwaukee a package containing documents showing Gardner purchased the TL 90108 from R.M. in October 2005. (*Id.* ¶ 7.) The government alleges these documents were fraudulent. (*Id.*)

Based on these documents, however, on December 15, 2005, the MPD wrote an official clearance report indicating that the stolen TL 90108 had been recovered and that Gardner was lawfully in possession of the vehicle. (*Id.* ¶ 8.) Around September 11, 2006, Gardner shipped the TL 90108 from Oakland, California to Geneva, Switzerland. (*Id.* ¶ 9.) Between 2007 and 2015, Gardner had the TL 90108 restored in France; however, Gardner replaced the original two-carburetor racing engine bearing number 17317C with a different Talbot Lago three-carburetor engine of that period. (*Id.* ¶ 10.) Gardner allegedly fraudulently caused the replaced engine to be stamped "17317C." (*Id.*) In 2015, Gardner caused the TL 90108 to be offered for sale to a potential buyer in Illinois named R.W. (*Id.* ¶ 11.)

The government alleges that Gardner falsely represented to R.W. that Gardner purchased the TL 90108 in October 2005 from R.M., that Gardner was the true owner of the TL 90108, that the TL 90108 was free and clear of all liens, and that the TL 90108 was an authentic 1938 Talbot Lago T150-C SS Coupe with Chassis No. 90108 and Engine No. 17317C. (*Id.* ¶ 12.) Gardner also provided R.W. the paperwork he had previously sent to the MPD, as well as the MPD clearance report. (*Id.* ¶ 13.)

Around August 27, 2015, an LLC owned by R.W. agreed to buy the TL 90108 from Gardner for $7.6 million, with $6.8 million to be paid directly to Gardner. (*Id.* ¶ 14.) Gardner states that questions regarding the 2001 theft were raised again after Gardner's former attorney, Joseph L. Ford, became involved in the matter and pushed R.M. to have the vehicle re-listed as stolen, signing a contract with R.M. that the two would wait until its restoration was completed by Gardner and sold to another before they would make an effort to obtain title. (Docket # 27 at 3.)

### 2. Background Facts Relevant to this Motion

Gardner asserts that the government's entire case against him is predicated on his alleged theft of the TL 90108 from Lieske's Milwaukee garage around March 4, 2001. (Docket # 28 at 2.) In order to establish these facts at trial, the government has two alleged participants/eyewitnesses to the theft—Christopher Burke and William Brown. (*Id.*)

On March 19, 2019, the government interviewed Brown regarding his involvement in the alleged theft from Lieske's garage in 2001. (*Id.*) During the initial interview, Brown does not refer to Gardner by name; rather, he states that there was a "Swiss guy" that he met with at the airport in Chicago shortly before the theft occurred in Milwaukee. (*Id.*) Brown described the "Swiss guy" as a white male, about 5'9" to 5'10" with a medium build. (*Id.*) Brown did not recall the "Swiss guy" having a foreign accent. (*Id.*) Prior to testifying before the grand jury, Brown was taken to the scene of Lieske's garage and further interviewed by the FBI. (*Id.*) Brown was shown a photograph of Gardner, and Brown identified the person in the photo as the "Swiss guy." (*Id.*) After reviewing the photograph, Brown commented that the photo of the "Swiss guy" was kind of blurry and that he looked older in the photo than Brown remembered. (*Id.* at 2–3.)

## ANALYSIS

Gardner moves to suppress Brown's identification of Gardner in the photograph on the grounds that the identification process was unduly suggestive. (*Id.* at 4.) Gardner further moves to suppress any subsequent in-court identification of Gardner by Brown as tainted by the original unduly suggestive identification. (*Id.* at 5.) Gardner requests an evidentiary hearing to determine the date of the photo used to identify Brown and how it was obtained, whether law enforcement had available any alternative photos of Gardner at the time, and

whether exigent circumstances existed that required the FBI to use the single-photo "show-up" identification process. (Docket # 39 at 6–7.)

It is well established that evidentiary hearings are warranted only when the defendant's allegations are definite, non-conjectural, and detailed enough to enable the court to conclude that a substantial claim is presented and that there are disputed issues of material fact that will affect the outcome of the motion. *United States v. Coleman*, 149 F.3d 674, 677 (7th Cir. 1998). Evidentiary hearings on motions to suppress are not granted as a matter of course but are held only when the defendant alleges sufficient facts that if proven would justify relief. *United States v. Hamm*, 786 F.2d 804, 807 (7th Cir. 1986) ("[A] trial court need only grant a suppression hearing when a defendant presents facts justifying relief, that is, facts which are definite, specific, detailed and nonconjectural.").

Gardner is not entitled to an evidentiary hearing to challenge the out-of-court identification. As will be further explained below, whether the admission of testimony regarding an out-of-court identification violates the defendant's due process rights is determined through a two-step analysis. While the information Gardner seeks to learn from an evidentiary hearing goes to the analysis of the first element, the motion falls short as to the second element. Thus, an evidentiary hearing is unnecessary to decide this motion, and Gardner's motion for an evidentiary hearing is denied.

With respect to testimony regarding suggestive out-of-court identifications, the Due Process Clause is concerned primarily with the substantial likelihood of misidentification. *United States v. Hawkins*, 499 F.3d 703, 707 (7th Cir. 2007) (citing *Neil v. Biggers*, 409 U.S. 188, 198 (1972)). Thus, the Supreme Court has observed that "'[t]he admission of testimony concerning a suggestive and unnecessary identification procedure does not violate due process

5

so long as the identification possesses sufficient aspects of reliability.'" *Id.* (quoting *Manson v. Brathwaite*, 432 U.S. 98, 106 (1977)). To determine whether the admission of testimony regarding an out-of-court identification offends the defendant's due process rights, the court conducts a two-step analysis. *Id.* First, the defendant must establish that the identification procedure was unduly suggestive. *Id.* If the defendant establishes this factor, then the court must determine whether, under the totality of the circumstances, the identification was nonetheless reliable. *Id.*

As to the first element, Gardner must show both that the identification procedure was suggestive and that such suggestiveness was unnecessary. *Id.* It is undisputed that Brown's identification of Gardner was a show-up identification—Brown was shown only one photograph of one suspect. *See United States v. Newman*, 144 F.3d 531, 535 (7th Cir. 1998) (stating that a "show-up identification" is one in which "witnesses confront only one suspect"). And the Seventh Circuit has "noted many times that a show-up identification . . . is inherently suggestive and should be employed only if compelled by extraordinary circumstances." *Id.* Such "extraordinary circumstances" could include situations of extreme urgency, such as where an individual is apprehended close in time and proximity to the scene of a crime and such process "allows identification of the suspect while the witness' memory is still fresh." *Hawkins*, 499 F.3d at 708.

The government asserts that the FBI engaged in a show-up identification because the only photo the FBI had of Gardner at the time was a full-length photo, which included his body, and using that photo in the array would have appeared different from the other photos, which were mugshot-style photos. (Affidavit of Former FBI Special Agent Timothy Bisswurm ¶ 2, Docket # 31-1.) Agent Bisswurm further asserts that the photograph of Gardner had

columns in the background, which would have appeared different from the other photographs. (*Id.*) Thus, Agent Bisswurm avers that to make this photograph consistent with other photographs in an array, it would have been necessary to zoom in on Gardner's face and head, which caused the photograph to become pixelated and blurry. (*Id.* ¶ 3.) Agent Bisswurm asserts that the blurriness and pixelation would have also made Gardner's photo stand out from the others. (*Id.*)

The government's rationale for using the show-up procedure is inadequate. While Agent Bisswurm asserts that the full-length photograph was the only photograph he had of Gardner "at the time," Gardner asserts that the government had in its possession other photographs of Gardner, including his passport and driver's license photographs, taken closer in time to the alleged theft. (Docket # 39 at 9.) Assuming this is correct, it is unclear why the FBI would not have used one of those photographs, which appear much more consistent with the "mugshot-style" photos Agent Bisswurm contends are usually presented in a photo array. The government fails to show any urgency or other extraordinary circumstances compelling the use of a show-up identification.

The analysis, however, does not end there. Even when an identification procedure is unduly suggestive, it need not be suppressed if, under the totality of the circumstances, the identification was nonetheless reliable. *Hawkins*, 499 F.3d at 710. The factors to be considered in evaluating the likelihood of misidentification include:

> [T]he opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Biggers*, 409 U.S. at 199–200. Even though the time between the alleged crime and Brown's identification of Gardner was lengthy—occurring approximately eighteen years later—I

conclude based on the totality of the circumstances that Brown's identification of Gardner was nonetheless reliable. Brown told the FBI that after meeting the "Swiss guy," they flew together on a flight from Chicago to Florida where he remembers making "small talk" at both the airport and on the plane. (Docket # 31 at 7.) Brown is alleged to have committed a theft with Gardner and spent multiple days with him. (*Id.*) Thus, this is not a situation of a "casual or passing observer, as is so often the case with eyewitness identification." *Manson v. Brathwaite*, 432 U.S. 98, 115 (1977). Rather, Brown had ample opportunity to view Gardner's face such that he could positively identify him years later. Further, Brown also provided a detailed and accurate description of Gardner in March 2019 prior to viewing the photograph. Brown described Gardner as a white male, about 5'9" to 5'10" tall with a medium build, grayish hair, and balding. (Docket # 31 at 8.) Finally, while Brown noted that the "Swiss guy" looked older in the photograph than he remembers (Docket # 28 at 3), this comports with the fact that the photograph Brown was shown was taken years after Brown's interactions with Gardner. Thus, it makes sense that Gardner would appear older in the photograph than what Brown remembered.

Furthermore, nothing forecloses Gardner's ability to challenge Brown's identification of Gardner at trial. In *Manson*, the Supreme Court stated that short of a finding of a "very substantial likelihood of irreparable misidentification," evidence of a witness' identification is "for the jury to weigh." 432 U.S. at 116. The Court went on to say that "[w]e are content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable

feature." *Id.* For these reasons, I recommend Gardner's motion to suppress Brown's out-of-court identification be denied.

Gardner further requests that any future, in-court identification by Brown also be precluded. Even if, however, a prior pre-trial identification was found impermissibly suggestive, a subsequent in-court identification is also admissible if, under the totality of the circumstances, the in-court identification is independently reliable. *Cossel v. Miller*, 229 F.3d 649, 655 (7th Cir. 2000). To determine whether an identification is reliable despite a suggestive pre-trial identification procedure, the court again considers the factors as articulated in *Biggers* and stated above. *Id.* For these reasons, I will defer to the trial judge any ruling on Brown's ability to identify Gardner in court during trial.

**NOW, THEREFORE, IT IS RECOMMENDED** that the defendant's motion to suppress evidence of Brown's out-of-court identification of Gardner (Docket # 28) be **DENIED**. I defer ruling to the trial judge on any future in-court identification of Gardner by Brown.

**FURTHER, IT IS ORDERED** that the defendant's motion for an evidentiary hearing is **DENIED**.

Your attention is directed to General L.R. 72(c), 28 U.S.C. § 636(b)(1)(B) and Federal Rules of Criminal Procedure 59(b), or Federal Rules of Civil Procedure 72(b) if applicable, whereby written objections to any recommendation or order herein, or part thereof, may be filed within fourteen days of the date of service of this recommendation or order. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Failure to file a timely objection with the district court shall result in a waiver of a party's right to appeal. If no response or reply will be filed, please notify the Court in writing.

Dated at Milwaukee, Wisconsin this 29th day of March, 2023.

BY THE COURT

_____
NANCY JOSEPH
United States Magistrate Judge