# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                          Case No. 19-CR-99

CHRISTOPHER GARDNER,

    Defendant.

## ORDER ON DEFENDANT'S MOTION TO EXCLUDE FORD'S TESTIMONY

       On May 29, 2019, a grand jury sitting in the Eastern District of Wisconsin returned a five-count indictment against Christopher Gardner, charging him with four counts of wire fraud in violation of 18 U.S.C. §§ 1343 and 2 and one count of transportation of a stolen motor vehicle in foreign commerce in violation of 18 U.S.C. §§ 2312 and 2. (Docket # 1.) Gardner was extradited from Italy and appeared in this district on June 17, 2022. (Docket # 9.) At that time, Gardner was arraigned on the charges and entered a plea of not guilty. (*Id.*) This case has been designated complex (Docket # 11), and a jury trial before the Honorable Lynn Adelman will be scheduled after resolution of all pretrial motions.

       Currently before me is Gardner's motion to exclude the testimony of Joseph L. Ford and any derivative evidence. (Docket # 26.) Gardner also requests an *in camera* inspection of documents and an evidentiary hearing on this motion. (*Id.*)

# FACTS

*1.  Background Regarding the Alleged Fraudulent Scheme*

The government alleges that on or about March 4, 2001, Gardner burglarized the workshop of Roy Leiske in Milwaukee, Wisconsin, at which time he stole a 1938 Talbot Lago T150C-SS Teardrop Coupe, bearing chassis number 90108 and having a two-carburetor racing engine bearing the number 17317C ("TL 90108"). (Indictment ¶¶ 2–3.) The vehicle was one of only approximately sixteen Talbot Lago Teardrop Coupes of its style ever made. (*Id.* ¶ 3.) When it was stolen, the TL 90108 was in a disassembled and unrestored condition. (*Id.*) The government alleges that Gardner caused the vehicle to be transported from Wisconsin and kept in storage until Leiske died in July 2005. (*Id.* ¶ 4.)

Around October 2005, the government alleges Gardner forged a bill of sale and title transfer documents falsely indicating that Gardner had legally bought the TL 90108 from Leiske's heir, R.M. (*Id.* ¶ 5.) The government alleges Gardner forged the documents to defraud potential buyers into believing Gardner was the true owner of the TL 90108 and could convey clear title to the vehicle. (*Id.*) Around October 10, 2005, Gardner traveled to Milwaukee to meet with the Milwaukee Police Department ("MPD") to ask for assistance regarding the TL 90108. (*Id.* ¶ 6.) Gardner allegedly falsely told the MPD that even though the TL 90108 was reported as stolen in 2001, Leiske's nephew had located parts to that automobile, and Gardner was in the process of lawfully purchasing those parts from the nephew. (*Id.*) Around October 23, 2005, Gardner allegedly mailed law enforcement in Milwaukee a package containing documents showing Gardner purchased the TL 90108 from R.M. in October 2005. (*Id.* ¶ 7.) The government alleges these documents were fraudulent. (*Id.*)

Based on these documents, however, on December 15, 2005, the MPD wrote an official clearance report indicating that the stolen TL 90108 had been recovered and that Gardner was lawfully in possession of the vehicle. (*Id.* ¶ 8.) Around September 11, 2006, Gardner shipped the TL 90108 from Oakland, California to Geneva, Switzerland. (*Id.* ¶ 9.) Between 2007 and 2015, Gardner had the TL 90108 restored in France; however, Gardner replaced the original two-carburetor racing engine bearing number 17317C with a different Talbot Lago three-carburetor engine of that period. (*Id.* ¶ 10.) Gardner allegedly fraudulently caused the replaced engine to be stamped "17317C." (*Id.*) In 2015, Gardner caused the TL 90108 to be offered for sale to a potential buyer in Illinois named R.W. (*Id.* ¶ 11.)

The government alleges that Gardner falsely represented to R.W. that Gardner purchased the TL 90108 in October 2005 from R.M., that Gardner was the true owner of the TL 90108, that the TL 90108 was free and clear of all liens, and that the TL 90108 was an authentic 1938 Talbot Lago T150-C SS Coupe with Chassis No. 90108 and Engine No. 17317C. (*Id.* ¶ 12.) Gardner also provided R.W. the paperwork he had previously sent to the MPD, as well as the MPD clearance report. (*Id.* ¶ 13.)

Around August 27, 2015, an LLC owned by R.W. agreed to buy the TL 90108 from Gardner for $7.6 million, with $6.8 million to be paid directly to Gardner. (*Id.* ¶ 14.) Gardner states that questions regarding the 2001 theft were raised again after Gardner's former attorney, Joseph L. Ford, became involved in the matter and pushed R.M. to have the vehicle re-listed as stolen, signing a contract with R.M. that the two would wait until its restoration was completed by Gardner and sold to another before they would make an effort to obtain title. (Docket # 27 at 3.)

3

*2. Background Facts Relevant to this Motion*

Gardner and Ford have had a personal relationship since before 1990. (Docket # 26 at 3.) In 1990, however, their personal relationship soured during an unrelated real estate transaction related to the sale of a homestead in Florida. (*Id.*) As a result, Gardner and Ford did not see each other or speak from 1990 until 2004. (*Id.*) However, during written communications between the two in 2004, Gardner believed Ford to be a licensed attorney maintaining a practice in Louisiana. (*Id.*)

In early 2005, Gardner was undergoing cancer treatment in France when he learned that Christopher Burke, the son of his former girlfriend, had stolen Gardner's 2002 Aston Martin from his property in Florida. (*Id.*) Because Gardner was undergoing treatment in France, he contacted Ford to retain him for his legal assistance because he knew Ford was holding himself out as an attorney in Florida. (*Id.*) Gardner asserts that Ford was contracted and paid as an attorney to make legal claims and engage in recovery actions to obtain Gardner's property from Burke. (*Id.*) Gardner claims Burke was also "mining" his personal identifying information to engage in business under his name and reputation. (*Id.* at 4.) From June 2005 through 2006, Ford was retained and paid by Gardner to address this legal situation. (*Id.*) Gardner asserts that this was the start of a several-year long attorney-client relationship, with Ford serving as Gardner's legal counsel on many matters until late 2012 or early 2013, when Gardner allegedly learned Ford was defrauding him. (*Id.*)

Gardner alleges that Ford represented him throughout his alleged "documented and legal purchase" of the TL 90108 from R.M. and during his continuing efforts to secure additional missing pieces. (*Id.*) Gardner asserts Ford was paid as an attorney to review and audit contracts for the TL 90108's restoration from 2008 through 2011, consult and prepare

legal correspondence involving a dispute with witness T.P. regarding an identity claim of two other Talbot Lagos, identified by number 90111 and 90115, and assisted in the 2009 filing of civil complaints against witness Bizon and his associates regarding their theft of the number 90108 Talbot Lago engine and other parts of vehicles owned by Gardner during the several year restoration of the vehicle. (*Id.* at 4–5.) Gardner alleges that through Ford's representation on all of these matters and Gardner's communications to his counsel in those matters, Ford learned of the 2005 Talbot Lago purchase in Milwaukee, gained access to extensive documents related to the vehicle, including the title of the vehicle in question, learned the names of parties and witnesses involved in the 2005 Talbot Lago transaction such as Burke, Bizon, R.M., Craig, and Damien Campbell, as well as information related to those who Gardner had engaged in litigation and may not be friendly with Gardner, such as Bizon. (*Id.* at 5.) Gardner asserts that every bit of information Ford knew about this vehicle stemmed directly from his representation of Gardner from 2005 through 2013. (*Id.*) He argues that in addition to representation on the Talbot Lago matter, Ford provided Gardner with legal services in a variety of related legal matters and that none of this information would have been known to Ford but for his legal representation of Gardner and his privileged communications to Ford throughout that relationship. (*Id.* at 5.)

## ANALYSIS

Gardner moves to exclude from use at trial any and all privileged communications Gardner made to Ford during their attorney-client relationship that Ford subsequently, improperly disclosed to the government, as well as any evidence derived from disclosure of the privileged communications. (*Id.* at 14.) Gardner requests an evidentiary hearing on the questions of whether Ford engaged in an attorney-client relationship with Gardner, whether

5

Ford disclosed privileged communications between himself and Gardner to other parties, including potential witnesses and the government and its investigators, and whether the disclosure of Gardner's privileged communications by Ford directed and impacted the investigation in this case. (*Id.* at 17.) Gardner further moves for an *in camera* review of relevant documents to determine whether the documents are subject to attorney-client privilege.

The government objects to Gardner's motion, asserting that Gardner fails to establish Ford was a licensed attorney in Florida. (Docket # 33 at 6–8.) The government also asserts that Gardner fails to identify any specific communications between him and Ford during the purported relationship that he claims are subject to privilege. (*Id.* at 14–15.) In his reply, Gardner cites to two sets of documents, MPD_FORD_000001 through MPD_FORD_000058 and FORD DOCS_000001 through FORD DOCS_015140, as those Ford provided to the government contrary to his ethical obligations as an attorney. (Docket # 37 at 9.)

A party seeking to invoke the attorney-client privilege must establish all of the following essential elements:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.

*United States v. White*, 950 F.2d 426, 430 (7th Cir. 1991). As such, before addressing whether any disclosed documents are subject to the attorney-client privilege, I must first consider the threshold question of whether Ford and Gardner had an attorney-client relationship. Again, Gardner requests an evidentiary hearing on this issue. Evidentiary hearings on motions to suppress are not granted as a matter of course but are held only when the defendant alleges

6

Case 2:19-cr-00099-LA-NJ    Filed 03/29/23    Page 6 of 9    Document 42

Ford disclosed privileged communications between himself and Gardner to other parties, including potential witnesses and the government and its investigators, and whether the disclosure of Gardner's privileged communications by Ford directed and impacted the investigation in this case. (*Id.* at 17.) Gardner further moves for an *in camera* review of relevant documents to determine whether the documents are subject to attorney-client privilege.

The government objects to Gardner's motion, asserting that Gardner fails to establish Ford was a licensed attorney in Florida. (Docket # 33 at 6–8.) The government also asserts that Gardner fails to identify any specific communications between him and Ford during the purported relationship that he claims are subject to privilege. (*Id.* at 14–15.) In his reply, Gardner cites to two sets of documents, MPD_FORD_000001 through MPD_FORD_000058 and FORD DOCS_000001 through FORD DOCS_015140, as those Ford provided to the government contrary to his ethical obligations as an attorney. (Docket # 37 at 9.)

A party seeking to invoke the attorney-client privilege must establish all of the following essential elements:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.

*United States v. White*, 950 F.2d 426, 430 (7th Cir. 1991). As such, before addressing whether any disclosed documents are subject to the attorney-client privilege, I must first consider the threshold question of whether Ford and Gardner had an attorney-client relationship. Again, Gardner requests an evidentiary hearing on this issue. Evidentiary hearings on motions to suppress are not granted as a matter of course but are held only when the defendant alleges

sufficient facts which if proven would justify relief. *United States v. Coleman*, 149 F.3d 674, 677 (7th Cir. 1998). Evidentiary hearings are warranted only when the allegations and moving papers are sufficiently definite, specific, and non-conjectural, and detailed enough to enable the court to conclude that a substantial claim is presented and that there are disputed issues of material fact that will affect the outcome of the motion. *Id.* The government argues that Ford was not acting as a professional legal advisor, the communications were not related to that purpose, Gardner was not Ford's client, and the communications were not made in confidence. (Docket # 33 at 6–14, 18–21.) Gardner, on the other hand, contends that Ford was retained and paid to provide legal services on Gardner's behalf from 2005 through 2013, including representing him throughout the alleged purchase of the Talbot Lago from R.M. that is at issue in this case. (Docket # 26 at 4–5.) Given the clear disagreement between the parties regarding the nature and purpose of Ford and Gardner's relationship, I find an evidentiary hearing on this issue is warranted.

Gardner did not, however, provide a statement pursuant to Crim. L. R. 12(c) (E.D. Wis.) and is requesting between four to six hours of in-court time for the hearing. (Docket # 26 at 3.) Although a hearing will be scheduled, Gardner is also ordered to provide the following statement no later than **April 5, 2023**: (1) a short, plain statement of the principal legal issue or issues at stake and specific grounds for relief in the motion; (2) a statement that he has conferred with the government and a description of the material facts in dispute; (3) a list of witnesses expected to testify at the evidentiary hearing and a short, succinct proffer of their anticipated testimony; and (4) a statement of how much time is expected for the evidentiary hearing. The parties are ordered to confer prior to Gardner submitting this statement and attempt to narrow the issues and facts to those actually in dispute to keep the

7

hearing focused on the relevant issues. The clerk's office will contact the parties to schedule the evidentiary hearing. To simplify scheduling of the hearing for any out-of-state witnesses, if the parties both agree, the evidentiary hearing may be held over Zoom.

Gardner also requests an *in camera* inspection of over 15,000 documents to determine whether the attorney-client privilege applies. (Docket # 37 at 9.) Because I must first address the threshold issue of whether Ford and Gardner had an attorney-client relationship, I will address the second part of Gardner's motion after addressing this threshold question. Gardner is reminded, however, that the "claim of privilege cannot be a blanket claim; it must be made and sustained on a question-by-question or document-by-document basis." *White*, 950 F.2d at 430 (internal quotation and citation omitted). In his motion, Gardner asks both the Court and the government to review the over 15,000 documents and determine whether they are privileged. (Docket # 37 at 19 (stating the government "is able to review and see each document at its will and how it is clearly privileged").)

But it is Gardner, as the party invoking the privilege, who has the burden of showing the privilege applies. Thus, even if not required by the local rules in this criminal case, a privilege log would be a useful tool for Gardner to specify which documents he is asserting are privileged. Otherwise, even if I find that Gardner and Ford had an attorney-client relationship, this blanket assertion of privilege is insufficient to establish that the privilege applies. Thus, if I find that Gardner and Ford had an attorney-client relationship, Gardner must be prepared to establish privilege on a document-by-document basis.

Finally, even assuming Ford and Gardner had an attorney-client relationship and privileged documents were improperly disclosed, Gardner will still need to establish that suppression is the appropriate remedy. The government has argued that courts are reticent to

8

Case 2:19-cr-00099-LA-NJ    Filed 03/29/23    Page 8 of 9    Document 42

extend the fruit of the poisonous tree doctrine beyond the context of constitutional violations. (Docket # 33 at 23–24.) Gardner contends that these cases are distinguishable because when the government has knowledge an attorney is violating the attorney-client privilege, the client's due process rights are implicated. (Docket # 37 at 25.) But there is a dearth of authority in support of that position. Thus, assuming Gardner shows an attorney-client relationship and the improper disclosure of privileged documents on a document-by-document basis, Gardner must also be prepared to show why suppression is the appropriate remedy in this case.

**IT IS SO ORDERED**.

Dated at Milwaukee, Wisconsin this 29th day of March, 2023.

BY THE COURT

_____
NANCY JOSEPH
United States Magistrate Judge