UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

    *Plaintiff*,

v.                                                      Case No. 2:19-CR-00099

CHRISTOPHER GARDNER,

    *Defendant.*

---

**DEFENDANT'S MOTION TO REOPEN DETENTION DECISION FOLLOWING NEARLY 14 MONTHS IN PRETRIAL CUSTODY &
FOR THE ABILITY TO POST BOND TO SECURE RELEASE WITH MONITORING AS RECOMMENDED BY U.S. PROBATION & PRETRIAL SERVICES**

---

Defendant Christopher Gardner, by his counsel, Jason D. Luczak and Nicole M. Masnica of Gimbel, Reilly, Guerin & Brown LLP, respectfully requests, pursuant to the Bail Reform Act, 18 U.S.C. §3142(f)(2), and the Fifth Amendment's Due Process Clause, that this Court reopen the June 17, 2022, pretrial detention decision and permit Mr. Gardner to secure his release with the posting of $100,000 cash bond with the condition that he follow all court orders, all requirements of U.S. Probation & Pretrial Services and participate on electronically-monitored home detention to occur at an approved residence within five miles from the U.S. Probation & Pretrial Services, Eastern District of Wisconsin office. Mr. Gardner contends that there has been a significant change in circumstances since the pretrial detention order was issued by this court and not known to the court at the time detention was ordered, specifically: (1) that the case is

1

substantially complex, such that there has been a demonstrated need for significant investigation, review of tens-of-thousands of pages of discovery documents (including thousands of documents turned over for the first time this spring after Mr. Gardner had spent several months in custody), and numerous pretrial evidentiary hearings, such that a firm trial date cannot appropriately be set at this point as additional litigation and investigation must still be accomplished; (2) that based upon the charges and allegations against Mr. Gardner, pursuant to the federal sentencing guidelines, he reached the sentencing range for the demonstrated conduct, and as he maintains his innocence and wishes to take the matter to trial, there is no end in sight to his current detention; (3) Mr. Gardner has demonstrated a significant personal and financial investment in the defense of this case, engaging in private legal representation, the services of experts and continued investigation at his own expense to prove his innocence, demonstrating to the court his interest in fighting this case and taking the matter to trial in the future, declining to engage in plea negotiations that would likely yield his immediate release or release in the near future, while likewise undermining the government's arguments regarding the strength of its case against him; and (4) Mr. Gardner's health has demonstrably become more precarious, with healthcare providers secured through the government documenting a new spot of basal cell carcinoma on Mr. Gardner's face and a number of concerning progressive symptoms (such as spreading numbness and lack of feeling indicating potential spread of necrosis) related to his years-long cancer battle that dates back nearly twenty years.

In support of this motion, Mr. Gardner asserts the following:

**STATEMENT OF FACTS**

*A.    Brief Background of the Allegations Against Mr. Gardner*

On March 4, 2001, Roy Leiske contacted authorities and reported that parts making up a 1938 Talbot Lago T150C-SS "Teardrop Coupe" were stolen from his warehouse in Milwaukee, Wisconsin. At the time the vehicle was removed from his warehouse, the vehicle was in unrestored condition and allegedly disassembled. Mr. Leiske reported that there were no signs of forced entry, and that the perpetrator of the offense seemingly knew the layout of the warehouse and where pieces and documents regarding the vehicle were stored in various locations throughout the garage. The Government claims that Mr. Gardner committed this crime and was in Wisconsin, personally participating in the theft of the vehicle. The Government contends that through an elaborate scheme, Mr. Gardner induced the nephew and heir of Roy Leiske, R.M., into selling him a different Talbot sedan, and that he paid a substantial amount of money for that vehicle to cover up the 2001 theft and to obtain a clean title on the vehicle. Mr. Gardner has always and continues to maintain his innocence in these allegations. The continued investigation, the fruits of which will be presented by the defense at trial, will demonstrate that the investigation conducted by the government was guided by individuals with means and motivation to fabricate a case against Mr. Gardner to obtain their own stolen and unearned interest in a car which Mr. Gardner spent years and substantial financial investment restoring, which is now valued at well over its $7.7 million purchase price.

3

Case 2:19-cr-00099-LA-NJ   Filed 08/08/23   Page 3 of 14   Document 72

While the government has previously argued that Mr. Gardner has substantial wealth and access to significant financial resources, this claim remains unsupported by any factual basis aside from a January 2015 article from Art en Suisse magazine (one written more than eight years ago and before these allegations had wreaked havoc on Mr. Gardner's life, destroying his business and reputation in the car restoration world). Additionally, while Mr. Gardner has lived in Switzerland for nearly twenty years prior to his incarceration, he is not a citizen of the country and is likely to not be permitted to return. Moreover, in the months after his extradition, an anonymous party contacted Mr. Gardner's Swiss mortgage lender to notify the company of this case, which gave the bank the ability to recall the note early. Mr. Gardner's Swiss legal counsel has been working to fight this action to avoid Mr. Gardner losing his equity in the home as he does not have the funds to repay the mortgage in full at this time. Further, the home, where he resided at the time of his arrest, is now being rented out to tenants to attempt to cover some of the costs. Mr. Gardner's personal effects have been sold or put in storage. He is not the mysterious, wealthy international thief the Government has painted him to be.

  B. *Mr. Gardner's Cooperation with the Investigation & the Proceedings Leading to His Extradition*

As set forth in a previous bond motion (Doc. 12), Mr. Gardner has been cooperative with the investigation and offered to speak with authorities. In the summer of 2018, Mr. Gardner was interviewed via telephone by investigators from the Federal Bureau of Investigation. Mr. Gardner provided a detailed summary of his account of the purchase of the vehicle in question, as well as the individuals involved. He offered to meet with

4

U.S. investigators with his Swiss counsel present if they would make the trip to travel to Switzerland. At that time, the associated civil case in which Joseph Ford and R.M. are attempting to acquire legal title to the fully restored Talbot, which is still pending in the Milwaukee County Circuit Court, had been ongoing for more than two years.

  C. *Mr. Gardner's Detention in Italy & his Extradition to the U.S.*

  As set forth in the 2022 bond motion, following the filing of the indictment, Mr. Gardner was arrested while visiting Genoa, Italy on June 15, 2021. Shortly before his arrest, his daughter Laura Gardner, a U.S. citizen who resides in Colorado, visited him in Switzerland after not seeing him for nearly two years due to the interceding pandemic. The two planned a short getaway to Genoa to visit the Monumental Cemetery of Staglieno and various other historical sites of interest to Laura, who is an artist. Genoa is just a few hours' drive from Mr. Gardner's home, so the two traveled by car. Once the pair checked into their hotel, an Interpol flag notified Italian authorities of his presence and they came to arrest him that day.

  After his arrest, Mr. Gardner was permitted home detention in Florence, Italy, while awaiting extradition to the United States. Mr. Gardner, who this court is now well-aware has suffered from significant health issues for many years related to a cancer diagnosis, was not provided adequate medical care while on home detention as he was neither a resident of Italy nor had health insurance coverage in that country. His health ailments were documented by an Italian physician during his time on house arrest, but he was not provided the appropriate care to manage his health. (Doc. 17-1).

5

When it became clear he could not obtain the medication and treatment he needed to manage his serious health conditions if he continued to remain in Italy, Mr. Gardner, upon the advice of his then-counsel who is no longer involved in representing him, returned to Switzerland to seek emergency medical care. At the time he went back to Switzerland, there was no end in sight to his Italian detention and no date of extradition to the U.S. scheduled by the government. He was living alone in a small apartment in Florence with occasional check-ins from Italian authorities. His health grew more and more precarious by the day.

On his trip from Italy to his home in Switzerland, Mr. Gardner made no effort to avoid detection. He traveled via train, crossing the border between Italy and Switzerland by showing his appropriate identification documents. Upon his arrival into Switzerland, Mr. Gardner sought immediate assistance of various medical professionals. He remained at his home in Switzerland and still he made no attempts to flee or avoid extradition. Mr. Gardner was arrested at his home approximately three weeks later on December 17, 2021. He was scheduled to see his treating oncologist the following week for testing and management of the symptoms of his disease. Again, this demonstrates Mr. Gardner was not attempting to avoid detection by police and went to Switzerland out of necessity to avoid a substantial health crisis.

Following arrest, Mr. Gardner was held in custody for several months in Switzerland pending extradition. Mr. Gardner was extradited on June 16, 2022 and flown into Chicago, from where he was intended to be transferred to the Eastern District of Wisconsin in the custody of U.S. Marshals. Though he ultimately made this trek, the trip

6

was delayed when upon landing, Mr. Gardner nearly suffered a stroke from the air travel's impact on his body. He was taken to the hospital by U.S. Marshals, where he was hospitalized and held overnight for evaluation.

Once in Milwaukee, the Honorable Magistrate Judge William E. Duffin presided over Mr. Gardner's initial appearance on Friday, June 17, 2022. At the initial appearance, the government requested detention on the grounds that Mr. Gardner posed a serious risk of flight. (Doc. 9). Magistrate Judge Duffin granted the government's motion and ordered that Mr. Gardner be detained as a risk of flight pending a detention hearing. (*Id.*) Mr. Gardner now appeals the ruling of Magistrate Judge Duffin.

One previous motion challenging the constitutionality of Mr. Gardner's continued detention was filed on July 3, 2022, (Doc. 12) which the court denied in writing on July 25, 2022. (Doc. 21). Since the denial of the motion to reopen bond was ordered last summer, Mr. Gardner has spent a year in custody with no date set to resolve this matter at trial due to its complexity and the need to complete the investigation.

Defense counsel has conferred with the Government regarding this request, and, while the Government did spend several days considering its position on release, has indicated it declines to support Mr. Gardner's release at this time.

**ARGUMENT**

The bond statute authorizes pretrial detention and a detention hearing only if one of the factors listed in §3142(f) is met. In *United States v. Salerno*, 481 U.S. 739, 755 (1987), the Supreme Court upheld the Bail Reform Act, 18 U.S.C. § 3142, over a Fifth Amendment substantive Due Process challenge in part on the grounds that detention hearings could

7

be held only under the limited circumstances set out in § 3142(f). As the *Salerno* Court held: "[t]he Bail Reform Act *carefully limits the circumstances under which detention may be sought* to the most serious crimes. See 18 U.S.C. § 3142(f) (detention hearings are primarily available if the case involves a crime of violence, offenses for which the sentence is life imprisonment or death, serious drug offenders, or certain repeat offenders)." *Salerno*, 481 U.S. at 747 (emphasis added). The Supreme Court held that the factors listed in § 3142(f) serve a gatekeeping function, as only certain categories of defendants are eligible for detention from the outset. The reasoning for the previous detention order set forth by the court was the court's conclusion that Mr. Gardner, at the time of the order, posed a "serious flight risk" due to him previously leaving his Italian detention and as his personal and residential ties were all overseas. (Doc. 9). Mr. Gardner asserts, given the changes of circumstances in this case and the new information provided in this motion, those concerns can be sufficiently dissuaded such that Mr. Gardner need not be detained without the ability to post reasonable bond.

First, Mr. Gardner contends that at the time bond was set, the complexity of this case, the pretrial litigation and substantial amount of discovery that needed to be evaluated and investigated prior to trial was unknown to the parties and the court. Pre-trial litigation has taken over a year, requiring out-of-state trips for all parties and extensive motion work that is not yet completed, as motions in limine cannot appropriately be filed until the current outstanding pretrial motions are resolved. This matter and impending motions in limine continue to take a significant amount of time

8

given the amount of discovery, the number of witnesses, and the fact that many witnesses and key evidence in this case are located out of state and out of the country. This case earned a complex case designation many months ago and discovery continued to be turned over (in the thousands of pages) until spring of 2023, many months after Mr. Gardner's extradition. (Doc. 11). This matter is currently in the midst of pretrial motion litigation has not been set for a trial date.

Second, considering Mr. Gardner's current custody credit time on this matter, he has served pre-trial what is essentially a sentence that falls within the federal sentencing guidelines for the crimes of which he has been accused. As of the date of this motion, Mr. Gardner has served approximately 765 days in custody related to this case, calculating the total sum of the estimated time from his Italian detention (he was arrested June 15, 2021 and the arrest warrant issued in Italy on November 30, 2021 for a total of 168 days), his time spent in custody in Switzerland and his incarceration following his extradition to the U.S. at Dodge County Jail (December 17, 2021 to the date of filing, totaling 597). Prior to his arrival in June of 2022, Mr. Gardner had been incarcerated in Switzerland since December 17, 2021, according to reports received from the Federal Bureau of Investigation provided in discovery by the United States Government. Breaking the credit down to thirty-day months, this equates to essentially a sentence, served pre-trial, of 25 months and 15 days.

Per the Sentencing Guidelines calculator created by the United States government[1], if Mr. Gardner were convicted of all five counts, he would likely be designated a level 14 offense on each of the four counts of wire fraud contrary to 18 U.S.C. §1343 presuming a base level of 7 under § B1.1(a)(2) (as the government has made no claims about the actual value of the alleged stolen vehicle or loss amount incurred by the alleged victim, who may stand to incur a significant windfall in the millions as a result of a potential conviction), +5 under §2B1.1(b)(10), +2 under §2B1.1(b)(15), and a criminal history level of I under §4A1.1. A level 14 designation would put Mr. Gardner's sentencing range at approximately 15-21 months for the offense of wire fraud.

Regarding the calculation for transportation of a stolen motor vehicle in foreign commerce contrary to 18 U.S.C. §2312, presuming a base level of 6 §2B1.1(a)(2) (as again the government has made no claims about the actual value of the alleged stolen vehicle or loss amount incurred by the alleged victim as a result of the offense and, even taking the Government's allegations as truth, Mr. Gardner allegedly stole old, rusted parts of the Teardrop that had to be restored by skilled professionals, which enhanced their alleged value greatly), +6 under §2B1.1(b)(10), +2 under §2B1.1(b)(15), and a criminal history level of I under §4A1.1 would likewise produce an offense level 14 with a sentencing guideline range of approximately 15-21 months for transportation of a stolen motor vehicle in foreign commerce.

---

[1] https://www.sentencing.us/ Accessed July 28, 2023.

Mr. Gardner contends that the time he has served pretrial (25 and a half months, over two years), is likely to fall into the range of a potential sentence ordered if he were to lose at trial[2], and that he should not be subject to a lengthier period of incarceration simply because he maintains his innocence and refuses to accept responsibility for a crime he did not commit. It is a gross miscarriage of justice that Mr. Gardner, since he maintains his innocence and intends to proceed to trial, has already nearly completed the equivalent of the sentence that he would very likely incur upon conviction.

Third, Mr. Gardner's health also has continued to deteriorate over his year and some months of confinement, including the identification of a patch of basal cell carcinoma on his face and progressive numbness in the location where he has suffered necrosis as a result of his cancer treatments in the past. (Exh. 1224 – C. Gardner's Medical Records from Dodge County Detention Facility). According to public health experts, all incarcerated individuals, let alone those with a complicated medical history, "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" "infection control is challenging in these settings."[3] Mr. Gardner is both in a vulnerable age group, as he is over sixty-five, and also has several pre-existing conditions that could dramatically alter

---

[2] While the government approached Mr. Gardner about a potential resolution of the case via an unspecified plea negotiation, indicating it was open to a resolution earlier this year and before the start of the evidentiary motions related to Mr. Ford, Mr. Gardner is adamant in his innocence and does not intend to enter into any pretrial plea negotiation.

[3] "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (March 2, 2020), at https://bit.ly/2W9V6oS.

11

the course of an infection if he were to become ill. Mr. Gardner has struggled with health issues nearly his entire adult life and throughout his incarceration at the Dodge County Detention Facility. Given Mr. Gardner's significant history of poor health and complications related to his cancer, he is particularly susceptible to any infection he may contract while incarcerated.

Finally, and perhaps most important to the court's previous finding that Mr. Gardner is a serious flight risk, his connection to countries outside of the United States has significantly diminished during his incarceration since 2021. Specifically, as detailed above, shortly after Mr. Gardner's extradition, an anonymous source contacted the lender on his Switzerland property about his incarceration, causing the bank to recall the note ahead of schedule. While Mr. Gardner is seeking legal intervention in Swiss courts to protect the financial interest he has in the home, he has had to rent out the property to assist in covering expenses, selling or moving all his personal property into storage. Additionally, because Mr. Gardner is solely a citizen of the United States and not Switzerland, he is unsure whether he has lost good standing with the country following his extradition and does not know that he will be able to return even following an acquittal. After being absent from his Swiss home for nearly two years, Mr. Gardner has lost many personal connections from the country, and his remaining familial connections, including his daughter, are all within the U.S. He has turned in his passport, leased his home abroad, struggled with health issues, and was even approved by Pretrial Services to preside with his daughter in Colorado from the outset of this case. (Doc. 8).

For these reasons, Mr. Gardner proposes this court permit him release into the community, as the following conditions that will reasonably assure his future appearance in court and the safety of the community (*See* 18 U.S.C. §3142(c)):

1. The posting of $100,000 cash bond;

2. That prior to his release, Mr. Gardner obtain a residence approved by the U.S. Probation and Pretrial Services Department within five miles of the U.S. District Court, Eastern District of Wisconsin;

3. That Mr. Gardner be placed on home detention, unable to leave the residence without advanced permission of his pretrial services agent;

4. That he appear at all scheduled court appearances where his appearance is required; and

5. That he surrender any and all passport and travel documents prior to his release.

## CONCLUSION

For the reasons detailed above, Mr. Gardner respectfully requests that he be released with conditions this Court deems appropriate, under §§ 3142(a)–(c).

Dated this 4th day of August, 2023.

>Respectfully submitted,
>
>GIMBEL, REILLY, GUERIN & BROWN LLP
>
>By:   */s/ Jason D. Luczak*
>    JASON D. LUCZAK
>    State Bar No. 1070883
>    Email: jluczak@grgblaw.com

          NICOLE M. MASNICA
          State Bar No. 1079819
          Email: nmasnica@grgblaw.com
       Attorneys for Defendant

POST OFFICE ADDRESS:

330 East Kilbourn Avenue, Suite 1170
Milwaukee, Wisconsin 53202
Telephone:  414/271-1440