# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

     Plaintiff,

     v.                                 Case No. 19-CR-99

CHRISTOPHER GARDNER,

     Defendant.

---

### REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO EXCLUDE FORD'S TESTIMONY AND DERIVATIVE EVIDENCE

---

On May 29, 2019, a grand jury sitting in the Eastern District of Wisconsin returned a five-count indictment against Christopher Gardner, charging him with four counts of wire fraud in violation of 18 U.S.C. §§ 1343 and 2 and one count of transportation of a stolen motor vehicle in foreign commerce in violation of 18 U.S.C. §§ 2312 and 2. (Docket # 1.) Gardner was extradited from Italy and appeared in this district on June 17, 2022. (Docket # 9.) At that time, Gardner was arraigned on the charges and entered a plea of not guilty. (*Id.*) This case has been designated complex (Docket # 11) and a jury trial before the Honorable Lynn Adelman will be scheduled after resolution of all pretrial motions.

Gardner moves to exclude the testimony of Joseph L. Ford and any derivative evidence. (Docket # 26.) Gardner argues that Ford served as his attorney from 2005 through 2013 and divulged privileged communications to the government. (*Id.*) Gardner moves to exclude all privileged communications and derivative evidence obtained by the government as a result of the allegedly breached privilege. (*Id.*) Evidentiary hearings were held on Gardner's motion on May 24, 2023, June 7, 2023, and June 9, 2023. The Court heard

testimony from eight witnesses over the course of these three hearings regarding the nature of Ford's and Gardner's relationship. For the reasons further explained below, I recommend that Gardner's motion to exclude Ford's testimony be denied.

**FACTS**

*1.     Background Regarding the Alleged Fraudulent Scheme*

The government alleges that on or about March 4, 2001, Gardner burglarized, and caused two other individuals to burglarize the workshop of Roy Leiske in Milwaukee, Wisconsin. During the burglary Gardner allegedly stole and caused the theft of a 1938 Talbot Lago T150C-SS Teardrop Coupe, bearing chassis number 90108 and having a two-carburetor racing engine bearing the number 17317C ("TL 90108"). (Indictment ¶¶ 2–3.) The vehicle was one of only approximately sixteen Talbot Lago Teardrop Coupes of its style ever made. (*Id.* ¶ 3.) When it was stolen, the TL 90108 was in a disassembled and unrestored condition. (*Id.*) The government alleges that Gardner caused the vehicle to be transported from Wisconsin and kept in storage until Leiske died in July 2005. (*Id.* ¶ 4.)

Around October 2005, the government alleges that Gardner forged a bill of sale and title transfer documents falsely indicating that Gardner had legally bought the TL 90108 from Leiske's heir, Richard Mueller. (*Id.* ¶ 5.) The government alleges that Gardner forged the documents to defraud potential buyers into believing Gardner was the true owner of the TL 90108 and could convey clear title to the vehicle. (*Id.*) Around October 10, 2005, Gardner traveled to Milwaukee to meet with the Milwaukee Police Department ("MPD") to ask for assistance regarding the TL 90108. (*Id.* ¶ 6.) Gardner allegedly falsely told the MPD that even though the TL 90108 was reported as stolen in 2001, Leiske's nephew had located parts to that automobile, and Gardner was in the process of lawfully purchasing those parts from the

2

nephew. (*Id.*) Around October 23, 2005, Gardner allegedly mailed law enforcement in Milwaukee a package containing documents showing Gardner purchased the TL 90108 from Mueller in October 2005. (*Id.* ¶ 7.) The government alleges these documents were fraudulent. (*Id.*)

Based on these documents, however, on December 15, 2005, the MPD wrote an official clearance report indicating that the stolen TL 90108 had been recovered and that Gardner was lawfully in possession of the vehicle. (*Id.* ¶ 8.) Around September 11, 2006, Gardner shipped the TL 90108 from Oakland, California to Geneva, Switzerland. (*Id.* ¶ 9.) Between 2007 and 2015, Gardner had the TL 90108 restored in France; however, Gardner replaced the original two-carburetor racing engine bearing number 17317C with a different Talbot Lago three-carburetor engine of that period. (*Id.* ¶ 10.) Gardner allegedly fraudulently caused the replaced engine to be stamped "17317C." (*Id.*) In 2015, Gardner caused the TL 90108 to be offered for sale to R.W., a potential buyer in Illinois. (*Id.* ¶ 11.)

The government alleges that Gardner falsely represented to R.W. that Gardner purchased the TL 90108 in October 2005 from Mueller, that Gardner was the true owner of the TL 90108, that the TL 90108 was free and clear of all liens, and that the TL 90108 was an authentic 1938 Talbot Lago T150-C SS Coupe with Chassis No. 90108 and Engine No. 17317C. (*Id.* ¶ 12.) Gardner also provided R.W. the paperwork he had previously sent to the MPD, as well as the MPD clearance report. (*Id.* ¶ 13.)

Around August 27, 2015, an LLC owned by R.W. agreed to buy the TL 90108 from Gardner for $7.6 million, with $6.8 million to be paid directly to Gardner. (*Id.* ¶ 14.) Gardner states that questions regarding the 2001 theft were raised again after Gardner's former attorney, Joseph L. Ford, became involved in the matter and pushed Mueller to have the

vehicle re-listed as stolen, signing a contract with Mueller that the two would wait until its restoration was completed by Gardner and sold to another before they would make an effort to obtain title. (Docket # 27 at 3.)

2.    *Facts Relevant to this Motion*

Gardner seeks to suppress documents Ford turned over to law enforcement, as well as any derivative evidence, on the grounds that Ford, as his attorney, breached his attorney-client privilege. The government contends that Ford never acted as Gardner's attorney in any matter, much less as his attorney regarding the TL 90108. The Court held an evidentiary hearing over the course of three days regarding the issues of whether Ford and Gardner had an attorney-client relationship and if so, the parameters of the relationship. Joseph Ford, Marc Favre, Antoine Barret, David Clark, Philip Varricchio, Robert Pluth, Eric Fraser, and Herbert Haas testified. (Docket # 60, 65, 66.)

*Joseph Ford*

In 1985, Ford purchased two vehicles from Gardner— a Mercedes S-Class sedan and a BMW 7 Series sedan. (Transcript of May 24, 2023 Evidentiary Hearing ("May 24 Tr.") 148, Docket # 60.) Ford was working as an architect at that time and in 1987, enrolled in law school at Loyola University. (*Id.*) Gardner was operating a very successful classic car business out of his home in New Orleans. (May 24 Tr. 148–49.) Impressed with Gardner's success, Ford sought to enter the business and started helping Gardner with marketing. (May 24 Tr. 149.) Around 1987, Gardner's collector motor car license was discontinued by the state, so Ford got a license and started his own classic car business called Collector Motor Cars, Ltd. (May 24 Tr. 142, 149.) Ford used income from his car business to pay for law school. (May 24 Tr. 149.) Ford's peak year in his car business was 1988, selling over one hundred cars.

(May 24 Tr. 150.) Ford obtained his law degree in 1990. (May 24 Tr. 141.) Ford did not perform any legal work for Gardner after graduating law school. (May 24 Tr. 149.) Around 1991 or 1992, Ford and Gardner had a falling out over the purchase of a house in Florida and they stopped speaking for many years. (May 24 Tr. 150–51.)

Then, in September 2004, Ford stated that he received an email from Gardner out of the blue. (May 24 Tr. 151.) Ford responded with a lengthy email "telling [Gardner] what went on in [Ford's] life . . . since '92 to the present." (May 24 Tr. 152–53, Def.'s Ex. 1042.) In this email, Ford told Gardner that he was licensed to practice law in Louisiana and had applied to practice in Florida. (Def.'s Ex. 1042.) He stated: "I am not excited about essentially starting a legal career now but I can't do cars in any meaningful way without credit and without access to a least a good chunk of my $600k of equity in my house." (*Id.*) Ford testified that he was interested in doing car deals with Gardner and was not interested in practicing law. (May 24 Tr. 156.)

In January 2005, Gardner emailed Ford telling him about battling cancer in 2004 and that while he was in the hospital, a man named Chris Burke allegedly stole his Aston Martin. (June 7 Evidentiary Hearing Transcript ("June 7 Tr.") 316–17, Docket # 65; Gov't Ex. 3.) Gardner asked Ford whether he ever received his law license. (*Id.*) Ford responded stating that he passed two of the three parts of the test and was scheduled to take the third part in February. (June 7 Tr. 318.) Ford stated that if "you got any business ideas, do tell. Maybe I can assist and benefit us both." (*Id.*) Gardner responds by asking whether Ford wanted to partner with him to locate, repossess, and sell the Aston Martin and/or Gardner's other vehicles. (June 7 Tr. 320–22.)

In June and July 2015, Ford and Gardner exchanged emails regarding Gardner's proposal to partner with Ford to sell cars. (June 7 Tr. 323–24, Gov't Ex. 5.) Within these exchanges, Gardner asked Ford for a lawyer referral to file a federal lawsuit regarding one of his car deals. (June 7 Tr. 324–25.) Ford responded, telling Gardner that he "need[ed] [him] to help [himself] make some money," as he was unable to take the bar exam due to dealing with a lawsuit he was involved in over a mortgage. (June 7 Tr. 325–26.) Ford asked Gardner whether he wanted to "do some real estate deals." (June 7 Tr. 326.) However, on October 14, 2005, Gardner again proposed to pay Ford to repossess vehicles for him, including the Aston Martin. (June 7 Tr. 331–32.) Gardner stated, "If you successful, you are my agent. You will gain in all you ventures in my energy flow and your children will less effort with your monetary guidance." (June 7 Tr. 332, Gov't Ex. 9.) On October 31, 2005, Gardner told Ford not to "offer my teardrop to anyone" as he has "all sorts of clearances to cross, registrations to document, and inventory to make sure of." (June 7 Tr. 272–73, Def. Ex. 1164.)

Sometime in early 2006, Gardner received communications from a dealer in California offering to sell him parts to the TL 90108. (May 24 Tr. 175.) Ford states that Gardner told him that "some guy in California" was trying to sell him parts to the TL 90108 he purchased in 2005, despite Gardner believing that he had purchased the whole car. (*Id.*) The identity of the dealer in California is not clear, although it appears it may have been Pat Craig, Mueller, or the two working together. For example, in an email dated February 24, 2006, Ford sent Gardner a "suggested reply" addressed to "SL/Craig" telling him that he should say that he "already bought and paid for everything related to the car and the car" and that the pieces are either "duplicates of things or things that were supposed to be forwarded to me as a part of the . . . fully signed contract already in place." (June 7 Tr. 274, Def. Ex. 1160.) Ford suggested

6

that Gardner tell "SL/Craig" to forward the "package" of parts for his review and if "after my full inspection, it is something I want then I'll pay you $1,000 for your trouble since I really already bought the stuff once already." (*Id.*) While Ford testified that Craig was Pat Craig, he stated that he did not know who S.L. stood for. (June 7 Tr. 276.) However, Mueller was known as "Skip" and "Leiske" was the last name of the original owner, Mueller's relative. (*Id.*)

Ford testified that Gardner told him Craig subsequently died but Craig's dealership still had the parts and Gardner wanted to retrieve them. Ford suggested Gardner return to the original seller, Mueller, to demand the parts back. (May 24 Tr. 175.) In September 2006, Gardner asked Ford to review a bill of sale regarding the TL 90108 parts. (June 7 Tr. 334.) In an email to Gardner dated September 5, 2006, Ford stated that after reviewing the bill of sale, he concluded that Gardner "bought a disassembled car with parts scattered in two or three places." (June 7 Tr. 266–67, Def. Ex. 1057.) Ford advised Gardner that: "Unde [sic] no circumstances did the sale of a complete car not occur, regardless if some parts later turn up . . . . At this point, DO NOT have the guy sell you anything he finds since you already bought it and saying it is a 'sale' in any way undermines and contradicts your prior docs and claims. Internally inconsistent docs are a NO and can wreck your position in a court case." (June 7 Tr. 335–37, Gov't Ex. 14.)

In an email the following day, Ford continued to advise Gardner on the language of the bill of sale, stating that he should "ALWAYS keep it simple and in plain english. You do not want to appear if you have access to a legal dictionary. Courts are suspicious when a lay person attempts to 'armor up' a simple and straightforward transaction." (*Id.*) Ford states that "If he still has some 40% of the car, or you suspect he has anything more, call me as I may

7

change the 99 to 100 percent thing to a different phrase. You do NOT want to be proving or stating to anyone at this point in the transaction that you are still missing things . . . . Fuzzy is GOOD." (*Id.*) Around this same time, Gardner was communicating with Ford about vehicles seized in France worth $3 million that he wanted to get back, noting that the "money could roll the entire talbot project professionally . . . ." (June 7 Tr. 368, Gov't Ex. 43.) Ford responded to Gardner in an email dated October 1, 2006 with his observations and advice regarding traversing the French legal system. (*Id.*) However, Ford told Gardner that he "know[s] [his] limitations," stating "I am neither a practicing attorney nor a seasoned French practicing attorney, thus I think I will insist on that consult with that judge . . . ." (*Id.*)

In addition to issues related to the TL 90108, Gardner was involved in various litigation both in Europe and the United States between 2004 and 2006. During that period, Ford stated that he served as a "legal tactics consultant" for Gardner Enterprises in Switzerland and France. (May 24 Tr. 143–44, 147.) Ford testified that in that position he consulted or liaised with Gardner's Europe-based attorneys. (May 24 Tr. 144.) Ford stated that it was his job to act as "CEO," creating a game plan for the litigation, drawing on his background as a trained lawyer. (May 24 Tr. 145.) Ford also acted as Gardner's "attorney in fact" or "power of attorney" to attempt to repossess vehicles Gardner owned. (May 24 Tr. 199–200, Def.'s Ex. 1049.)

During the next seven years, between 2007 and 2015, the restoration of the TL 90108 took place in Europe. During this period, Gardner and Ford again had multiple interactions and business dealings both related and unrelated to the TL 90108. For example, Gardner proposed an idea known as the "Talbot Lago Project" to start a micro car company that builds faithful replicas of Teardrops using donor Talbot Lago sedans but rebodying them. (June 7

8

Tr. 350–51.) Gardner asked Ford's advice on the project and requested Ford become the project manager; however, Ford advised that he could not be involved in the project without a business plan because "the endeavor [was] too nebulous." (June 7 Tr. 352–53, Gov't Ex. 26.)

In June 2009, Gardner and Ford entered into an "Advisor – Client Agreement" where Ford agreed to provide "ongoing litigation advice, organization of all legal actions and strategy" to Gardner for Gardner's efforts in "obtain[ing] a refund by way of judicial enforcement and legal action as to the June 24, 2008 mineral claim purchase contract between [Gardner] and Letcher." (May 24 Tr. 208, Def.'s Ex. 1077.) In September 2009, Ford assisted Gardner with "unravel[ing] a puzzle of invoices for [ ] 1920's Bugatti parts repair" from Thierry Bizon in France. (June 7 Tr. 280, Def. Ex. 1087.) Ford advised Gardner that "someone needs to fine tooth comb thru all TB CG correspondence, with a legal eye, to pick out the legally relevant, useful bits." (*Id.*) Also in September 2009, Ford referred to himself as the "coordinating attorney for Swiss and American attorneys and actions." (May 24 Tr. 222, Def.'s Ex. 1085.)

In April 2012, Ford referred to himself in an email as "an advisor on legal matters to Mr. Christopher Gardner." (May 24 Tr. 231, Def.'s Ex. 1140.) Also in 2012, Gardner and Ford were both involved in litigation in Ohio over a Ferrari where both men were represented by Attorney Herb Haas. (June 7 Tr. 282.) Ford, however, believed Gardner should pay all of Haas' legal fees because Ford had been assisting Haas by drafting legal documents to use in the case. (*Id.*) In a letter dated June 2012, Ford tells Gardner that "Based on my past 20 years of in-depth work, any attorney time I contribute going forward is very effective, hard to replace, and thus valuable." (June 7 Tr. 283, Def. Ex. 1174.)

Regarding the restoration project of TL 90108, in April 2009, Ford emailed Gardner a suggested agenda for Gardner to discuss with his French attorney, Antoine Barret. (June 7 Tr. 277, Def. Ex. 1075.) The first agenda item is the "Talbot Restoration and Parts Mfg – Contracts Needed." (*Id.*) Ford tells Gardner that the agenda was his "Ford work product" and that Gardner could pay Ford $6,000 to use the plan. (*Id.*) When asked whether he was bringing legal expertise to the Talbot project, Ford testified that he was bringing "organizational skills and master plan skills . . . just commonsense business advice" that he did not regard as legal advice. (June 7 Tr. 278–79.)

Ford and Gardner had another falling out in 2013 over the Ferrari litigation. (June 7 Tr. 285.) Ford testified that Richard Adatto published a book in 2007 tying chassis number 90108 to the stolen Leiske vehicle; however, he did not read the book until 2013. (June 7 Tr. 285–88.) Rather, Ford testifies that he did not become aware of Gardner's alleged theft of the TL 90108 until Bizon informed him in 2013. (June 7 Tr. 269.) Ford then reached out to Mueller in July 2013, offering his services to help recover the TL 90108 that is rightfully his as Leiske's heir. (June 7 Tr. 288, Def. Ex. 1208.) Ford proposed an 80/20 split with Mueller of any recovery, with Ford taking 80 percent of the recovery. (*Id.*) After Mueller and Ford entered into an agreement for recovery of the TL 90108 (June 7 Tr. 290, Def. Ex. 1012), in September 2014, Ford advised Mueller to contact the MPD and have the car relisted as stolen (June 7 Tr. 291). The FBI became aware of the case in October 2016. (June 9 Tr. 448.)

*Marc Favre*

Favre, an attorney licensed to practice in Switzerland, testified that he began representing Gardner in the early 2000s. (May 24 Tr. 16.) Favre met Ford in person once in Mont-sur-Rolle, at a property owned by Gardner, on June 11, 2009. (May 24 Tr. 17.) Favre

otherwise only communicated with Ford through e-mail both before and after this in-person meeting. (*Id.*) Favre testified that Ford provided him legal documents related to three cases Favre was representing Gardner on—a case regarding property Gardner owned in Switzerland, a case regarding the purchase of a mine in the United States, and a case regarding the same mine, but venued in Switzerland, regarding canceling the contract for the mine. (May 24 Tr. 18.) Favre testified that the mine contract was drafted by Ford and signed in Switzerland. (*Id.*) Favre testified that he understood Ford to be an attorney, stating that Ford "expressed himself like an attorney - - the mail that he - - E-mails that he sent said that he represented the entity - - Mr. Gardner, and he addressed and talked to me like a colleague, the equivalent of an attorney." (May 24 Tr. 19.) Favre stated that Gardner was ill at the time and was receiving chemotherapy, and Ford was taking care of various affairs on Gardner's behalf. (*Id.*) Favre stated that Gardner presented Ford as the person taking care of his affairs in the United States. (*Id.*) Favre testified that he received emails from Ford that contained a paragraph at the bottom of the email stating that "This electronic mail transmission from Joseph Ford is private and confidential. It may constitute an attorney-client communication that is privileged at law." (May 24 Tr. 23.)

*Antoine Barret*

Barret, an attorney licensed and practicing in France, testified that he represented Gardner from approximately 2007 until 2013. (May 24 Tr. 54, 66.) Barret testified that when he met Gardner in 2007, Gardner indicated that Ford was his attorney in the United States and had written an article regarding the matter Barret was representing Gardner on at the time in France. (May 24 Tr. 55–57.) Barret stated that he met Ford once or twice and he was "sure [Ford] was an attorney because . . . Gardner always presented him as such and said he

was involved in his - - but there were some relationships that did resemble that of an attorney-client, but I don't have any specific ideas about that." (May 24 Tr. 62.)

*David Clark*

Clark, who lives in California, works brokering car sales with private clients. (May 24 Tr. 77.) Clark testified that he was involved in litigation in Ohio regarding a Ferrari and an individual named Kristi Lawson. (May 24 Tr. 77.) Through Lawson, Clark came into contact with Gardner and Ford. (*Id.*) Clark had done business with Gardner in the past. (*Id.*) Due to Gardner's illness, he did not want to get involved in the litigation, so he referred Clark to Ford. (May 24 Tr. 78.) Clark stated that Ford told him that he had a law degree and a law license in Louisiana that was inactive. (*Id.*) Clark testified that Ford told him that he did not practice law. (*Id.*) Clark further testified, however, that in 2010, there was "no question about it" that Ford was acting as Gardner's attorney because in "an article written in the Bugatti magazine . . . Joe Ford wrote the article and he said at the bottom that he was acting as Chris Gardner's attorney." (May 24 Tr. 79.) However, in October 2013, in the course of the Ohio litigation, Clark signed an affidavit stating that "[a]t no time did we think Ford neither was to act as a lawyer nor did Ford offer to act as a lawyer, for us or for anyone else. At no time did Ford claim to have acted as Gardner's lawyer." (Gov't Ex. 97 at ¶ 7.) Clark further averred that "[i]n recent weeks, Gardner asked [Clark] to provide an affidavit saying that I offered the Ohio Parts to Gardner and that Gardner agreed to buy them using Ford as his agent. Gardner also asked me to state that Ford represented himself to be an actively licensed and practicing Lawyer. I refused to provide any such affidavit because that would not be the truth." (*Id.* ¶ 9.) Then, in November 2013, Clark similarly testified during the Ohio litigation that Gardner never identified Ford as his attorney. (Gov't Ex. 98 at 308.)

12

When confronted with this contradictory testimony, Clark stated that regarding the affidavit, Ford drafted it and although he signed it, he was "being lied to by Gardner and Ford at the time." (May 24 Tr. 80–81.) Clark similarly testified that he believed his testimony in the Ohio litigation was accurate at the time but that he subsequently learned information that makes him believe it is now inaccurate. (May 24 Tr. 89–92.) When asked what his current understanding is about the relationship between Gardner and Ford, Clark testified that he was first introduced to Ford by Gardner in 2010; however, he did not know that they were partners until mid-2012. (May 24 Tr. 92.) He testified that he would not sign the same affidavit if he was presented with it today. (May 24 Tr. 98.)

*Philip Varricchio*

Varricchio testified that he is a practicing attorney in Pennsylvania and Nevada. (May 24 Tr. 106.) Varricchio represented Gardner with regard to domesticating a Swiss judgment in Nevada in connection with a mining dispute. (May 24 Tr. 108.) Varricchio stated that Ford did not hold himself out as Gardner's attorney and identified himself not as an attorney, but as a business partner or representative of Gardner. (May 24 Tr. 109.) Varricchio testified that in the course of representing Gardner on the judgment issue, he filed a notice of attorney fee lien that was sent to various individuals. (May 24 Tr. 116, Gov't Ex. 72.) While Varricchio refers to multiple individuals as "attorney," Ford is not referenced as an attorney. (*Id.*) Varricchio testified that he would not have identified Ford as an attorney unless it "had been represented to me or if I understood him to be an attorney." (May 24 Tr. 117.) Varricchio testified that he perceived Ford as "the guy on the ground" who was more like a personal assistant or representative of Gardner. (May 24 Tr. 129.)

13

*Robert Pluth*

Pluth is an attorney in Chicago who was involved in civil litigation in Wisconsin regarding the Talbot-Lago 90108, representing the purchaser of the vehicle. (May 24 Tr. 135.) In August 2018, Pluth spoke with Gardner, the seller of the vehicle. (*Id.*) Gardner stated that Ford acted as his attorney about fifteen years prior, in about 2003. (May 24 Tr. 136.) Gardner told Pluth that Ford had nothing to do with the Talbot-Lago; however, at a later point in the conversation he stated that Ford may have drafted the contract by which Gardner acquired the Talbot-Lago. (May 24 Tr. 137.)

*Eric Fraser*

Fraser is a special agent with the FBI in Milwaukee. (June 9, 2023 Evid. Hearing Tr. ("June 9 Tr.") at 445, Docket # 66.) Agent Fraser was assigned to Gardner's case in June 2022, following Special Agent Timothy Bisswurm. (June 9 Tr. 446.) The FBI first became involved in the alleged stolen vehicle case in 2016. (June 9 Tr. 449.) Agent Fraser testified that Ford turned over USB flash drives, documents, and emails to the FBI. (June 9 Tr. 450.) He stated that Ford was a cooperating witness in the case and had provided the FBI information since that time. (June 9 Tr. 451.) Agent Fraser testified that Ford was not a practicing attorney, and in the year since Agent Fraser was involved in the investigation, he has not been a part of any actions to attempt to stop Ford from handing over documents arguably protected by attorney-client privilege. (June 9 Tr. 451–52.) Agent Fraser testified that as far as he knows, Ford never informed the FBI that he was Gardner's attorney. (June 9 Tr. 463.) Agent Fraser testified that he sought information from the Louisiana State Bar Association regarding Ford's license to practice law and determined that while Ford was admitted to practice in Louisiana in October 1991, his law license became inactive from July

1, 1999 through August 29, 2015. (June 9 Tr. 465–66.) Agent Fraser also sought information

from the Florida bar but did not find any record of an attorney by the name of Joseph Ford.

(Tr. 466.)

*Herbert Haas*

Haas is a practicing attorney in Ohio. (June 9 Tr. 478.) Haas previously represented

both Gardner and Ford in the Ohio litigation related to the Ferrari. (*Id.*) Haas testified that

during the Ferrari case, Ford did not work as an attorney either with Haas or under Haas in

that case. (June 9 Tr. 482.) Haas was aware that Ford was an attorney and during the course

of the litigation, Ford would send Haas a "laundry list" of things to do and the bottom of

Ford's email contained a "pro forma" statement regarding confidentiality and that the

communication may constitute an attorney-client communication that is privileged at law.

(June 9 Tr. 483.) Haas testified, however, that Ford's performing "some legwork" was no

different than what many of his clients do in a case, whether or not they have a legal

background. (June 9 Tr. 484–85.)

## ANALYSIS

As a threshold matter, I must determine whether Gardner and Ford had an attorney-

client relationship and whether Ford represented Gardner as his attorney in regard to the TL

90108. Assuming an attorney-client relationship existed and Ford breached Gardner's

attorney-client privilege, I must then determine the appropriate remedy for the violation.

*1.       Attorney-Client Privilege*

In federal courts, except when state law supplies the applicable rule of law, the

attorney-client privilege is "governed by the principles of the common law as [it] may be

interpreted by the courts of the United States in the light of reason and experience." *United*

15

*States v. BDO Seidman, LLP*, 492 F.3d 806, 814 (7th Cir. 2007) (citing Fed. R. Evid. 501).

Although it ultimately was not adopted by Congress, the rule of attorney-client privilege

promulgated by the Supreme Court in 1972 as part of the Proposed Federal Rules of Evidence

has been recognized "as a source of general guidance regarding federal common law

principles." *Id.* at 814–15 (quoting *In re Grand Jury Investigation*, 399 F.3d 527, 532 (2d Cir.

2005)). "[I]n order for the attorney-client privilege to attach, the communication in question

must be made: (1) in confidence; (2) in connection with the provision of legal services; (3) to

an attorney; and (4) in the context of an attorney-client relationship." *Id.* at 815. The purpose

of the privilege is to "encourage full disclosure and to facilitate open communication between

attorneys and their clients." *Id.* (internal quotation and citation omitted). The Seventh Circuit

states that:

> Open communication assists lawyers in rendering legal advice, not only to
> represent their clients in ongoing litigation, but also to prevent litigation by
> advising clients to conform their conduct to the law and by addressing legal
> concerns that may inhibit clients from engaging in otherwise lawful and socially
> beneficial activities. The cost of these benefits is the withholding of relevant
> information from the courts.

*Id.* Here Gardner faces his first hurdle. Again, for attorney-client privilege to attach, the

communication in question must have been made to an *attorney*. It is undisputed that while

Ford graduated from law school and was admitted to practice in Louisiana in October 1991,

his law license was inactive from July 1, 1999 through August 29, 2015. (June 9 Tr. 465–66.)

And the evidence demonstrates that Gardner was aware of this fact. (June 9 Tr. 402–403,

Gov't Ex. 68.) Gardner recognizes that "traditionally" the attorney-client privilege applies

"where an individual seeks legal counsel from a licensed, practicing attorney," however, he

argues that the privilege does not hinge solely on whether the alleged legal advisor in the

relationship is properly licensed. (Def.'s Br. at 3, Docket # 77.) Gardner cites to several district

16

court cases from around the country that found privilege attached to those who make confidential communications to an individual under the genuine, but mistaken, belief the person was an attorney. (*Id.* at 3–4.)

What Gardner appears to invoke is the concept of the "quasi-lawyer" that appeared in a rejected version of Fed. R. Evid. 503(a)(2). *See* Wright & Miller § 5481 "Quasi-Lawyer," 24 Fed. Prac. & Proc. Evid. § 5481 (1st ed.). Under this proposed rule, a person who is not authorized to practice law may still qualify as a "lawyer" for purposes of the attorney-client privilege if the putative client "reasonably believed" that the person was authorized to practice. *Id.* The theory of the "quasi-lawyer" for purposes of attorney-client privilege first appeared in the well-known and oft-cited treatise by John Henry Wigmore, Wigmore on Evidence. *See id.* In 8 Wigmore, Evidence, § 2302 (McNaughton Rev. 1961), the treatise states that:

> The theory of the privilege [ ] clearly requires that the client's bona fide belief in the status of his adviser as an admitted attorney should entitle him to the privilege. No doubt an intention to employ only such a person is necessary, as well as a respectable degree of precaution in seeking one. But from that point onward he is entitled to peace of mind, and need not take the risk of a deception or of a defective professional title.

*Id.* In Wigmore's Code of Rules of Evidence in Trials at Law, he states that while the attorney-client privilege "does not cover a consultation with a person who has legal knowledge but is *not admitted to the bar* as a practitioner," Wigmore, Code of Evidence, 3d ed., 1942, § 2420; he states that the privilege depends on the client's "*intent* and *reasonable belief* as to the status of the person consulted" under § 2420, *see id.* § 2422.

The Uniform Law Commission, an organization that seeks to "simplify[y] individuals' lives and facilitates business transactions by providing consistent rules and procedures from state to state," published the Uniform Rules of Evidence. *See*

17

https://www.uniformlaws.org/(last visited Oct. 31, 2023). In these model rules, Rule 502 addresses Lawyer-Client Privilege and defines "lawyer" as "a person authorized, or reasonably believed by the client to be authorized, to engage in the practice of law in any State or country." Some states, including Wisconsin, have codified this definition of "lawyer" into law. *See* Wis. Stat. § 905.03.

It is against this backdrop that I examine the cases Gardner cites in support of the proposition that a "quasi-lawyer" is subject to attorney-client privilege. Gardner argues that "[f]ederal courts have widely agreed . . . that when an individual seeks legal counsel regarding a problem under the mistaken belief that the individual from which they are seeking advice is a licensed, practicing attorney, the person should be afforded the same measure of privilege and protection provided to those who have rightly consulted with licensed legal counsel." (Def.'s Br. at 3–4.) Gardner cites to several district court cases, including *United States v. Boffa*, 513 F. Supp. 517 (D. Del. 1981); *United States v. Mullen & Co.*, 776 F. Supp. 620 (D. Mass. 1991); *United States v. Tyler*, 745 F. Supp. 423 (W.D. Mich. 1990); and *United States v. Rivera*, 837 F. Supp. 565 (S.D.N.Y. 1993), and one circuit court case, *In re Grand Jury Subpoena Duces Tecum*, 112 F.3d 910 (8th Cir. 1997) in support of his argument. (*Id.* at 4.)

The oldest case Gardner cites, *Boffa*, involved a "jailhouse lawyer" named Robert Morgan who never received any formal legal training but acquired some legal knowledge while incarcerated. 513 F. Supp. at 520. Morgan agreed to assist the defendants in the *Boffa* case in responding to grand jury subpoenas and otherwise conducted legal research on the defendants' behalf. *Id.* The defendants claim that Morgan fraudulently held himself out to the defendants as an attorney, that the defendants reasonably believed that he in fact was an attorney and that pursuant to this belief, the defendants disclosed confidential

18

communications to Morgan which were protected by the attorney-client privilege. *Id.* at 521.

In addressing the issue, the *Boffa* court stated that:

> The proceeding before the Court presents one significant deviation from this classic formulation in that both sides agree that Morgan was not a member of the bar of a court at the time that he purportedly represented the defendants. Nonetheless, the rationale behind the privilege equally supports the theory that the privilege should be extended to those who make confidential communications to an individual in the genuine, but mistaken, belief that he is an attorney. 8 Wigmore, Evidence, s 2302 (McNaughton Rev. 1961); *see Dabney v. Investment Corp. of America*, 82 F.R.D. 464, 465 (E.D.Pa.1979). Prudence dictates that such a belief should be reasonable in order to lay claim to the protections of the privilege and that a "respectable degree of precaution" in engaging the services of the "attorney" must be demonstrated. Wigmore, supra, at s 2302. Where such a belief is proved, however, the client should not be compelled to bear the risk of his "attorney's" deception and he should be entitled to the benefits of the privilege as long as his bona fide belief in his counsel's status is maintained.

*Id.* at 523. In other words, the *Boffa* court endorses the concept of the "quasi-lawyer" attorney-client privilege from Wigmore. The *Boffa* court also cites to *Dabney v. Investment Corp. of America*, 82 F.R.D. 464, 465 (E.D. Pa. 1979) in support. *Id.* In *Dabney*, the court noted that "It has long been held that the privilege applies only to members of the bar of a court or their subordinates"; however, "Courts have recognized an exception, however, to the general requirement that an attorney-confidant be a member of the bar, in cases where the client is genuinely mistaken as to the attorney's credentials." *Dabney*, 82 F.R.D. at 465. However, the "courts" *Dabney* cites in support is actually Wigmore on Evidence § 2302. *Id.*

Following the lead of *Boffa*, both *Mullen* and *Tyler* cite only to *Boffa* as authority for the proposition that "the attorney-client privilege may apply to confidential communications made to an accountant when the client is under the mistaken, but reasonable, belief that the professional from whom legal advice is sought is in fact an attorney." *See Mullen*, 776 F. Supp. at 621; *Tyler*, 745 F. Supp. at 425. The *Rivera* court cites to *Boffa*, *Tyler*, and Wigmore. *Rivera*,

837 F. Supp. at 567 n.1. And the Eighth Circuit's decision relies on *Mullen*, *Tyler*, and *Boffa*. 112 F.3d at 923 n.11.

In other words, all roads lead back to Wigmore as authority for this rule. As the *Tyler* court noted, "there is scant case law on the question of whether an attorney-client privilege applies when the defendant erroneously believes that he or she is consulting with an attorney, but the person who is being consulted is not licensed to practice law." 745 F. Supp. at 425. And given Gardner's lack of citation to any additional cases since 1997, it seems the paucity of authority continues. Thus, Gardner's contention that courts have "widely agreed" on this issue (Def.'s Br. at 3) overstates the reality of the state of the law. Furthermore, while state law governs privilege in civil cases, the common law, as interpreted by the United States courts, governs in federal criminal cases. *See* Fed. R. Evid. 501. And Wigmore's rule contravenes the common law. *See* Wright & Miller § 5481 (noting that in Wigmore's code, "he states this as the common law rule. In fact, the common law rule was apparently to the contrary"); *Dabney*, 82 F.R.D. at 465 ("It has long been held that the privilege applies only to members of the bar of a court or their subordinates.") Even more telling, a version of Wigmore's rule was proposed and rejected as part of the Federal Rules of Evidence. Thus, I am unconvinced that the attorney-client privilege applies in a "quasi-lawyer" situation under federal law.

Because it is undisputed that Ford was not a licensed attorney at the relevant time, Garner cannot meet all four elements prescribed by the Seventh Circuit for the privilege to attach, namely, that the communication in question was made "to an attorney." *See BDO Seidman, LLP*, 492 F.3d at 815. Thus, I recommend Gardner's motion be denied on the basis that attorney-client privilege did not attach.

## 2. Mistaken Belief

Although I recommend Gardner's motion be denied on the ground that Ford was not an attorney and thus the attorney-client privilege does not attach, for the sake of completeness, even if the "quasi-lawyer" theory applied to the federal rules, I do not find that Gardner has shown that he had a genuine, but mistaken, belief that Ford was an attorney. Again, there is a dearth of case law on whether the attorney-client privilege actually extends to a "quasi-lawyer" situation, and even less guidance on what makes a client's belief "reasonable." *See* Wright & Miller § 5481. As Wright & Miller explain, the legislative history of the Model Code provision supports an inference that its drafters were only concerned about the case where the client was actively misled by the putative "lawyer," whereas, for example, "those who incorporated this provision into the California Evidence Code seem to have supposed that its effect was to relieve the client of any duty of inquiry." *Id.*

Given this lack of authority, I turn to the few cases that have addressed what is considered a "reasonable belief" for guidance. In *Boffa*, while the court embraced Wigmore's "quasi-lawyer" theory, the court also found that "in order to qualify for the relief sought," the defendant needed to prove that the putative attorney "fraudulently held himself out to the defendant as an attorney." 513 F. Supp. at 523. And the court in *Boffa* found that the defendant failed to meet their burden by presenting "[v]irtually no evidence . . . to demonstrate . . . what [defendant's] state of mind actually was with respect to [the putative attorney] or what precautions, if any, [defendant] took to ascertain [the putative attorney's] status." *Id.* at 525.

In *Tyler*, the only case in which a court found the putative client's belief to be reasonable, the putative attorney and client were both inmates in a federal prison when the alleged privileged communications took place. 745 F. Supp. at 424. Relying on *Boffa*, the *Tyler*

21

court found that the defendant proved that the putative attorney fraudulently held himself out as an attorney to the defendant because he had a law school diploma hanging on his cell wall and because other inmates addressed him as "counselor" and he assisted prisoners on all types of legal matters. *Id.* at 425.

There is no record support for a finding that Gardner reasonably believed Ford was a licensed attorney. As stated earlier, it is undisputed that Ford was unlicensed in the State of Louisiana, the only state in which Ford had ever been admitted to the bar, from July 1, 1999 through August 29, 2015. (June 9 Tr. 465–66.) Gardner presents no evidence that Ford ever misrepresented the status of his law license to Gardner. Rather, the evidence shows that Gardner was well aware that Ford was unlicensed during the relevant period. For example, in an email Ford sent to Gardner dated October 1, 2006, Ford reminded Gardner that he was "neither a practicing attorney nor a seasoned French practicing attorney." (June 7 Tr. at 368–69, Gov't Ex. 43.) Similarly, in an email Gardner sent to Ford on May 14, 2010, Gardner specifically asked whether Ford has "the right to make an appeal as a none [sic] practicing attorney unrecognized by the court"? (June 9 Tr. 402–403, Gov't Ex. 68.)

Nonetheless, I agree that the evidence shows that Ford was actively assisting Gardner at various times with litigation Gardner was involved in by drawing on his legal knowledge and background. And given Ford's communications, it was reasonable for Gardner's European lawyers to believe that Ford acted and sounded like an attorney. The October 1, 2006 email is a prime example of what Ford was doing over the relevant years. In that email, while acknowledging his "limitations" and reminding Gardner that he was not "a practicing attorney," he still gave Gardner his take on the French litigation. (Gov't Ex. 43.) Similarly, while Ford may testify that he was only giving Gardner "commonsense business advice"

22

when sending him proposed "work product" (*see* June 7 Tr. 277, Def. Ex. 1075; June 7 Tr. 278–79); this testimony is disingenuous at best. The record is replete with examples of Ford giving what certainly appears to be "legal advice" to Gardner. But the question is not whether others reasonably believed Ford was Gardner's attorney. Nor is the question whether Gardner reasonably believed Ford was practicing law without a license. The question is whether *Gardner* reasonably believed Ford was *a licensed attorney*. In other words, was Gardner misled about Ford's credentials? The evidence is clear that Gardner knew Ford was not a licensed attorney.

*Dabney* is instructive here. In *Dabney*, the putative client knew his putative lawyer, a third-year law student, was not a licensed attorney at the time the advice was given. 82 F.R.D. at 465. This individual was even hired by the company later that same year after he graduated from law school and continued to work for the client as in-house counsel. *Id.* Despite this, the court rejected the defendant's argument that the "quasi-lawyer" exception should rest not simply on a *bona fide* mistake as to whether the putative attorney was a member of the bar, but "as to whether in all respects save formal licensing, he was a qualified professional legal advisor." *Id.* The defendant argued that the putative attorney was "performing the duties of an attorney, was regarded and treated as an attorney, and was made privy to certain confidential information that would have been disclosed only to an attorney"; thus, he argued the privilege should attach despite the "mere absence of formal certification." *Id.* The court found that to "recognize an attorney-client privilege under the circumstances of this case would contravene established case law and set a highly questionable precedent." *Id.* at 466. The court explained:

> Criteria for admission to the bar are carefully established and maintained in order to guarantee some minimum level of competence within the legal

23

profession. To extend the attorney-client privilege to communications made to a law student unsupervised by a duly qualified lawyer would, to some extent, encourage the public to entrust its legal concerns and seek legal advice from persons as yet unqualified to engage in the practice of law. It would, to that extent, undermine the power of the state to regulate this most sensitive of professions, whose members are viewed, in the Preamble to the Pennsylvania Code of Professional Responsibility, as "guardians of the law, playing a vital role in the preservation of society." It would permit the claiming of the privilege not simply where one party to a conversation is an attorney whose professional advice is sought, but in virtually any situation where legal confidences are exchanged. It would unnecessarily blur the dividing line between qualified and unqualified attorneys, to the certain dismay of the lay public and the ultimate detriment of the legal profession.

*Id.* The *Dabney* court's reasoning applies with equal force here. Gardner may well have believed that Ford was a smart person who graduated law school and thus asked him to provide, or otherwise accepted, Ford's advice on legal matters Gardner was involved in. But that does not alter the fact that Gardner knew he was accepting this advice from an unlicensed attorney. The absence of formal certification, and Gardner's explicit knowledge of this absence, destroys any claim Gardner has to privilege under a "quasi-lawyer" theory. Thus, I further recommend the motion be denied on this ground.

Given these findings, I need not determine whether Ford specifically provided Gardner legal advice as to the TL 90108 at issue in this case. At the end of the day, whatever legal advice or assistance Ford may have provided Gardner regarding the TL 90108, Gardner fails to show that he reasonably believed that Ford was a licensed attorney or that Ford misled him about his legal credentials.

### 3. Appropriate Remedy

Finally, Gardner has another difficult hurdle. Even assuming Gardner could show that he and Ford had an attorney-client relationship subject to the privilege, I am unconvinced that the appropriate remedy is suppression of all communications and derivative evidence.

The attorney-client privilege is indeed "one of the oldest recognized privileges for confidential communications known to the common law . . . because the privilege has the effect of withholding relevant information, courts construe the privilege to apply only where necessary to achieve its purpose." *BDO Seidman*, 337 F.3d at 810–11 (internal quotations and citations omitted). But the attorney-client privilege is an evidentiary privilege; it is not a constitutional right. *See Lange v. Young*, 869 F.2d 1008, 1012 n.2 (7th Cir. 1989). Thus, the "violation of a defendant's attorney-client privilege [ ] does not require the suppression of derivative evidence." *United States v. Segal*, 313 F. Supp. 2d 774, 780 (N.D. Ill. 2004). Rather, a defendant is only entitled to the suppression of derivative evidence if the government's conduct violated one of his constitutional rights. *Id.* Courts have found that the government's disregard for a defendant's attorney-client privilege only violates one's constitutional right to due process if the violation "was caused by serious governmental misconduct that is outrageous enough to shock the conscience of the Court." *Id.*; *see also United States v. Kennedy*, 225 F.3d 1187, 1194 (10th Cir. 2000) ("Misconduct by law enforcement officials in collecting incriminating evidence may rise to the level of a due process violation when the misconduct is outrageous enough to shock the conscience of the court."); *United States v. Haynes*, 216 F.3d 789, 796 (9th Cir. 2000) ("We acknowledge that 'a claim of outrageous government conduct premised upon deliberate intrusion into the attorney-client relationship will be cognizable where the defendant can point to actual and substantial prejudice.'") (quoting *United States v. Voigt*, 89 F.3d 1050, 1066 (3d Cir. 1996)).

Stated differently, even if Gardner could show an attorney-client relationship with Ford, Gardner has not shown outrageous conduct by the government which shocks the conscience. Agent Fraser testified that Ford was a cooperating witness and provided law

25

enforcement documents. (June 9 Tr. 451.) He testified that as far as he knows, Ford never informed the FBI that he was Gardner's attorney. (June 9 Tr. 463.) The evidence does not indicate that the government, for example, sought Ford out and put him up to divulging his client's privileged information. Rather, Ford voluntarily went to the MPD, who eventually involved the FBI, regarding the TL 90108 allegedly stolen by Gardner. This is a far cry from outrageousness on the part of the government. Thus, even if Gardner could prove his communications with Ford were privileged, he cannot show that suppression is the appropriate remedy. I recommend Gardner's motion be denied.

## CONCLUSION

Gardner contends that Ford acted as his attorney from 2005 through 2013 and unlawfully divulged privileged communications to the government. He argues that Ford's testimony, as well as any derivative evidence, must be suppressed. I find that because Ford was undisputedly not a licensed attorney during the relevant period, Gardner cannot prove that the attorney-client privilege attaches. I further find that even if a "quasi-lawyer" relationship existed, the privilege still does not apply because Gardner did not reasonably believe Ford was a licensed attorney. Finally, I find that even if Gardner and Ford had an attorney-client relationship, because Gardner has not shown outrageous government conduct, suppression is not warranted. For all of these reasons, I recommend Gardner's motion to exclude be denied. Given this finding, it is unnecessary to conduct an *in camera* review of the documents sought to be excluded.

**NOW, THEREFORE, IT IS RECOMMENDED** that defendant's Motion to Exclude Testimony of Joseph L. Ford (Docket # 26) be **DENIED**.

**IT IS FURTHER ORDERED** that to the extent defendant seeks the government to provide an index of exhibits for purposes of addressing pretrial motions (Docket # 70), the motion is **DENIED**.

Your attention is directed to General L.R. 72(c), 28 U.S.C. § 636(b)(1)(B) and Federal Rules of Criminal Procedure 59(b), or Federal Rules of Civil Procedure 72(b) if applicable, whereby written objections to any recommendation or order herein, or part thereof, may be filed within fourteen days of the date of service of this recommendation or order. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Failure to file a timely objection with the district court shall result in a waiver of a party's right to appeal. If no response or reply will be filed, please notify the Court in writing.

Dated at Milwaukee, Wisconsin this 1st day of November, 2023.

BY THE COURT

_____

NANCY JOSEPH
United States Magistrate Judge