# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**UNITED STATES OF AMERICA**
        **Plaintiff,**

  v.                                                         **Case No. 19-CR-99**

**CHRISTOPHER GARDNER**
        **Defendant.**

---

## DECISION AND ORDER

Defendant Christopher Gardner moves to exclude the testimony of Joseph Ford and all evidence obtained by law enforcement as a result of Ford's revelation of allegedly privileged communications. Defendant contends that Ford acted as his attorney from 2005 to 2013, and that in the years since the termination of their relationship Ford has engaged in a scheme to fabricate this case using information he gained pursuant to that representation.

The magistrate judge conducting pre-trial proceedings held an evidentiary hearing over the course of three days, then issued a recommendation that the motion be denied. The magistrate judge concluded: (1) that Ford was not a licensed, practicing attorney during the period at issue; (2) that defendant failed to demonstrate a genuine, if mistaken, belief that Ford was a licensed attorney; and (3) that even if defendant could overcome these hurdles, the remedy of suppression of derivative evidence was not available on these facts.

Defendant objects, requiring me to review the matter de novo. See Fed. R. Crim. P. 59(b). For the reasons that follow, the recommendation will be adopted and defendant's motion denied.

## I. FACTS AND BACKGROUND

The government charged defendant with wire fraud and transportation of a stolen motor vehicle in foreign commerce. The government alleges that in 2001 defendant recruited two men to steal a rare car, a 1938 Talbot Lago Teardrop Coupe (TL 90108), from Roy Lieske's garage in Milwaukee. After Lieske died, in 2005, defendant allegedly forged a bill of sale and title transfer documents making it appear that he legitimately bought the car from Lieske's heir, Richard Mueller. Using those documents, defendant persuaded police to remove the automobile from a stolen property database, which permitted him to ship the car to Europe. After restoring the vehicle, in 2015 defendant arranged for its sale to an unwitting buyer for more than $7,000,000.

The magistrate judge's report provides a detailed recitation of the facts pertinent to the instant motion, including summaries of the testimony and exhibits offered at the evidentiary hearing. (R. 91 at 2-15.) I adopt that discussion and present an abbreviated version of events herein.

At various times between 1985 and 2013, defendant and Ford engaged in business dealings, regarding cars, real estate, and other matters. At times, Ford referred to himself as a "legal tactics consultant" or an "advisor on legal matters" to defendant. However, Ford was not a licensed attorney during the relevant time. Ford graduated from law school in 1990 and became a member of the Louisiana bar in 1991, but his law license was inactive from 1999 to 2015. Moreover, Ford lived in Florida throughout the relevant period, and he never became a member of the Florida bar.

After Ford and defendant had a falling out in 2013, Ford partnered with Mueller in an effort to regain title to the TL 90108. As part of that effort, Ford advised Mueller to have the car

2

re-listed as stolen. Ford subsequently cooperated with the Milwaukee Police Department and the FBI in the investigation leading to the instant indictment. Defendant argues that Ford improperly turned over documents and otherwise provided privileged information to the government about the TL 90108.

At the hearing, the parties presented testimony from a number of attorneys and business associates regarding the nature of Ford and defendant's relationship. For instance, Marc Favre, defendant's Swiss lawyer, testified that Ford provided him with legal documents and expressed himself like an attorney. A French lawyer, Antoine Barret, similarly testified that Ford presented as an attorney. David Clark, a car broker who did business with Ford and defendant, gave conflicting testimony about the relationship, ultimately stating: "I don't know whether Joe Ford was working as an attorney for Gardner or they were partners. I don't know." (Hr'g Tr. at 101:15-16.)[1] Robert Pluth, a lawyer who represented the buyer of the TL 90108, testified that during a 2018 phone call defendant said Ford acted as his attorney 15 years earlier. According to Pluth, defendant made contradictory statements about Ford's involvement in this matter, first stating Ford had nothing to do with the Talbot Lago but later mentioning that Ford may have drafted the contract by which he acquired the car. An American lawyer who represented defendant in a different matter, Philip Varricchio, testified that Ford did not hold himself out as a lawyer but rather defendant's business partner or representative. Herbert Haas, an American lawyer who represented defendant and Ford in the matter that led to their falling out (a dispute over a Ferrari), testified that he was aware Ford was a lawyer but that Ford did no legal work in the case, just "some legwork" no different than what many clients do.

---

[1]Clark's wavering seemed to stem from his distrust of both men. "What you have is two congenital liars, Ford and Gardner." (Tr. at 82:15-16.)

3

FBI Special Agent Eric Fraser characterized Ford as a cooperating witness, who provided the FBI with flash drives, documents, and emails. Fraser testified that, as far as he knows, Ford never informed the FBI he was defendant's lawyer. For his part, Ford denied ever practicing as an attorney, aside from some freelance work for his dad. Ford testified that he made clear to defendant that he was not a licensed, practicing attorney, and that their's was a business relationship. Ford also pointed to emails in which defendant referred to him as a "personal friend with a law degree" (Tr. at 372:8-9), an "old friend" with "a law-related background" (Tr. at 373:23-25), and "a nonpracticing attorney unrecognized by the court" (Tr. at 402:24-25). Ford further explained that while defendant at one point granted him power of attorney to repossess cars, he never acted as defendant's attorney at law; he also pointed to an "advisor client agreement" the two entered into regarding a mining claim. (Tr. at 381:21.) Defendant did not testify at the hearing.

## II. DISCUSSION

### A. Attorney-Client Privilege

Where legal advice of any kind is sought from a professional legal adviser in his capacity as such, the communications relating to that purpose, made in confidence by the client, are at his instance permanently protected from disclosure by himself or by the legal adviser, except the protection be waived. United States v. Evans, 113 F.3d 1457, 1461 (7th Cir. 1997). The party seeking to invoke the privilege bears the burden of proving all of its essential elements. Id. And because the privilege is in derogation of the search for the truth, it is construed narrowly. Id.; see also United States v. Leonard-Allen, 739 F.3d 948, 952-53 (7th Cir. 2013) (explaining that, because the privilege may operate in derogation of the search for truth, the

4

court will construe the privilege to apply only where necessary to achieve its purpose of encouraging clients to make full disclosure to their attorneys). Courts have further held that the privilege generally does not cover business advice, regardless of whether the advice comes from an attorney. E.g., Fleischmann v. McDonald's Corp., 244 F.R.D. 434, 439 (N.D. Ill. 2007) (citing Rehling v. City of Chicago, 207 F.3d 1009, 1019 (7th Cir. 2000)); North American Mortg. Investors v. First Wisconsin Nat'l Bank, 69 F.R.D. 9, 11 (E.D. Wis. 1975) ("The possession of a law degree and admission to the bar is not enough to establish a person as an attorney for purposes of determining whether the attorney-client privilege applies. For the privilege to exist, the lawyer must not only be functioning as an advisor, but the advice given must be predominantly legal, as opposed to business, in nature.").

It is undisputed that Ford was not licensed as an attorney during the period defendant claims Ford acted as his lawyer. After engaging in a thorough review of the cases and other authorities, the magistrate judge concluded that, under federal common law, the privilege applies only to communications with licensed attorneys (R. 91 at 15-20); she further concluded that, even under the "quasi-lawyer" concept defendant advanced, defendant failed to show that he had a genuine but mistaken belief that Ford was a licensed attorney (R. 91 at 21-24). Because the record clearly supports the latter conclusion, it is unnecessary for me to address the former.

The magistrate judge explained that the few cases endorsing the quasi-lawyer concept require the defendant to prove the putative lawyer fraudulently held himself out as an attorney. (R. 91 at 21-22.) She then noted that the record here contains no evidence that defendant reasonably believed Ford was a licensed attorney. Ford lived in Florida at all relevant times, and he told defendant, when they rekindled their relationship in 2004, that he was not licensed

5

in Florida. (Tr. at 155.) In 2006, Ford reminded defendant that he was not "a practicing attorney." (Tr. at 369:11.) And in 2010, defendant referred to Ford as "a nonpracticing attorney unrecognized by the court." (Tr. at 402:24-25.) In other emails, defendant referred to Ford as a "personal friend with a law degree" (Tr. at 372:8-9) and an "old friend" with "a law-related background" (Tr. at 373:23-25). Defendant presented no evidence that Ford ever misrepresented the status of his law license. (R. 91 at 22.)

To be sure, there is evidence that Ford assisted defendant with litigation,[2] and that Ford at times held himself out to others as an attorney or legal advisor. (E.g., Tr. at 192, 222, 231.) As the magistrate judge noted:

> The record is replete with examples of Ford giving what certainly appears to be "legal advice" to Gardner. But the question is not whether others reasonably believed Ford was Gardner's attorney. Nor is the question whether Gardner reasonably believed Ford was practicing law without a license. The question is whether <u>Gardner</u> reasonably believed Ford was <u>a licensed attorney</u>. In other words, was Gardner misled about Ford's credentials? The evidence is clear that Gardner knew Ford was not a licensed attorney.
> . . .
> Gardner may well have believed that Ford was a smart person who graduated law school and thus asked him to provide, or otherwise accepted, Ford's advice on legal matters Gardner was involved in. But that does not alter the fact that Gardner knew he was accepting this advice from an unlicensed attorney. The absence of formal certification, and Gardner's explicit knowledge of this absence, destroys any claim Gardner has to privilege under a "quasi-lawyer" theory.

(R. 91 at 23-24.)

In his objections, defendant asserts two flaws in the magistrate judge's analysis. First,

---

[2]On the other hand, Ford also performed carpentry work at defendant's house, not something typically done by one's lawyer. (Tr. at 409.) At times, defendant paid Ford by wiring money to Ford's son's account because Ford did not have a bank account. (Tr. at 406.) A reasonable person would likely expect his lawyer to have a bank account. While these facts do not preclude an attorney-client relationship, as defendant notes in reply (R. 94 at 3 n.1), they certainly cut against one. See United States v. Boffa, 513 F. Supp. 517, 524 (D. Del. 1981) (finding that "peculiar" financial arrangements undermined a privilege argument).

6

defendant argues that the magistrate judge erred by requiring a mistaken belief that the putative lawyer was a <u>licensed</u> attorney, as opposed to a mistaken belief that the individual was an <u>attorney</u>. (R. 92 at 5.) While there is limited authority on this issue, the cases and treatises support the former requirement. See, e.g., <u>John Ernst Lucken Revocable Trust v. Heritage Bancshares Grp., Inc.</u>, No. 16-CV-4005-MWB, 2017 U.S. Dist. LEXIS 21299, at *3-4 (N.D. Iowa Feb. 15, 2017) (stating the general rule that the privilege cannot attach where the communications were not made with a member of the bar, "with the exception where the person asserting the privilege had a reasonable but mistaken belief that the person with whom they were communicating was in fact a licensed attorney"); <u>Speaker v. County of San Bernardino</u>, 82 F. Supp. 2d 1105, 1113 (C.D. Cal. 2000) (surveying the federal case-law and noting that "courts in various jurisdictions have likewise concluded that the attorney/client privilege applies when the client reasonably believes that her or his confidential communications are with a licensed attorney"); 24 Wright & Miller, <u>Federal Practice and Procedure</u> § 5481 (1st ed. 2023) (stating that under the quasi-lawyer theory "a person who is not authorized to practice law may still qualify as a 'lawyer' for purposes of the attorney-client privilege if the putative client 'reasonably believed' that the person was authorized to practice").

Indeed, earlier in his objections defendant states:

> Federal courts have held that when an individual seeks legal counsel regarding a problem under the mistaken belief that the individual from which they are seeking advice is a licensed, practicing attorney, the person should be afforded the same measure of privilege and protection provided to those who have rightly consulted with licensed legal counsel.

(R. 92 at 2.) As the <u>John Ernst</u> court noted, in a case also involving a lawyer with an inactive license,

> this a rational standard. It provides adequate protection to those who reasonably

7

rely on a person's representations of being an active attorney even if that turns out to be untrue. Under those circumstances, it is appropriate for all the protections of the attorney-client relationship to attach. Additionally, the punishment should not be on the unsuspecting "client" when it comes to light the imposter is not actually licensed. On the other hand, where a "client" knows or has reason to know that the person is not actively licensed to practice law, extending the attorney-client protection to that relationship would be inappropriate.

2017 U.S. Dist. LEXIS 21299, at *4-5.

Defendant contends that Dabney v. Investment Corp. of America, 82 F.R.D. 464 (E.D. Pa. 1979), supports his position (R. 92 at 5-6; R. 94 at 1-2), but I do not read the case that way. Dabney addressed "whether the attorney-client privilege attaches to confidential communications made to a law student or law school graduate who has not yet been admitted to the bar." Id. at 465. The court noted that, while it "has long been held that the privilege applies only to members of the bar of a court or their subordinates," some courts had recognized an exception "to the general requirement that an attorney-confidant be a member of the bar, in cases where the client is genuinely mistaken as to the attorney's credentials." Id. In rejecting the defendant's argument in favor of the privilege in that case, the court explained:

> Defendant's argument, therefore, is reduced to the contention that its attorney-client privilege may be preserved by a bona fide mistake not simply as to whether Mr. Katzoff was a member of the bar, but as to whether in all respects save formal licensing, he was a qualified professional legal advisor. ICA argues that because Mr. Katzoff was performing the duties of an attorney, was regarded and treated as an attorney, and was made privy to certain confidential information that would have been disclosed only to an attorney, the attorney-client privilege should attach to those communications and should not be deterred by the mere absence of formal certification. I conclude that to recognize an attorney-client privilege under the circumstances of this case would contravene established case law and set a highly questionable precedent.
>
> Criteria for admission to the bar are carefully established and maintained in order to guarantee some minimum level of competence within the legal profession. To extend the attorney-client privilege to communications made to a law student unsupervised by a duly qualified lawyer would, to some extent, encourage the

8

> public to entrust its legal concerns and seek legal advice from persons as yet unqualified to engage in the practice of law. It would, to that extent, undermine the power of the state to regulate this most sensitive of professions[.] It would permit the claiming of the privilege not simply where one party to a conversation is an attorney whose professional advice is sought, but in virtually any situation where legal confidences are exchanged. <u>It would unnecessarily blur the dividing line between qualified and unqualified attorneys</u>, to the certain dismay of the lay public and the ultimate detriment of the legal profession.
> . . .
> Because in this case Mr. Katzoff was neither a <u>fully qualified attorney</u> nor the agent of such an attorney, confidential communications between him and defendant ICA are not properly subject to a claim of attorney-client privilege.

82 F.R.D. at 465-66 (emphasis added).[3] While <u>Dabney</u> did not state the requirement as clearly as the authorities cited above, the court appeared to assume that for the quasi-lawyer theory to apply the client must demonstrate a mistaken belief that the putative attorney was "fully qualified."

Second, defendant argues that the magistrate judge cherry-picked evidence showing he knew Ford was not licensed, ignoring evidence about the near decade of time during which Ford consistently provided legal advice to him. (R. 92 at 6; R. 94 at 2-3.) This argument suffers from the same flaw as the first: that defendant chose to accept, and at times act upon, legal advice from an unqualified person does not make their communications privileged.

As the government notes in response, the magistrate judge properly focused on the evidence demonstrating that defendant clearly knew Ford was not a licensed attorney. (R. 93 at 7-8, citing testimony and exhibits.) This evidence demonstrates that Ford told defendant in

---

[3]There is support for the proposition that "so long [as] an attorney is licensed to practice law in some jurisdiction, then the client's communications to him will be privileged even if the attorney's advice might technically constitute the unauthorized practice of law in another jurisdiction." <u>Le Bleu Corp. v. Fed. Mfg. LLC</u>, No. 17-CV-0549, 2018 U.S. Dist. LEXIS 56291, at *5 (E.D. Wis. Apr. 2, 2018). But in the present case, defendant knew that Ford was not licensed to practice law <u>anywhere</u> during the relevant period.

9

no uncertain terms that he was not a practicing attorney, and that defendant could not have reasonably believed otherwise. See John Ernst Lucken Revocable Trust, 2017 U.S. Dist. LEXIS 21299, at *7-8 (finding that the privilege did not apply where the "client" knew the lawyer's license was inactive and referred to him as a "consultant").

Defendant also overstates the significance of the evidence he cites in the objections. Defendant contends that Ford gave legal advice regarding the recovery of car parts from Mueller. (R. 92 at 6.) But Ford testified that he offered advice on a bill of sale as a car seller, not a lawyer, and that lawyers are not usually involved in preparing such documents. (Tr. at 177.) Moreover, in its response the government contends that documents presented at the hearing suggesting an attorney-client relationship relating to these parts appear to have been altered. (R. 93 at 14-18.) In reply, defendant notes that Ford produced these documents and argues that, if anyone altered them, Ford did. (R. 94 at 5.) Ford testified that many of the documents he turned over to law enforcement had previously been produced by defendant or his lawyers in earlier litigation. Defendant does not in reply address on the merits the significant contradictions noted by the government over five pages of its response. I need not definitively resolve who, if anyone, altered these documents; it suffices to say they do not constitute reliable evidence of an attorney-client relationship.

Defendant further notes that his European lawyers thought Ford was his attorney. (R. 92 at 6-7; R. 94 at 5.) As indicated earlier, the issue is not how others perceived the relationship. The documentary evidence shows that defendant referred to Ford, not as his lawyer, but as an old friend with a law degree. And, it is worth nothing, the American lawyers, Varricchio and Haas, testified differently. Varricchio, in particular, said that Ford held himself out as defendant's business partner, not his lawyer. (Tr. at 109.) Varricchio also pointed to

10

evidence in the Nevada case he handled that defendant identified Ford as his "American agent" (Tr. at 111:21) and "business associate" (Tr. at 115:12-13). Varricchio further pointed to communications he had with one of defendant's successor attorneys that "Gardner knew [Ford] wasn't an attorney" (Tr. at 118:20); "Gardner well knew that Ford was not an attorney but opted to save money" (Tr. at 119:21-22); and "Gardner was always quick to point out his knowledge that Joe Ford was never a licensed attorney. In fact, Gardner had many other lawyers available to advise him of that fact. Gardner knew of Ford's limits and elected to do business with him nonetheless. Gardner had multiple lawyers in Europe and in the U.S. at all times [who] would have disregarded any legal or financial counsel proffered by Joe Ford.'" (Tr. at 121:6-12.) It is also significant that, while defendant seemed content to accept quasi-legal advice from Ford on certain matters, he hired licensed attorneys to handle his litigation matters in court.

Finally, defendant contends that an arbitrator and an Ohio court determined that Ford acted as his attorney, suggesting it was reasonable for defendant to believe Ford was his lawyer. (R. 92 at 7; R. 94 at 3-5.) It is unnecessary to delve into the extensive litigation over the Ferrari matter, which involved a court in Ohio, an arbitration panel in Florida, and a judge in London, England, and produced a number of rulings touching on the nature of defendant and Ford's relationship. Defendant does not contend any of those rulings are binding here. In any event, it appears that the judge in Ohio later determined that defendant and Ford had a client/advisor relationship (Tr. at 424), and that defendant "was not represented by Joe Ford, he was represented by Herb Haas." (Tr. at 426:14-15.)

In reply, defendant argues that the Ohio court did not change its tune. "Though the court noted that Mr. Gardner was represented by Mr. Haas 'as a matter of law,' it noted directly after that 'there's plenty of evidence in the record that Haas was consulting extensively with Ford.'"

11

(R. 94 at 4.) At the hearing in this case, Haas testified: "Mr. Ford was not an attorney working with me or under me in that case." (Tr. at 482:12-13.) In any event, the issue is not whether Haas consulted with or believed Ford to be a lawyer. The issue is whether defendant reasonably believed Ford was a licensed attorney.

Defendant also faults the government for failing to address the arbitration decision, which issued after the Ohio court proceedings. (R. 94 at 5.) But that document is not as clear as defendant might like. It states, in pertinent part:

> 4.     With respect to Gardner, Ford held himself out as an attorney and acted and performed services normally provided by an attorney. Through this relationship, Ford created a position of trust and confidence that gives rise to a fiduciary duty owed to Gardner.
>
> 5.     Additionally, we find that the parties also engaged in business arrangements as partners or joint venturers, which are distinct from the relationship relating to the provision of law-related services. As a matter of law, this relationship gives rises to a fiduciary duty from each partner or joint venturer to the other.
>
> 6.     Ford is not entitled to retain fees for providing legal or law related services to Gardner or for Gardner's benefit. Gardner is entitled to reimbursement of all monies he paid to Ford, either directly or indirectly, through Ford's son or any third party as a result of and in compliance with the Ferrari 375 Plus Agreement referred to above.

(R. 26-5 at 3; Ex. 1010 at 3.) Ultimately, the arbitration panel concluded that neither "party prevailed in this dispute against the other because each party was entitled to relief under their contractual agreement." (Id. at 4.) This document supports the magistrate judge's observation that Ford ostensibly provided legal advice, but it does not support a conclusion that defendant reasonably believed Ford was a licensed attorney.

For all of these reasons and those stated by the magistrate judge, defendant cannot meet his burden of demonstrating the privilege applies to his communications with Ford.

12

**B. Remedy**

Even if defendant's communications with Ford should be deemed privileged, defendant fails to demonstrate that suppression of derivative evidence is the proper remedy.[4] Evidence obtained as the result of a constitutional violation may be suppressed under the fruit of the poisonous tree doctrine. United States v. Segal, 313 F. Supp. 2d 774, 780 (N.D. Ill. 2004) (citing Wong Sun v. United States, 371 U.S. 471, 484 (1963)). However, the attorney-client privilege is not a constitutional right but an evidentiary privilege, the violation of which does not require the suppression of derivative evidence. Id. (citing Lange v. Young, 869 F.2d 1008, 1012 n.2 (7th Cir. 1989); United States v. Marashi, 913 F.2d 724, 731 n.11 (9th Cir. 1990)); see also United States v. Snyder, 71 F.4th 555, 566 (7th Cir. 2023) ("The attorney-client privilege, by contrast, is not a constitutional right but an evidentiary privilege.").

Courts have acknowledged that violation of the attorney-client privilege may implicate a defendant's "due process rights if the violation was caused by serious governmental misconduct that is outrageous enough to shock the conscience of the Court." Segal, 313 F. Supp. 2d at 780 (citing United States v. White, 879 F.2d 1509, 1513 (7th Cir. 1989); United States ex rel. Shiflet v. Lane, 815 F.2d 457, 465-66 (7th Cir. 1987)). In White, for instance, the Seventh Circuit stated:

> If, however, the government, having the kind of hold over an attorney that it had over Center—for when it approached him he had been convicted but not yet sentenced—extracts from him client secrets that it then uses in a criminal trial of the client to the latter's substantial prejudice, this might be the kind of serious governmental misconduct that would violate a criminal defendant's rights under the due process clause of the Fifth Amendment.

---

[4] In previous submissions, the government has suggested it will not call Ford at trial. (See R. 90 at 5.)

13

White, 879 F.2d at 1513. The magistrate judge saw no evidence of such misconduct here, citing Agent Fraser's testimony that Ford was a cooperating witness who voluntarily approached law enforcement and provided information about the allegedly stolen car. Agents did not seek Ford out and persuade him to provide privileged information; certainly, there is no evidence law enforcement induced, pressured, or threatened Ford to cooperate. Nor did Ford tell the agents that he was defendant's lawyer. (R. 91 at 25-26.)

In his objections, defendant argues that the investigating agents should have realized based on a review of the documents Ford provided that Ford was holding himself out as defendant's lawyer during their business dealings. That Ford came to law enforcement voluntarily does not, defendant contends, excuse the agents' failure to recognize the privileged nature of the information Ford provided. (R. 92 at 7-8; R. 94 at 5-6.)

Defendant cites no authority for the proposition that law enforcement agents engage in serious misconduct by failing to comb through documents, voluntarily provided, to determine the nature of the relationship between the cooperator and the target. Nor could a review of the documents in this case have provided the agents with a clear answer. The parties have engaged in protracted litigation over the nature of defendant and Ford's relationship, in this court and elsewhere. The magistrate judge prepared a 27-page report on the issue. Under these circumstances, it is impossible to conclude that the investigating law enforcement officers engaged in serious misconduct by failing to ascertain for themselves that Ford was defendant's lawyer. Defendant makes no claim that Ford ever told law enforcement he was or had been defendant's lawyer, regarding the TL 90108 or any other matter.

Defendant also complains that the government contacted several of his lawyers while preparing for the hearing on this motion, more proof that the government is willing to disregard

14

his attorney-client privilege. (R. 92 at 8.) However, the magistrate judge and the parties discussed how to handle the privilege issues during the hearing (Tr. at 9-11), and on this record I see nothing improper with the government contacting witnesses identified by the defense for the hearing. Defendant develops no argument that the government attempted to solicit from his lawyers privileged communications related to the matters they handled. Nor does the record support a claim that the government improperly solicited more information from Ford during the proceedings. (R. 93 at 22-23; R. 93-1 at 1, advising the defense of an "unsolicited email from Joe Ford".)

### III. CONCLUSION

**THEREFORE, IT IS ORDERED** that the magistrate judge's recommendation (R. 91) is adopted, as stated herein, and defendant's motion (R. 26) is denied.

**IT IS FURTHER ORDERED** that this matter is scheduled for telephonic status on **Friday, January 5, 2024, at 11:30 a.m.** The court finds that the ends of justice served by so continuing the case outweigh the best interests of the defendant and the public in a speedy trial. 18 U.S.C. § 3161(h)(7)(A). The parties should at the status be prepared to discuss further scheduling of the case, including the setting of a trial date.

Dated at Milwaukee, Wisconsin, this 20th day of December, 2023.

/s/ Lynn Adelman
LYNN ADELMAN
District Judge